IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No.

AECOM TECHNICAL SERVICES, INC.

Plaintiff,

v.

FLATIRON | AECOM, LLC

Defendant.

## COMPLAINT AND JURY DEMAND

Plaintiff AECOM Technical Services, Inc. ("ATS"), through counsel, hereby states as follows in support of its Complaint and Jury Demand ("Complaint") against Defendant FLATIRON | AECOM, LLC (the "JV"):

## NATURE OF THE CASE

1. ATS brings this diversity contract action for damages arising out of the JV's multiple and continuing breaches of the parties' May 23, 2016 Subcontract for Design Services ("Subcontract"), under which the JV hired ATS to perform design services related to the JV's design/build highway construction work on the project owned by the Colorado Department of Transportation ("CDOT") and commonly known as the C-470 Express Lanes project (the "Project"). The JV directed and partially paid ATS to perform substantial Additional Design

Services[1] under the Subcontract, but now refuses to pay ATS the remaining amounts due for ATS' completion of the requested Additional Design Services.[2]

## PARTIES

2.  Plaintiff ATS is a California corporation with a principal place of business located at 300 South Grand Avenue, 9th Floor, Los Angeles, California 90071, United States of America. Accordingly, ATS is a citizen of the State of California.

3.  The defendant JV is a Colorado limited liability company with a principal place of business located at 385 Interlocken Crescent, Suite 900, Broomfield, Colorado 80021, United States of America. The JV has two members: (i) Flatiron Constructors, Inc., a Delaware Corporation with a principal place of business located at 385 Interlocken Crescent, Suite 900, Broomfield, Colorado 80021, United States of America; and (ii) AECOM Energy & Construction, Inc., an Ohio corporation with a principal place of business located at 6200 South Quebec Street, Greenwood Village, Colorado 80111. Accordingly, the JV is a citizen of the State of Colorado, the State of Delaware, and the State of Ohio.

## JURISDICTION AND VENUE

4.  This Court has subject matter jurisdiction under 28 U.S.C. §1332(a) because the matter in controversy exceeds the amount of $75,000 and there is a complete diversity of parties.

5.  This Court has personal jurisdiction over the JV, and Venue is proper pursuant to 28 U.S.C. § 1391, because the JV is a resident of the State of Colorado, a substantial part of the

---

[1] Capitalized terms have the meanings ascribed to them in the May 23, 2016 Subcontract unless otherwise defined herein.

[2] Under the Subcontract, "Additional Design Services" mean "additional services that Designer is capable of providing or procuring," which are outside the scope of base "Design Services" required by the contract documents. Subcontract, Ex. A at p. 17, §§1.1, 1.4.

events giving rise to ATS' claims occurred in the State of Colorado, and the Project that is the subject of this civil action is situated in the State of Colorado.

## GENERAL ALLEGATIONS

6. This dispute arises out of the JV's failure to pay ATS amounts due for the additional and out-of-scope design services that the JV directed ATS to perform on the Project.

7. On November 9, 2015, the JV and ATS entered into a Contractor/Designer Teaming Agreement ("Teaming Agreement"), whereby the JV engaged ATS to serve as the lead designer in the JV's pursuit of the Project. In this capacity and pursuant to the Teaming Agreement, ATS developed a preliminary design for the JV's Technical and Cost Proposals to CDOT.

8. CDOT issued a request for proposals for the Project in February 2016, and on March 30, 2016, CDOT awarded the Project to the JV.

9. On May 23, 2016, the JV and ATS entered into the Subcontract, whereby the JV hired ATS to serve as the lead designer on the Project.

**A.   The Subcontract**

10. The Subcontract memorializes the JV's agreement to pay ATS for ATS' Design Services on the Project, which Design Services included, but were not limited to, "all obligations of design professionals required by the [Project] Contract Documents." *See* Subcontract, attached hereto as Exhibit A at p. 16, §1.1.

11. The Subcontract also states that should ATS provide Additional Design Services at the direction of the JV or CDOT, the JV would compensate ATS for such Additional Design Services:

> Change Orders. Designer will also provide additional services ("Additional Design Services") that Designer is capable of providing or procuring pursuant to a written authorization from the Design Change Control Board describing the Additional Design Services, the method of compensation for the Additional Design Services and the adjustment to the mutually agreed Design Schedule based on such Additional Design Services. All Additional Design Services shall be performed in accordance with the requirements of the Contract Documents.

Subcontract, Ex. A at p. 17, §1.4.

12. With regard to Project design evolution, the parties agreed that ATS' design would "freeze" at certain milestones, and that any re-designs directed by the JV after a Design Freeze would constitute a Change for which ATS is entitled to compensation under the Section 2.5 payment provisions:

> Design Evolution and Refinement. To assure proper performance of the Design Services after the bid, both Parties agree to participate in joint design sessions between themselves as described below . . . The preliminary design that forms the basis of the Contractor's bid, subject to the outcome of the initial design workshops between Designer and Contractor to review the design and incorporate required changes and design evolution and refinement, will be considered the conceptual design and frozen (the "Initial Design Freeze"). Designer will also submit "Preliminary Design Plans", "Pre-RFC Review Documents", and "RFC Documents" as required in Sections 3.5.4 and 3.5.5 of Book 2 of the Design- Build Agreement, to Contractor for its review. Constructability reviews will take place by the Contractor immediately after these milestone design submittals. Upon completion of each of the reviews, design freezes shall be deemed to occur for the level of design that is represented in each design review including the Initial Freeze and Milestone Freezes (a "Design Freeze"). Any reasonable changes of new design material in such reviews shall not constitute Changes. The Parties acknowledge that re-designs directed by the Contactor after a Design Freeze that change the premises upon which a Design Freeze was based (but excluding the evolution and refinement of the solutions already envisaged by the Parties in the preliminary

4

> design as of the bid date) will constitute a Change for which Designer is entitled to compensation under Section 2.5. . . .

*Id.* at p. 23, §2.7.

13. The Subcontract further provides that the JV and ATS were to jointly agree on the establishment of a Design Change Control Board to pre-authorize and establish the compensation and schedule adjustments associated with certain Additional Design Services:

> <u>Design Change Control Board</u>. The Parties agree on the establishment of a Design Change Control Board described on Attachment 1. Contractor shall not be obligated to make any payments to Designer for work performed which is outside the work scope described herein ("change") or ("changes"), unless Designer has obtained the written authorization to perform the work for which the compensation is sought from the Design Change Control Board; provided, however Contractor may approve changes resulting in cost decreases or cost increases less than $50,000 so long as such approval is in writing executed by the Contractor's project manager. When the Design Change Control Board authorizes change work it shall obtain a mutual agreement with the Designer on a cost for the work it authorizes and an adjustment in the Designer's schedule. Contractor shall not have to pay more than the amount specified by the Design Change Control Board for the change work authorized without further action by the Design Change Control Board, subject also to the dispute resolution process. The Design Change Control Board shall authorize payments for Contractor directed changes and for changes which Owner acknowledges are its responsibility. . . .

*Id.* at p. 21, §2.5.

14. Under the Subcontract, the JV agreed to pay ATS for Additional Design Services as follows:

> Payment shall be made when the work is performed for such Contractor directed changes and for changes which Owner acknowledges are its responsibility. For changes which the Parties believe are the Owner's responsibility but which the Owner has not acknowledged as its responsibility, payment shall be made when payment is received from Owner which may not occur (if it occurs at all) until after a determination that there was an Owner directed

5

> change by the dispute resolution procedures contained in the Design/Build Contract. Designer specifically agrees to accept the risk that changes which the Parties believe to be Owner directed and which are approved for payment by the Design Change Control Board at Designer's request may not be found to be Owner's responsibility in the dispute resolution procedures and therefore not paid for by the Owner, provided that such changes are sufficiently itemized by the Contractor and adjudicated by the Owner separate from other changes. For work approved by the Design Change Control Board and identified as the Contractor's responsibility, Contractor shall pay Designer for such changes as Additional Design Services. Designer's invoices to Contractor for the costs of its subcontractors who perform work approved by the Design Change Control Board shall be compensated as Additional Design Services. Such costs of Designer's subcontractors shall not be further marked up by Designer. For work approved by the Design Change Control Board and identified as the Owner's responsibility, Contractor shall pay Designer on the same basis as Contractor is permitted to bill Owner for the services Designer performs under the terms of the Design/Build Contract and such payment shall be subject to Sections 2.6 and 2.7

*Id.* at p. 21, §2.5.

15. The Subcontract also outlines when the JV should pay ATS for Additional Design Services, including those directed by the Owner:

> Pay When Paid Clause It shall be a condition of Contractor's obligation to pay Designer that Contractor have received payment of the amount of payment Contractor requested for Designer's services from Owner (other than work identified as Contractor's responsibility pursuant to this Section 2.6 or agreed to in writing by Contractor to be its responsibility). Contractor shall pay Designer within ten (10) days of receipt of payment from Owner. If Owner has refused or failed to make payment to Contractor for reasons unrelated to Designer's Design Services), Contractor shall pay Designer's invoice amounts not being disputed in good faith within 90 days of Contractor's receipt of Designer's invoice notwithstanding Owner's nonpayment. Contractor shall have the right to set-off and deduct from amounts otherwise due Designer any undisputed back-charges which Contractor has against Designer. Invoice amounts being disputed in good faith shall be promptly submitted to the Design Change Control Board and determined in accordance with the procedures set forth in

>Attachment 1. Upon determination in accordance with Attachment 1, the Party determined to be liable shall pay the other Party within 10 days

*Id*. at p. 22, §2.6.

**B.     Commencement of Design Services Under The Subcontract**

16.     Pursuant to the Subcontract, ATS commenced its Design Services on the Project in May 2016.

17.     As lead designer, ATS diligently progressed "cross-discipline" designs for virtually all aspects of the Project, including, but not limited to, designs for the Project drainage, roadway construction, structures, geotechnical, signing, traffic control, utilities, and intelligent transportation systems.

18.     The JV, through its conduct, waived the Section 2.5 Design Change Control Board requirement, and the parties therefore did not establish a Design Change Control Board with regards to Additional Design Services during the vast majority of ATS' design work on the Project.

**C.     The JV's Directives to Perform Additional Design Services**

19.     The JV routinely directed ATS to perform significant Additional Design Services throughout the Project without use of the Design Change Control Board process contemplated under Subcontract Section 2.5.

20.     Among many other Additional Services, the JV directed ATS to:

>a.     Re-align, re-design, and/or reconfigure material aspects of ATS' drainage, structural, geotechnical, signing, roadway, and intelligent transportation systems designs to save costs on constructability;
>
>b.     Re-align, re-design, and/or reconfigure material aspects of ATS' drainage, structural, geotechnical, signing, roadway, and intelligent transportation systems designs to meet the JV's and/or CDOT's preferences;

    c.    Prepare out-of-scope alternative design concepts to save costs on constructability;

    d.    Prepare and submit Project drawings and design plans that were substantially more detailed than those required by the Contract Documents to meet the JV's and/or CDOT's preferences; and

    e.    Undertake out-of-scope utility coordination efforts.

21.    On several occasions, the JV also interrupted the natural progression of ATS' designs by directing ATS to re-design "frozen" designs in a manner that substantially changed the premises upon which the Design Freeze was based.

22.    As one example out of many, the JV waited until ATS' drainage design "froze" under Section 2.7 of the Subcontract, and then directed ATS to completely overhaul critical aspects of the design, such as: (i) redesigning, relocating, and consolidating drainage ponds; (ii) eliminating pond detention volumes, and (iii) re-designing base drainage elements based on the JV's own late identification of utility conflicts.

23.    The JV directed similar post-Design Freeze re-designs on ATS' roadway, signing, and intelligent transportation systems designs.

24.    CDOT also directed changes to the Project that required ATS to perform Additional Design Services.

25.    ATS also was required to perform Additional Design Services on several occasions when the parties discovered errors and/or omissions in the Contract Documents, fundamental Design Assumptions, and Project utility information.

26.    As a result, ATS has completed its primary scope of Design Services on the Project, as well as substantial Additional Design Services.

**D.     The Dispute**

27.     Over the course of the Project, ATS submitted numerous Proposed Change Orders ("PCOs") to The JV, requesting compensation for the substantial Additional Design Services performed.

28.     The JV approved many of these ATS PCOs and the JV has paid ATS for many Additional Design Services — including several over $50,000 — however, the JV has rejected and refused to pay ATS' remaining valid PCOs for Additional Design Services.

29.     Among other excuses, the JV claims that ATS is not entitled to compensation because ATS did not first obtain approval from the (then-nonexistent) Design Change Control Board.

30.     The JV has also failed and refused to pay ATS for PCOs stemming from CDOT directed changes to the Project despite the passage of significant time since those services were invoiced. Furthermore, upon information and belief, the JV has already received payment from CDOT for certain Additional Design Services performed by ATS, but has refused to remit corresponding payment to ATS.

31.     After providing the JV with substantial time to remit payment, ATS formally demanded that the JV approve the PCOs and compensate ATS for the Additional Design Services it performed on the Project.

32.     The JV responded by demanding that the parties institute the Design Change Control Board as a pre-condition to payment, even though the JV had already waived, through its conduct, the requirement that the Design Change Control Board decide issues of entitlement over Additional Design Services.

33. ATS acquiesced to the JV's demand in hopes of resolving disputes pertaining to the PCOs, and so the parties established the Design Change Control Board in late 2018.

34. In early 2019, the parties paused the Design Change Control Board process so that ATS and the JV could endeavor to resolve the PCO disputes through executive level negotiations.

35. Since that time, ATS' executive team has tried to engage Flatiron's executive team in a collaborative, good faith dispute resolution process regarding the unpaid Additional Design Services, but that process has also proven unsuccessful.

36. To date, and despite repeated demands, the JV has failed and refused to pay ATS for the substantial Additional Design Services that the JV requested and ATS performed on the Project.

37. ATS has suffered more than $5,000,000 in damages due to the Additional Design Services that it performed without payment.

38. The JV's refusal to pay for Additional Design Services constitutes a breach of the parties' Subcontract.

39. The JV has also been unjustly enriched by virtue of not having paid ATS for the full value of services ATS rendered at the JV's request.

**FIRST CLAIM FOR RELIEF**
**(Breach of Contract)**

40. ATS restates and realleges the allegations set forth in the preceding paragraphs as though fully set forth herein.

41. The Subcontract constitutes a valid and binding contract between ATS and the JV.

42. ATS fully performed all of its obligations under the Subcontract, including its full performance of the Design Services and the Additional Design Services directed by the JV.

43. The JV has paid ATS for many of the Additional Design Services directed by the JV and performed by ATS on the Project under the parties' Subcontract.

44. However, the JV has materially breached the Subcontract by failing and refusing to pay ATS for the remaining balance of the Additional Design Services directed by the JV and performed by ATS on the Project under the parties' Subcontract.

45. The JV has also materially breached the Subcontract by failing and refusing to pay ATS for the Additional Design Services directed by CDOT and performed by ATS on the Project under the parties' Subcontract.

46. As a result of Flatiron's material breaches of the Subcontract, ATS has been damaged in the amount to be determined by the trier of fact. ATS' damages are ongoing.

47. The JV is also liable for penalty interest at the rate of fifteen percent (15%) under Colo. Rev. Stat. § 24-91-103(2) for failure to timely pay ATS.

### SECOND CLAIM FOR RELIEF
### (Unjust Enrichment)
### (Alternative Relief)

48. ATS restates and realleges the allegations set forth in the preceding paragraphs as though fully set forth herein.

49. By accepting services from ATS, including the Additional Design Services directed by the JV and performed by ATS on the Project, the JV received substantial benefits at ATS' expense.

50. It is unjust for the JV to retain the benefits it obtained from ATS without paying for the services rendered.

51. As a result of Flatiron's unjust enrichment, ATS has been damaged in an amount to be determined by the trier of fact. ATS' damages are ongoing.

## **PRAYER FOR RELIEF**

WHEREFORE, ATS prays for the following relief:

A. Monetary judgment against the JV and in favor of ATS, in the amount to be determined by the trier of fact, together with pre-judgment and post-judgment interest to the fullest extent allowed by law;

B. An award in favor of ATS and against the JV for penalty interest at the rate of fifteen percent (15%) pursuant to Colo. Rev. Stat. § 24-91-103(2);

C. An award in favor of ATS and against the JV for ATS' reasonable costs incurred, including attorneys' fees as allowed by law and pursuant to Section 10.2 of the parties' Subcontract; and

D. An award in favor of ATS and against the JV for such other and further relief as the Court deems just and appropriate.

## **JURY DEMAND**

ATS demands a jury trial on all issues so triable.

Dated this 2nd day of October, 2019.

                                          *s/ M. Adam Lewis*
                                          Stephen D. Gurr, #19789
                                          M. Adam Lewis, #42585
                                          BRYAN CAVE LEIGHTON PAISNER LLP
                                          1700 Lincoln Street, Suite 4100
                                          Denver, Colorado  80203-4541
                                          Telephone:  (303) 861-7000
                                          Facsimile:  (303) 866-0200
                                          Email:  adam.lewis@bclplaw.com
                                                         steve.gurr@bclplaw.com

                                          Attorneys for Plaintiff AECOM Technical Services, Inc.

Plaintiff's Address:

300 South Grand Avenue, 9th Floor
Los Angeles, California 90071