**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Civil Action No. 19-cv-2811-WJM-KLM

AECOM TECHNICAL SERVICES, INC.,

      Plaintiff-Counterclaim Defendant,

v.

FLATIRON | AECOM, LLC,

      Defendant-Counterclaim Plaintiff.

---

**ORDER DENYING AECOM TECHNICAL SERVICES, INC.'S**
**AMENDED EARLY MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

This contract dispute is before the Court on Plaintiff-Counterclaim Defendant AECOM Technical Services, Inc.'s ("AECOM") Amended Early Motion for Partial Summary Judgment ("Motion") (ECF No. 96). For the following reasons, the Motion is denied.

## I. STANDARD OF REVIEW

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986). A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). An issue is "genuine" if the evidence is such that it might lead a reasonable trier of fact to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  In addition, the Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial.  *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

## II. BACKGROUND[1]

This case arises out of a contract dispute between AECOM and Defendant-Counterclaim Plaintiff Flatiron | AECOM, LLC ("Flatiron") over a highway construction project, for which Flatiron was the lead design/build contractor, and AECOM was the lead designer.  (*See* ECF No. 37 ¶ 11.)

According to Flatiron, AECOM prepared a design under the Contractor/Designer Teaming Agreement ("Teaming Agreement") that failed to follow basic engineering and Project requirements and affirmatively misled Flatiron about its conduct.  (ECF No. 101 at 6 ¶ 15.)  Flatiron provides examples of the alleged pre-bid problems, including an outdated drainage design, 34,000 feet of missing drainage pipe, and missing concrete barriers.  (ECF No. 101 at 7 ¶¶ 22, 24–25.)  Flatiron states that it has been injured by AECOM's breaches of the Teaming Agreement and the Subcontract, which have required Flatiron to expend "at least $195 million dollars to address and correct [AECOM's] gross negligence."  (ECF No. 101 at 8 ¶ 29.)

---

[1] The following factual summary is largely based on the parties' briefs on the Motion and documents submitted in support thereof.  All citations to docketed materials are to the page number in the CM/ECF header, which sometimes differs from a document's internal pagination.

A.      **Teaming Agreement**

On November 9, 2015, the parties entered into the Teaming Agreement (ECF No. 37-1) to pursue the C-470 Express Lanes Project ("Project") for the Colorado Department of Transportation ("CDOT").  (ECF No. 96 at 1.)  According to AECOM, the Teaming Agreement governed how the parties' relationship would then develop in the event that CDOT awarded the parties the Project.  (ECF No. 96 at 3 ¶ 2.)  However, Flatiron contends that the Teaming Agreement governed the parties' obligations prior to the submission of a proposal for the Project; Flatiron characterizes these obligations as the "Pre-Award Services" or the "pre-bid" work, in part citing a provision of the Teaming Agreement.  (ECF No. 101 at 4 ¶ 2 (citing ECF No. 37-1 at 2 § 5).)

The Teaming Agreement sets forth various provisions relevant here.  In the Teaming Agreement, the parties "agree[d] to negotiate in good faith a subcontract (the 'Subcontract') for design services to be provided for the Project subject to negotiation . . . ."  (ECF No. 37-1 at 2 § 3.)  Specifically, AECOM agreed to provide "the design and engineering services (the 'Pre-Award Services') required for the Project in order for Contractor Members to submit the required [Statement of Qualifications], and the [Request for Proposals] Proposal."  (ECF 37-1 at 3 § 5.)  Further, the Teaming Agreement provides that

> [t]his Agreement shall terminate in the event [of] . . . (vi)
> execution of the Subcontract. . . .  If the Parties enter into the
> Subcontract the terms of this Agreement shall be
> superseded by the Subcontract, Upon [*sic*] any such
> termination, this Contractor/Designer Teaming Agreement
> shall have no further effect; provided, however, those
> provisions which, by their terms are intended to survive
> termination, including and [*sic*] Section 10 (non-
> disclosure/confidentiality), Section 12 (liability upon
> withdrawal), Section 15 (limitation on damages) and Section
> 17 (Procurement Integrity) shall specifically survive

3

termination, [*sic*][.]

(ECF No. 37-1 at 3 § 4.)  In Section 15, the Teaming Agreement sets forth the limitation

on damages provision, which provides in part:

> . . . The Parties hereto agree that the provisions of this
> Agreement which, by their nature, are intended to survive
> termination or expiration of this Agreement, including, but not
> limited to, releases or limitations on liability or remedies,
> shall survive and continue in full force and effect following
> any such termination or expiration.  To the fullest extent
> permitted by law, limitations on liability set forth in this
> Agreement are intended to apply even in the event of
> default, negligence or strict liability on the part of the Party
> whose liability is limited or released.

(ECF No. 37-1 at 6 § 15.)  The Teaming Agreement also provided that the Subcontract

would include certain terms that the parties would negotiate, including: "Overall

limitation of liability capped at 100% of the final design portion of the agreed-upon

Subcontract amount;" "Subcap on schedule-related damages of 20% of the final design

portion of the agreed-upon Subcontract amount;" and "Mutual waiver of

consequential damages."  (ECF No. 37-1 at 7 § 20.)  According to Flatiron, the Teaming

Agreement contains no provision limiting liability, other than a mutual consequential

damages waiver.  (ECF No. 101 at 6 ¶ 16.)

**B.    Subcontract**

On April 4, 2016, CDOT awarded the Project to Flatiron.  (ECF No. 96 at 4 ¶ 7;

ECF No. 80-1 at 2.)  On May 23, 2016, the parties entered into the Subcontract.  (ECF

Nos. 37-2, 37-3.)

The Subcontract states that the "Lump Sum Base Design Fee Amount" for

AECOM's work is $9,058,493.65.[2]  (ECF No. 37-2 at 2.)  Additionally, the Subcontract

---

[2] AECOM states that the Total Design Fee is "an evolving number," which is evolving in

requires AECOM to obtain "project specific professional liability coverage . . . which covers the complete scope of [the] Subcontract," with coverage limits per claim and in the aggregate of $10 million.  (ECF No. 37-2 at 4 § 2.)

Under the Terms and Conditions/Scope of Services/Responsibilities Generally section of the Subcontract, "Design Services includes any additional services provided by Designer in accordance with this Subcontract *and all services provided by Designer pursuant to any 'Teaming Agreement'* or similar agreement between the Parties regarding the Project ('Teaming Agreement')."  (ECF No. 37-3 at 16 § 1.1 (emphasis added).)  However, in another portion of the Subcontract under the heading Exhibit 5 - Design Assumptions, it states that "Pre-Award services are *not included* in the Base Design Fee or scope of work."  (ECF No. 37-2 at 25 (emphasis added).)

The Subcontract contains a Limitations of Liability provision in Exhibit 1, stating in relevant part:

> **Limitations of Liability**.  Designer's aggregate liability to Contractor for any damages, claims, costs, or expenses arising *under the Subcontract*, whether in contract, tort or otherwise, shall be limited to 100% of the Lump Sum in the aggregate, less direct costs, plus additional design fees incurred pursuant to this Agreement ("Total Design Fee"). Any project specific insurance proceeds shall not count toward this cap. . . .

(ECF No. 37-2 at 6 § 1 (emphasis added).)  In the next section, the Subcontract provides:

> **Liability for Schedule**.  In the event Designer fails to timely perform the Design Services resulting in a demonstrable delay to the Project's critical path of construction, then

---

Flatiron's favor.  (ECF No. 96 at 11 n.3.)  According to AECOM, subsequent change orders are increasing the Total Design Fee, which is now in excess of $11 million and may still change because the Project is ongoing and more change orders may be executed.  (*Id.*)

> Designer shall be liable to Contractor for the Owner's liquidated damages ("LDs") the Contractor is charged to the extent directly resulting from this delay, along with Contractor's other direct costs and time related project overhead arising from such delay, including acceleration and other mitigation costs.  Contractor shall use commercially reasonable efforts to mitigate such delay.  Such liability for delay (including but not limited to LDs) shall be limited to 20% of the Total Design Fee in the aggregate which shall be included as part of the overall limitation of liability.

(ECF No. 37-2 at 6 § 2.)  The parties also waived consequential damages under the

Subcontract.  (ECF No. 37-2 at 8 § 12.)

The Subcontract contains certain provisions which refer to the Teaming

Agreement.  In the Order of Precedence section, the Subcontract states:

> **Order of Precedence**.  In the event of a conflict between the Teaming Agreement and this Subcontract, this Subcontract shall prevail, except with respect to the calculation of pre-bid compensation in which case the Teaming Agreement shall prevail.  Section 16.10 is amended by adding the following sentence to the end of the section: "In the case of a conflict between the terms of this Subcontract and the Design/Build Agreement and any incorporated document, the terms of this Subcontract shall take precedence."

(ECF No. 37-2 at 7 § 7.)  At the end of the Subcontract is the merger clause, which

provides:

> **Entire Agreement**.  This Agreement (together with any exhibits and documents incorporated herein by reference and any terms of a Teaming Agreement between the Parties regarding the Project not inconsistent with this Subcontract), represent the entire agreement between Designer and Contractor and supersedes all prior negotiations, representations and agreements regarding the Project, whether written or oral and cannot be amended except with the written approval of all Parties.

(ECF No. 37-3 at 33 § 16.10.)

**C.**     **Procedural History**

On October 2, 2019, AECOM filed its Complaint against Flatiron, alleging claims

for: (1) breach of the Subcontract; and (2) unjust enrichment.  (ECF No. 1.)  AECOM

alleges that Flatiron only partially paid AECOM for services performed under the

Subcontract and now refuses to pay the remaining amounts due.  (*Id.* at 1–2.)  On April

9, 2020, Flatiron filed its Answer and Amended Counterclaim, alleging counterclaims

for: (1) breach of the Teaming Agreement; (2) negligent misrepresentation; and (3)

breach of the design Subcontract.  (ECF No. 37.)

On February 23, 2021, the Court granted in part and denied in part AECOM's

Motion to Dismiss the Amended Counterclaim Pursuant to Fed. R. Civ. P. 12(b)(6) and

9(b) (ECF No. 46).  (ECF No. 97.)  In the Order, the Court dismissed with prejudice

Flatiron's negligent misrepresentation counterclaim and left pending Flatiron's claims for

breach of the Teaming Agreement and breach of the Subcontract.  (*Id.*)

On February 15, 2021, AECOM filed the Motion.  (ECF No. 96.)  Flatiron filed a

response in opposition (ECF No. 101), to which AECOM replied (ECF No. 109).  Thus,

the Motion is ripe for review.

**III. ANALYSIS**

In the Motion, AECOM argues that the Court should enter partial summary

judgment in its favor, and against Flatiron, on Flatiron's contract claims confirming that:

(1) AECOM's total liability for breach of contract claims is capped at the amount of the

Total Design Fee per the Subcontract and any applicable insurance coverage; (2)

AECOM's liability for schedule-related damages for breach of contract claims is further

capped at 20% of the Total Design Fee; and (3) Flatiron's consequential damages are

waived, whether pursuant to the terms of the Subcontract or the Teaming Agreement.

(ECF No. 96 at 15.)

Specifically, AECOM argues that the Subcontract's limitation of liability provisions apply to work it performed under the Teaming Agreement and the Subcontract. (ECF No. 109 at 4.) According to AECOM, even if the Court determines that the Teaming Agreement survives despite the merger clause and other provisions which it contends indicate the Subcontract supersedes the Teaming Agreement, the definition of "Design Services" demonstrates that the limitation of liability provisions apply to both AECOM's pre- and post-bid work. (*Id.* at 6.) AECOM points to the language which defines "Design Services" to include "all services provided by [AECOM] pursuant to any 'Teaming Agreement . . . between the Parties regarding the Project . . . .'" (*Id.*) Based on this definition, AECOM asserts that where the parties reference "Design Services" in the Subcontract, they are also referencing all services AECOM performed under the Teaming Agreement. (*Id.*) Thus, according to AECOM, it would be impossible to give meaning to the Subcontract's definition of "Design Services" without also giving effect to the Subcontract's limitation of liability for those same services. (*Id.* at 7.)

In response, Flatiron contends that genuine factual disputes exist over whether Flatiron's damages arise under the Teaming Agreement or the Subcontract; that the Subcontract's limitation of liability provisions are not enforceable under Colorado law; and that *SOLIDFX, LLC v. Jeppesen Sanderson, Inc.*, 841 F.3d 827, 838–41 (10th Cir. 2016), does not control the legal analysis of whether the limitation of liability provisions are enforceable. (*See generally* ECF No. 101.) Flatiron contends that the Teaming Agreement governs the parties' pre-bid conduct and the Subcontract governs their post-bid conduct. (*Id.* at 9.)

For support, Flatiron points to various provisions in the two contracts which it argues show that the Teaming Agreement was not meant to be subsumed by the Subcontract.  First, Flatiron cites language from the Subcontract's limitation of liability provision which states that it applies to "damages, claims, costs, or expenses *arising under the Subcontract*."  (*Id.* (quoting ECF No. 37-2 at 6 § 1(emphasis added)).)  Second, Flatiron quotes the provision from the Design Assumptions exhibit, which states that "Pre-Award services are not included in the Base Design Fee or scope of work."  (*Id.* (quoting ECF No. 37-2 at 25).)  Third, Flatiron points to language in the Teaming Agreement which states that multiple provisions will survive the Teaming Agreement.  (*Id.* (quoting ECF No. 37-1 at 5 § 15 ("limitations on liability. . ., shall survive and continue in full force and effect following any such termination or expiration"); ECF No. 37-1 at 2 § 4 ("Upon any such termination . . . Section 15 (limitation on damages) . . . shall specifically survive termination.")).)  In addition, Flatiron observes that the Teaming Agreement contains no limitation on AECOM's liability for breaches of the Teaming Agreement and that the Subcontract's limitation of liability provision specifically states it applies to damages "arising under the Subcontract."  (*Id.* at 10.)

To interpret the contracts at issue, the Court applies Colorado law.[3]  *See Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 417 (2010) ("It is a long-recognized principle that federal courts sitting in diversity apply state substantive law and federal procedural law." (internal quotation marks and citation omitted)) (concurring, J. Stevens).  Under Colorado law, "ambiguity in a written contract may be

---

[3] The Court has diversity jurisdiction under 28 U.S.C. § 1332(a).  (ECF No. 1 ¶ 4.)

resolved by looking to extrinsic evidence demonstrating the intent of the parties." *Fed. Deposit Ins. Corp. v. Fisher*, 292 P.3d 934, 940–41 (Colo. 2013) (dissenting opinion).  "It is similarly well-accepted, both in and outside this jurisdiction, that an ambiguity permitting resort to extrinsic evidence is established where different provisions of a contract are in irreconcilable conflict."  *Id.* (citing *Ryan v. Fitzpatrick Drilling Co.*, 342 P.2d 1040 (Colo. 1959); *People v. Johnson*, 618 P.2d 262, 266 (Colo. 1980); 11 Richard A. Lord, Williston on Contracts § 30:4, at 46 (4th ed. 1999); 5 Margaret N. Kiffin, Corbin on Contracts § 24.23, at 252 (Joseph M. Perillo ed., 1998)).

In Colorado, "[w]hile consideration of the contract as a whole in light of various interpretative aids may help to determine that an apparent conflict between individual words or provisions of the contract does not present an actual conflict at all, if apparently conflicting provisions are not reconcilable by the language of the contract itself, then there exists a facial ambiguity."  *Id.*  The Colorado Supreme Court has "held not only that once a court determines a document to be ambiguous, it may consider extrinsic evidence bearing on the intent of the parties, but also that extrinsic evidence may be conditionally admitted to determine whether the contract is actually ambiguous in the first place."  *Id.* (citing *E. Ridge of Fort Collins, L.L.C. v. Larimer & Weld Irrigation Co.*, 109 P.3d 969, 974 (Colo. 2005)).

Upon due consideration, the Court will deny AECOM's Motion because provisions of the Subcontract render it ambiguous on its face.[4]  Of particular importance to the Court's conclusion is the apparent clear conflict between two provisions that

---

[4] In ruling on the Motion, the Court has considered the parties' numerous and far-reaching arguments on all of the points raised.  However, for the sake of conserving judicial resources, the Court only addresses the arguments and evidence on which this Order depends.

appear in the Subcontract itself.  AECOM correctly observes that the definition of "Design Services" appears to incorporate work performed under the Teaming Agreement and the Subcontract.  (ECF No. 37-3 at 16 § 1.1.)  Of course, this reading supports AECOM's overarching contention that the limitation of liability applies to work it performed under *both* contracts.  (ECF No. 101 at 7.)

However, the Court agrees with Flatiron that the language in the Design Assumptions portion of the Subcontract which provides that "Pre-Award Services are not included in the Base Design Fee or scope of work," points toward a different conclusion.  (ECF No. 101 at 9; ECF No. 37-2 at 25.)  AECOM's steadfast reliance on the definition of "Design Services" is simply insufficient to overcome the conflict between these provisions in the Subcontract.  Additionally, as Flatiron emphasizes, the limitation of liability provision of the Subcontract specifies that it pertains to damages "arising under the Subcontract."  (ECF No. 37-2 at 6 § 1.)  While it is possible that AECOM's interpretation is accurate, it is far from clear at this point in the litigation.  On this basis, the Court finds that these material terms of the Subcontract are in direct conflict, rendering the document ambiguous, and as a consequence the Court cannot on this record grant summary judgment in AECOM's favor.

In addition, as Flatiron has explained, various provisions of the Teaming Agreement and the Subcontract call into question the parties' intent regarding whether and to what extent the Teaming Agreement survives the Subcontract.  The conflicting interpretations of what the parties intended regarding the limitation of liability provisions and how the Teaming Agreement and the Subcontract would interact are factual questions that are not susceptible to resolution on an early motion for partial summary

judgment.  Therefore, the Court will deny AECOM's Motion.[5]

## IV. CONCLUSION

For the reasons stated above, the Court ORDERS:

1.      AECOM Technical Services, Inc.'s Amended Early Motion for Partial Summary

Judgment (ECF No. 96) is DENIED;

2.      The Court *sua sponte* extends the page limits for summary judgment briefing as

follows:

   a.   Motions for summary judgment and responses thereto may be no

   more than 50 pages, exclusive of certificates of service and

   attorney signature blocks;

   b.   Reply briefs may be no more than 25 pages, exclusive of

   certificates of service and attorney signature blocks; and

   c.   The parties will continue to adhere to the scheduling deadlines set

   by the United States Magistrate Judge (*see* ECF No. 121);

3.      If either party raises the issue of the enforceability of the contracts' limitation of

liability provisions in summary judgment motion practice, the Court DIRECTS

them to address the nature and type of extrinsic evidence the Court may

consider in the course of interpreting the relevant provisions of the Teaming

Agreement and Subcontract.  Specifically, the parties must provide the legal

---

[5] One of AECOM's requests for relief in the Motion is that the Court enter summary judgment finding that Flatiron's consequential damages are waived, whether pursuant to the terms of the Subcontract or the Teaming Agreement.  (ECF No. 96 at 15.)  In its response, Flatiron states that "As for the consequential damages waiver, Flatiron does not seek consequential damages."  (ECF No. 101 at 3 n.2.)  Although the Court will deny AECOM's Motion, the Court will hold Flatiron to its representation that it is not seeking consequential damages.

underpinning for the permissible scope of this extrinsic evidence, and the requisite indicia of reliability of that evidence, if any, that the Court should look to before it may properly consider same in the context of a motion for summary judgment; and

4.     In previous briefing, the parties have complied with the undersigned's Revised Practice Standards III.F.3-4, to the extent that "[e]ach statement of fact must be accompanied by a specific reference to supporting evidence in the record."  The Court expects the parties' continued compliance with this Revised Practice Standard.  To aid the Court in efficiently reviewing the citations to exhibits, for **all future briefing**, including dispositive motion practice, the Court DIRECTS the parties to add to **all citations** the docket entry number and page number from the CM/ECF headers.  To the extent a pin citation is included, such as a deposition page and line number, or a BATES stamp number, those citations shall remain.  For example, a typical citation from a Statement of Material Facts, Smith Dep. 53:7-18, 60:19-23, June 19, 2019, should appear as follows: (ECF No. 626-57 at 4, 5; Smith Dep. 53:7-18, 60:19-23, June 19, 2019).[6]

Dated this 17th day of September, 2021.

BY THE COURT:

William J. Martinez
United States District Judge

---

[6] To the extent the parties have technical questions about this directive, they should first contact the Clerk's office.  Should any questions remain, the parties may then contact chambers.