**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:19-cv-02811-WJM-KLM

AECOM TECHNICAL SERVICES, INC.,

        Plaintiff/Counterclaim Defendant,

v.

FLATIRON | AECOM, LLC,

        Defendant/Counterclaim Plaintiff.

---

**AECOM TECHNICAL SERVICES, INC.'S
AMENDED MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

Plaintiff/Counterclaim Defendant AECOM Technical Services, Inc. ("ATS"), respectfully submits this Amended Motion for Partial Summary Judgment pursuant to F.R.C.P. 56, the Court's implicit invitation (ECF No. 168 at 12-13), and the Court's April 18, 2022 Order (ECF No. 212).

## Certificate of Conferral

Although not required under D.C.COLO.LCivR 7.1(b)(3), counsel for ATS conferred with counsel for Defendant Flatiron | AECOM, LLC ("Flatiron")[1] to confirm that Flatiron opposes the relief sought in this motion.

---

[1] The defendant and counterclaimant here is the Flatiron / AECOM Joint Venture. ATS will follow the Court's practice of referring to this Joint Venture as Flatiron.

## I.   INTRODUCTION

ATS and Flatiron entered into a Teaming Agreement to allow ATS to do just enough preliminary design work to enable Flatiron to bid on CDOT's C-470 Express Lane Project (the "Project").  The Teaming Agreement described how, if Flatiron won the contract, the parties would then enter into a Subcontract that would "supersede" the Teaming Agreement, including by imposing a liability cap equal to ATS's design fee (*i.e.* what it earned under the Subcontract – about $10 million)[2] and the proceeds of a project specific professional liability policy (another $10 million).

By the time Flatiron won the design-build Project, it had internally identified what it believed were various "short comings" and problems with ATS's preliminary design work performed under the Teaming Agreement.  Flatiron could have hired a different designer for the Project, and (if warranted) sued ATS under the Teaming Agreement for the costs of having to change designers.  Flatiron could have sought revisions to the proposed Subcontract, including its liability cap (in which case it might have had to find a new designer that would accept uncapped liability or higher exposure to the potential downside risks of working on such a huge Project).  Flatiron could have abandoned the Project.  But Flatiron knew (or certainly should have known) that if it signed the proposed superseding and liability-capped Subcontract with ATS and the Project experienced any design-related problems, Flatiron would have one and only one legal remedy: a claim for breach of the Subcontract, subject to the agreed-upon liability cap.

---

[2] The design fee amount has increased per change orders.  (*See* ECF No. 168 at 4 n.2).  The precise amount is not material to this motion, so ATS uses the round figure of $10 million.

83117927.4

Flatiron signed the Subcontract with ATS.  And, per Flatiron's claims in this action, design-related problems emerged during the construction process.  Flatiron now asserts that ATS is liable for $263.5 million of Flatiron's Project losses.[3]

Seeking to avoid the Subcontract's liability cap, Flatiron brought not one but **three** legal claims against ATS: negligent misrepresentation (not capped), breach of the Teaming Agreement (not capped), and breach of the Subcontract (capped).  Flatiron did this despite the Subcontract's fee-shifting provision, which is not a "prevailing party" provision but rather shifts fees if a party loses a majority of the claims it asserts.

This Court dismissed Flatiron's claim for negligent misrepresentation under Colorado's economic loss rule (ECF No. 97) but hesitated to dispose of the breach of Teaming Agreement claim on ATS's early motion for summary judgment due to possible ambiguity in the Subcontract's language that the Court believed might allow Flatiron to sue on the Teaming Agreement.  (ECF No. 168).  Flatiron has seized the apparent opening, preparing expert reports claiming that Flatiron's alleged $263.5 million of Project losses all stem from ATS's breach of the standard of care in the $729,000 worth of preliminary design work performed under the Teaming Agreement.

Flatiron's attempt to characterize its alleged losses this way fails as a matter of law.  Even if everything that went wrong with the Project did indeed stem from bad initial design work under the Teaming Agreement (which is utterly implausible, but a factual

---

[3] ATS vigorously contests these claimed losses, and whether these or any losses were caused by ATS's design work.  ATS entertains Flatiron's $263.5 million claim for purposes of this motion only.

83117927.4

premise the Court must entertain at summary judgment), that initial design work was incorporated into the liability-capped Subcontract per the Subcontract's definition of "Design Services."  By entering into the superseding Subcontract, any claim that Flatiron might assert for breach of the Teaming Agreement becomes a claim for breach of the liability-capped Subcontract.

The Court hesitated to reach this conclusion at the early summary judgment stage because of one sentence in the Subcontract: "Pre-Award Services are not included in the Base Design <u>Fee</u> or [the Subcontract's] <u>scope of work</u>."  (ECF No. 168 at 11) (emphases added).  That sentence, however, does not create any ambiguity regarding which contract controls.  It simply recites the fact that Flatiron had already separately paid $729,000 for the preliminary design work under the Teaming Agreement, and ATS did not have to redo that initial design work under the Subcontract because it had already been done.  And, if there were any doubt (which there is not), that doubt would be resolved by the Subcontract's merger clause, order of precedence provision, drafting history and established industry practice – all of which confirm the parties' intent that if Flatiron won the Project and ATS continued to work as the designer, <u>all</u> of ATS's design work (including the preliminary design work done under the Teaming Agreement) would be governed by the superseding Subcontract and subject to its liability cap.

Flatiron also waived any right to sue under the Teaming Agreement when it signed the superseding Subcontract.

And even if Flatiron could sue under the Teaming Agreement, its claimed $263.5 million in Project losses are at best unrecoverable consequential damages as a matter of law vis-à-vis the Teaming Agreement.

As a result, the Court can now confidently dismiss Flatiron's legally incognizable claim for breach of the Teaming Agreement for any or all of these three sound reasons: no ambiguity; a general waiver; and consequential damages waiver.

Finally, the Court can also rule at this stage that Flatiron has triggered the Subcontract's fee-shifting provision by bringing two incognizable claims (negligent misrepresentation and breach of the Teaming Agreement) along with its one cognizable but limited claim for breach of the Subcontract.

Flatiron's $263.5 million claim for breach of the Subcontract obviously cannot be disposed of on summary judgment and must go forward to determination through a lengthy and complex jury trial.  But any recovery by Flatiron will be subject to the agreed-upon liability cap totaling $20 million.  ATS will continue to defend against this claim with resources commensurate to the claim's magnitude and complexity.

## II.     MOVANT'S STATEMENT OF MATERIAL FACTS[4]

1.     When CDOT put out the C-470 Project to bid, Flatiron partnered with URS Energy & Construction, the construction side of AECOM, to form a Joint Venture to

---

[4] This section develops the relevant and factually undisputed aspects of the contracts' drafting history, per the Court's directive in ECF No. 168 at 12-13.  ATS will develop the law governing the Court's consideration of the extrinsic evidence in the Argument section below.

83117927.4

pursue the Project; and Flatiron engaged the design side of AECOM, ATS, as the Project's designer.  (ECF No. 37-1 at 2).

**A.      Flatiron and ATS negotiate and enter into the Teaming Agreement.**

2.      Flatiron and ATS began by negotiating a teaming agreement to enable ATS to do enough preliminary design work for Flatiron's estimators to run quantity take-off estimates on the amount of construction materials and services needed to build the Project, and thereby prepare and submit a bid for the Project.  *See* Teaming Agreement (ECF No. 37-1 at 3, recitals and ¶¶ 1 and 5).

3.      In July 2015, Flatiron sent ATS its stock teaming agreement template. **Exhibit 1**, Armstrong 30(b)(6) deposition at 24:4-15, 38:20-40:11; **Exhibit 2**, Armstrong deposition exhibit 474.

> **a.  The parties agree that the Teaming Agreement will be "superseded" by a future Subcontract.**

4.      Flatiron's teaming agreement template stated that "If the Parties enter into the Subcontract, the terms of this [Teaming] Agreement shall be deemed to be incorporated into the Subcontract, but only to the extent not inconsistent with the Subcontract."  **Exhibit 2**, Armstrong deposition exhibit 474 at FA0002120390 ¶ 4 (emphasis added); **Exhibit 1**, Armstrong 30(b)(6) deposition at 40:23-41:7.

5.      Flatiron's teaming agreement template also attached a term sheet for the proposed Subcontract, which included the contemplated liability cap.  *Id.* at FA0002120399.

6.      As the parties negotiated the terms of the Teaming Agreement, they struck out the word "incorporated" and inserted "superseded," so that the proposed

Teaming Agreement now read: "If the Parties enter into the Subcontract, the terms of this Agreement shall be <u>superseded</u> by the Subcontract":



*Compare* **Exhibit 3**, Armstrong deposition exhibit 482 at FA0002120132, ¶ 4 (9/30/2015 draft using "incorporated" in ¶ 4) *with* **Exhibit 4**, Armstrong deposition exhibit 483 at FA0002120838, ¶ 4 (10/8/2015 draft, using "superseded" in ¶ 4) *and* **Exhibit 5**, Armstrong deposition exhibit 485 at ATS00787332, ¶ 4 (redline document showing strikeout and insertion, image inserted above); **Exhibit 1**, Armstrong 30(b)(6) deposition at 84:7-93:21 and 109:1-115:9.

> **b.  The parties agree in the Teaming Agreement that the future Subcontract will cap ATS's potential liability.**

7.       The parties altered the "term sheet" attached to the proposed Teaming Agreement to cap ATS's overall potential liability at 100% of ATS's design fee (about $10 million).  **Exhibit 6**, Armstrong deposition exhibit 475 at ATS01706016 (showing markup); **Exhibit 1**, Armstrong 30(b)(6) deposition at 46:4-25.

8.       The parties then incorporated that liability limit into the text of the Teaming Agreement proper, by adding a new paragraph stating:

> **Overall** limitation of liability capped at 100% of the final design portion of the agreed-upon Subcontract amount. (emphases added)

*Compare* **Exhibit 7,** Armstrong deposition exhibit 477 at FA0002120767 (9/18/2015 Teaming Agreement draft, showing last paragraph as ¶ 18) *with* **Exhibit 8**, Armstrong deposition exhibit 479 at FA0002120155 (9/25/2015 Teaming Agreement draft, adding a

¶ 19 with terms for the anticipated Subcontract); **Exhibit 1**, Armstrong 30(b)(6) deposition at 61:10-64:18 (confirming insertion of "overall liability cap" into the draft Teaming Agreement proper).

9.       As a result of these negotiations, the parties entered into the November 9, 2015 Teaming Agreement.  (ECF No. 37-1).

10.      Per the final Teaming Agreement, if Flatiron did not win the Project, the Teaming Agreement would terminate, and the collaboration would be over.  *See* Teaming Agreement (ECF No. 37-1 at 3, ¶ 4); **Exhibit 1**, Armstrong 30(b)(6) deposition at 66:21-68:9.

11.      Per the final Teaming Agreement, if Flatiron's bid won the Project, the parties would enter into a Subcontract for ATS's design work that would supersede the Teaming Agreement and cap ATS's aggregate potential liability at 100% of ATS's design fee plus the proceeds of a project specific professional liability policy.  *See* Teaming Agreement (ECF No. 37-1 at 7 ¶ 20); **Exhibit 1**, Armstrong 30(b)(6) deposition at 24:4-15, 38:20-41:7, 46:4-25, 61:10-64:18, 84:7-93:21, 109:1-115:9; **Exhibits 2-8**, Armstrong deposition exhibits 474 at FA0002120390 ¶ 4 and FA0002120399; 482 at FA0002120132 ¶ 4; 483 at FA0002120838 ¶ 4; 485 at ATS00787332 ¶ 4; 475 at ATS01706016; 477 at FA0002120767; and 479 at FA0002120155.

12.      Flatiron paid ATS $729,661.35 for the Teaming Agreement's preliminary design work that Flatiron used to prepare its bid.  *See* Subcontract (ECF No. 37-2 at 2); **Exhibit 1**, Armstrong 30(b)(6) deposition at 218:3-16.

83117927.4

**B.   CDOT selects Flatiron's bid, and Flatiron and ATS enter into the Subcontract.**

13.   Before submitting its bid for the C-470 Project, Flatiron prepared an internal 19-page PowerPoint presentation for its leadership summarizing the bid. **Exhibit 9**, Flatiron Internal PowerPoint.

14.   Flatiron's PowerPoint states that ATS was slated as the Project's Designer. *Id.* at 2, FA0002184295.

15.   Flatiron's PowerPoint describes the terms of Flatiron's "Designer Teaming Agreement" with ATS as including "**Overall** limitation of liability capped at 100% of post-award design fee." *Id.* at 15, FA0002184308 (emphasis added).

16.   On February 25, 2016 (about a week before submitting the bid), Flatiron's Vice President of Estimating (and later 30(b)(6) representative) Keith Armstrong sent an email expressing "disappointment" with ATS's preliminary design work, and describing in great detail 12 specific problem areas. **Exhibit 10**, February 25, 2016 Armstrong email.

17.   On March 18, 2016 (about two weeks after submitting the bid, but before CDOT made its decision), Flatiron's Design Coordinator Andy Bright sent an internal email discussing ATS's "poor design," and listing dozens of "short comings" categorized by aspect of the Project (*e.g.* shortcomings with the design of the structures, walls, roadway, signs, etc.). **Exhibit 11**, March 18, 2016 Bright email.

18.   CDOT accepted Flatiron's bid and awarded the Project to Flatiron. *See* Subcontract (ECF 37-2 at 2).

83117927.4

19.     Flatiron chose to go forward with ATS as designer for the Project under the Subcontract, as contemplated in the Teaming Agreement.  *See* Subcontract (ECF No. 37-2 and -3).

20.     The Subcontract is for ATS's "Design Services" on the Project.  (ECF No. 37-2 at 2, title "STANDARD SUBCONTRACT FOR DESIGN SERVICES").

21.     The Subcontract defines the Design Services that ATS will provide under the Subcontract as including the preliminary design work that ATS had already performed under the Teaming Agreement:

> Responsibilities Generally.  Designer agrees to perform . . . all obligations of design professionals required by the Contract Documents (the "Design Services")…. **Design Services includes any additional services provided by Designer pursuant to any "Teaming Agreement"** or similar agreement between the Parties regarding the Project.

(ECF No. 37-2 at 16 § 1.1) (emphasis added).

22.     The Subcontract states that ATS shall perform the Design Services for the "Lump Sum Base Design Fee Amount" of $9,058,493.65.  (ECF No. 37-2 at 2).

23.     The Subcontract specifies that the cost of ATS's preliminary design work performed under the Teaming Agreement is not included in the Lump Sum Base Design Fee:

> The pre-bid design costs shall be paid in full, in the amount of $729,661.35, shall not be included in the Lump Sum Base Design Fee Amount."  *Id.* at 2;

> "Pre-Award Services are not included in the Base Design Fee or scope of work."  *Id.* at 25.

24.     The Subcontract also excludes the already-performed preliminary design work from the scope of work that ATS was to perform under the Subcontract:

"Pre-Award Services are not included in the Base Design Fee or scope of work."

*Id.* at 25 (emphases added).

25. The Subcontract contains the following relevant terms and provisions:

a. ATS will obtain a $10,000,000 "project specific professional liability coverage."  (ECF No. 37-2 at 4, ¶ 2).

b. The following limitation of liability provision:

**Limitations of Liability:**  Designer's aggregate liability to Contractor for any damages, claims, costs, or expenses arising under the Subcontract, whether in contract, tort or otherwise, **shall be limited to 100% of the Lump Sum in the aggregate, less direct costs, plus additional design fees incurred pursuant to this Agreement ("Total Design Fee").**  Any project specific insurance proceeds shall not count toward this **cap**…. It is expressly agreed that Contractor's sole and exclusive remedy against Designer under this Agreement, whether based in contract, tort or otherwise, is the award of damages, costs or expenses **not to exceed the stipulated amount defined above.**  *Id.* at 6 (emphases added).

c. This merger clause:

16.10  Entire Agreement.  **This Agreement** (together with . . . any terms of a Teaming Agreement between the Parties regarding the Project not inconsistent with this Subcontract), represent the entire agreement between Designer and Contractor and **supersedes all prior** negotiations, representations and **agreements** regarding the Project . . . . (ECF No. 37-3 at 33) (emphases added).

d. This "Order of Precedence" provision:

7.   Order of Precedence.  **In the event of a conflict between the Teaming Agreement and this Subcontract, this Subcontract shall prevail**, except with respect to the calculation of pre-bid compensation in which case the Teaming Agreement shall prevail.  (ECF No. 37-2 at 7) (emphasis added).

e. This mutual waiver of consequential damages provision:

16.11  Waiver of Consequential Damages. In no event shall any Party be liable to the others for any indirect, incidental, special or consequential damages . . . . *Id.* at 8 ¶ 12.

f.   This fee-shifting provision:

If the Party submitting the claim to litigation **prevails on less than half the claims it makes**, then the Party submitting the claim to litigation shall pay both Parties' costs of such litigation, including reasonable attorneys' fees. (ECF No. 37-2 at 7; ECF No. 37-3 at 31 ¶ 10.2) (emphasis added).

## III.   STANDARD FOR SUMMARY JUDGMENT

The Court is familiar with the standards governing Rule 56 summary judgments.

*See In re San Luis & Rio Grande R.R., Inc.*, 634 B.R. 599, 613 (Bankr.D.Colo. 2021)

(reviewing standards).  As particularly relevant here:

Summary judgment need not be an all-or-nothing exercise disposing of every cause of action. <u>Instead, a moving party may seek partial summary judgment</u> **<u>disposing of certain claims or deciding important but discrete legal issues</u>**.… The ability of the Court to enter partial summary judgment "serves the purpose of speeding up litigation by eliminating before trial matters wherein there is no issue of fact."

*Id.* (emphases added, citations omitted).

Here, ATS is not seeking summary judgment on Flatiron's one legally cognizable claim for breach of the liability-capped Subcontract.  That claim is too factually complex and disputed to address at summary judgment.  Rather, per the above legal standard, ATS seeks summary judgment to dispose of Flatiron's other remaining legal claim for breach of the Teaming Agreement, and to determine an important and discrete legal issue: applicability of the Subcontract's fee-shifting provision.  This claim and legal issue are appropriate for determination at the summary judgment stage under the above undisputed material facts.  This proposed disposition will leave Flatiron with the one legally cognizable claim that it has only ever had for trial: breach of the liability-capped Subcontract.

## IV.   SUMMARY OF THE ARGUMENT

Design professionals do not sign on to huge projects with huge potential downsides without appropriate liability limitations.  That is what ATS did here by negotiating *in the Teaming Agreement itself* a liability cap that would apply if Flatiron won the Project and went forward with ATS as its designer; and which the parties then confirmed in their superseding Subcontract.

Because Flatiron's recovery is plainly limited to $20 million under the controlling Subcontract, Flatiron has tried to find some way around the Subcontract and its liability limit, including by asserting a negligent misrepresentation claim (dismissed in ECF No. 97), and its willful and wanton breach theory (rejected in ECF No. 169).

Now, in light of this Court's observation that the Subcontract *might* be ambiguous and permit a claim under the Teaming Agreement (ECF No. 168 at 10-11), Flatiron has put all of its eggs into the Teaming Agreement basket, because the Teaming Agreement has no liability cap – just a mutual waiver of consequential damages.  Flatiron's experts opine in their reports that every dollar of Flatiron's alleged $263.5 million in losses was caused by ATS's breach of the standard of care in the $729,000 worth of preliminary design work that ATS performed under the Teaming Agreement.  This position is factually meritless for numerous reasons that ATS will develop at trial, and possibly through F.R.E. 702 motions and hearing.

The primary purpose of this partial summary judgment motion is to prevent Flatiron from evading the agreed-upon liability cap in the Subcontract by framing its claims as breaches of the uncapped but superseded Teaming Agreement.  At this

summary judgment stage, the Court can re-examine the parties' two contracts in light of the additional context and undisputed evidence developed above, and thereby confirm that there is no ambiguity and that the Subcontract's liability cap applies.  Specifically, the Court can rule that Flatiron's claim for breach of the Teaming Agreement fails as a matter of law for three reasons:

**1. Plain language** – The plain and unambiguous language of the Teaming Agreement and Subcontract, construed together, confirms that by entering into the superseding Subcontract, Flatiron's sole claim against ATS is for breach of that Subcontract, and its recovery is capped per the Subcontract's enforceable liability limitation.

**2. Waiver** – When Flatiron won the Project, it had already identified what it believed to be "short comings" in ATS's preliminary design work.  Flatiron could have stood on its rights under the Teaming Agreement – *e.g.* by hiring a new designer for the Project and suing ATS for the costs of changing designers under the Teaming Agreement, if warranted.  Instead, Flatiron entered into the superseding Subcontract with ATS and thereby waived any right to sue on the Teaming Agreement for its alleged Project losses.

**3. The $263.5 million in Project-related losses that Flatiron seeks are at most unrecoverable consequential damages vis-à-vis the Teaming Agreement as a matter of law**.  Much of Flatiron's claimed $263.5 million damages are consequential damages that are not recoverable under the Subcontract.  That analysis, however, would require developing all the details of the Project's performance – a fact-intensive

inquiry that will be disputed and is not suitable for summary judgment.  But when viewed as damages stemming from a breach of the preliminary Teaming Agreement, Flatiron's alleged $263.5 million in Project losses are not direct damages, but at most consequential damages as a matter of law, and therefore unrecoverable under the Teaming Agreement.  So even if Flatiron's claim for breach of the Teaming Agreement were not superseded by the Subcontract and waived, it would fail for lack of any cognizable damages.

The Court should therefore enter summary judgment on Flatiron's claim for breach of the Teaming Agreement for any or all of these three dispositive reasons, and confirm that Flatiron's one cognizable claim that may go to trial is for breach of the liability-capped Subcontract.

The Court should also rule that Flatiron's decision to bring two legally incognizable claims in an effort to get around the Subcontract's liability cap triggers the Subcontract's fee-shifting provision.

## V.    ARGUMENT

**A.    The parties agreed that Flatiron's sole remedy is through a claim for breach of the Subcontract, which is subject to an enforceable liability limit.**

As the Court has correctly indicated in prior orders, the Subcontract's liability cap is enforceable under Colorado law.  As the Tenth Circuit has summarized Colorado law:

> parties to a contract must be able to confidently allocate risks and costs during their bargaining without fear that unanticipated liability may arise in the future, effectively negating the parties' efforts to build these cost considerations into the contract.

*SOLIDFX, LLC v. Jeppesen Sanderson, Inc.*, 841 F.3d 827, 837 (10th Cir. 2016), quoting *Vanderbeek v. Vernon Corp.*, 50 P.3d 866, 871 (Colo. 2002).  *See also*, *e.g.*, *Constable v. Northglenn, LLC*, 248 P.3d 714, 718 (Colo. 2011) ("Strong policy considerations favoring freedom of contract generally permit business owners to allocate risk amongst themselves as they see fit.") (collecting cases).

This Court has recognized that the *SOLIDFX* case contains the most apposite analysis of Colorado law, and therefore controls the legal issue of the enforceability of the Subcontract's liability cap.  *See* ECF No. 169 (applying *SOLIDFX* to reject Flatiron's willful and wanton breach argument).[5]  *Accord Johnson Nathan Strohe, P.C. v. MEP Engineering, Inc.*, 501 P.3d 826 (Colo. App. 2021).[6]

### 1.    The Subcontract is not ambiguous, and its liability cap applies.

The only reason this Court did not apply *SOLIDFX* to enforce the Subcontract's liability cap on ATS's early summary judgment motion was its concern that the Subcontract might harbor some ambiguity in its definition of "Design Services" that

---

[5] In addition to being apposite and therefore controlling, *SOLIDFX* is also controlling here under the Tenth Circuit's rule that *stare decisis* applies to its *Erie*-predictions.  *See Wankier v. Crown Equipment Corp.,* 353 F.3d 862, 866 (10th Cir. 2003).  *SOLIDFX* therefore applies as controlling law unless the Colorado Supreme Court were to announce a different rule.

[6] Shortly after this Court applied *SOLIDFX* to reject Flatiron's willful and wanton argument, the Colorado Court of Appeals adopted the exact same legal analysis in a factually apposite context in *Johnson Nathan Strohe.*  There, the Colorado court distinguished the *Sonitrol* line of cases addressing exculpatory clauses for nominal consideration from proper limitation of liability provisions negotiated by sophisticated parties, which are enforceable per the analysis of *SOLIDFX* and the Colorado law on which it is based.  *Id.* at 831-33.  (The Court of Appeals also found the liability limitation ambiguous for reasons unique to that case, and not relevant here; but confirmed that the ambiguity did not render the liability limitation unenforceable.  *Id.* at 832.)

might in turn allow Flatiron to bring a claim under the Teaming Agreement, which has no liability cap.

Specifically, the Subcontract's definition of "Design Services" includes the preliminary design work that ATS did under the Teaming Agreement, incorporating it into the Subcontract.  (ECF No. 168 at 10-11).  That language turns any claim for breach of the Teaming Agreement into a claim for breach of the liability-capped Subcontract.  *Id.*  However, the Court also observed that this definition appeared to conflict with language in the Subcontract's Design Assumptions section, which states that "Pre-Award Services are not included in the Base Design Fee or scope of work."  *Id.* at 11.  The Court expressed concern that this apparent conflict might render the Subcontract ambiguous, allowing for the possibility that Flatiron could assert a cognizable claim for breach of the (uncapped) Teaming Agreement even though the parties went forward with the Project under the liability-capped and superseding Subcontract.  *Id.*

The Court is familiar with Colorado law on contractual ambiguity.  A contract is ambiguous if it is fairly susceptible to more than one interpretation.  *Stroh Ranch Dev., LLC v. Cherry Creek S. Metro. Dist. No. 2*, 935 F.Supp.2d 1052, 1060 (D. Colo. 2013) (citations omitted).  To determine whether ambiguity exists, the court considers the contract language with "reference to all contractual provisions and the nature of the transaction which forms the contract's subject matter."  *Id.*

83117927.4

A closer examination of the Subcontract's plain language, viewed in context of all the Subcontract's provisions, subject matter, and nature of the transaction, drafting history, and industry practice, confirms that there is no ambiguity.

The Subcontract is for ATS's "Design Services" on the Project.  *See* Subcontract (ECF No. 37-2 at 2, contract title).  As noted, the Subcontract's definition of "Design Services" includes the preliminary design work ATS performed under the Teaming Agreement.  *Id.* at 16 § 1.1 ("Design Services includes any additional services provided by Designer pursuant to any 'Teaming Agreement' or similar agreement between the Parties regarding the Project.").  The Subcontract also supersedes the Teaming Agreement (which terminates with execution of the Subcontract), and limits Flatiron's remedies to claims under the liability-capped Subcontract.  *Id.* (ECF No. 37-3 at 33 (merger clause), ECF No. 37-2 at 7 (order of precedence provision)).  Thus, once the parties sign the Subcontract, if Flatiron determines that ATS breached the Teaming Agreement, Flatiron can no longer sue for breach of the Teaming Agreement but may sue for breach of the liability-capped Subcontract only.

The language in the Subcontract's "Design Assumptions" section which the Court previously focused on – "Pre-Award Services are not included in the Base Design Fee or scope of work" – does not change this intended result.  There is nothing inconsistent or ambiguous about including the preliminary design work performed under the Teaming Agreement in the Subcontract's definition "Design Services," while at the same time excluding the <u>cost</u> of that preliminary design work from the Lump Sum Base Design Fee of $9,058,493.65.  The Subcontract simply notes that Flatiron had already

83117927.4

paid the $729,661.35 of preliminary design work separately, even though (by definition) that preliminary design work is part of the Design Services that are the subject of the liability-capped Subcontract.

Likewise, there is nothing inconsistent or ambiguous about excluding the already performed preliminary design work from ATS's "scope of work" under the Subcontract. The Subcontract can define a universe of tasks as the "Design Services" covered by the liability-capped Subcontract, and at the same time distinguish between the subset of Design Services that have been performed already (like the preliminary design work under the Teaming Agreement) from the subset of Design Services yet to be performed – the "scope of work" under the Subcontract.

Thus properly understood, the Subcontract's language admits no ambiguity.  The language that gave the Court pause simply means that Flatiron had already separately paid for the preliminary design work pursuant to the Teaming Agreement, and ATS doesn't have to redo it.  But, per this plain language, Flatiron agreed that if the parties entered into the Subcontract (as they did) then all of ATS's design work (including the preliminary design work performed under the Teaming Agreement) would be treated as "Design Services" under the Subcontract and subject to the Subcontract's liability cap.

2.   **Construing both contracts in their entirety confirms that the preliminary design work is subject to the Subcontract's liability cap.**

While the Court can stop at this plain language analysis, examining both the Teaming Agreement and Subcontract in their entirety and together forcefully confirms the above plain language analysis.

Under Colorado law, the purpose of contract interpretation is to ascertain the intent of the parties as expressed in their contract. *Stroh Ranch*, 935 F.Supp.2d at 1059 (citations omitted). When construing a contract, the court does not "view clauses or phrases in isolation," but rather must "examine the contract as a whole and attempt to determine the intent by reference to all of the contract's terms and provisions." *Id.* at 1060 (citations omitted).

As set forth above, per its plain and unambiguous language the Subcontract makes the preliminary design work part of the Subcontract, and subject to the Subcontract's liability limitations.

Any possible doubt is resolved by the Subcontract's merger clause, which confirms that the Subcontract is now the parties' "entire agreement" which "supersedes all prior … agreements." *See, e.g., Nelson v. Elway*, 908 P.2d 102, 107 (Colo. 1995) (enforcing similar merger clause to reject a claim for breach of an alleged earlier contract); *Breckenridge Co. v. Swales Management Corp.*, 517 P.2d 476, 477-48 (Colo. App. 1973) (where party "entered into a contract which specifically stated that it superseded the prior contract," second contract controlled) *rev'd in part on other grounds*, 522 P.2d 737, 739 (Colo. 1974).

Merger clauses work because basic principles of contract law allow parties to alter the terms of their agreements, so that the latest agreement controls. *See id.*; 17A Am.Jur.2d Contracts § 489, at 469-70 ("Parties may modify the terms of their agreement and if the terms of a subsequent agreement contradict the earlier agreement, the terms of the later agreement prevail, and supersede those of the earlier contract. Where two

contracts are made at different times, but where the [latter] is not intended to entirely supersede the first, but only to modify it in certain particulars, the two are to be construed as parts of one contract, the later superseding the earlier one wherever it is inconsistent."); *In re Est. of Gadash*, 413 P.3d 272, 278 (Colo. App. 2017) (A "binding integrated agreement discharges" inconsistent prior agreements"), quoting Restatement (Second) of Contracts § 215.

Thus, when the parties signed the Subcontract, the Teaming Agreement terminated (ECF No. 37-1 at 3, ¶ 4(vi)); and while the Teaming Agreement's uncapped liability limitation would survive its termination in any other termination event (*id.* at ¶ 4), both the Teaming Agreement and the Subcontract provide that when the Teaming Agreement terminates because the parties enter into the Subcontract, the superseding Subcontract's terms (including its liability cap) control.  (ECF No. 37-1 at 3 and 7, ¶¶ 4 and 20; ECF No. 37-3 at 33 ¶ 16.10 (merger clause)).  Thus, if there were any conflict between the two contracts (which there is not), the Subcontract would control under the merger clause.  *Nelson*, *supra*.

If that were not enough, the Subcontract's "Order of Precedence" provision further confirms that the Subcontract controls here.  It provides: "In the event of a conflict between the Teaming Agreement and this Subcontract, this Subcontract shall prevail...."  (ECF No. 37-2 at 7).[7]  Both contracts have provisions addressing limitations

---

[7] The Subcontract's order of precedence provision carves out one narrow area in which the Teaming Agreement's terms are effectively incorporated into the Subcontract and control: "In the event of a conflict between the Teaming Agreement and this Subcontract, this Subcontract shall prevail, **except with respect to the calculation of pre-bid compensation in which case the Teaming Agreement shall prevail**."  (ECF

on liability.  The Teaming Agreement's limitation of liability provision has no cap.  The superseding Subcontract's limitation of liability provision has a cap.  These two limitation of liability provisions would conflict, were that conflict not resolved by language in <u>both</u> contracts expressly stating that the once the parties sign the superseding Subcontract, its capped liability limit applies.  But if there were any doubt about which limitation of liability provision applies (which there is not), the order of precedence provision, like the merger clause, resolves this conflict in favor of the Subcontract.

Finally, there is the fact that the Teaming Agreement *itself* states that if the parties enter into the contemplated Subcontract (which they did), the Subcontract would contain a liability cap and would *supersede* the Teaming Agreement (as it does).  Most contractual disputes involving the effect of a merger clause involve a first agreement, followed by a second agreement that alters the first.  *E.g. Gadash*, *supra*.  Here, while the two contracts' liability limits conflict, the contracts themselves are actually in accord because the Teaming Agreement itself says that if the parties enter into the Subcontract then that Subcontract will supersede the Teaming Agreement.[8]  So even without the merger and order of precedence provisions, the Court would properly apply the Subcontract's capped liability limit because that is what the plain language of <u>both</u> contracts requires.

---

No. 37-2 at 7) (emphasis added).  The calculation of ATS's compensation for pre-bid work performed under the Teaming Agreement is not at issue in this action.

[8] This analysis might be a tad more involved if the Subcontract had "incorporated" consistent terms from the Teaming Agreement, but the parties' decision to have the Subcontract <u>supersede</u> the Teaming Agreement obviates that analysis.

In sum, the parties wrote *four* consistent provisions into their contracts to ensure that once the Project started, the liability-capped Subcontract would supersede the Teaming Agreement and limit ATS's potential liability:

- First, there is the plain and unambiguous language that makes the preliminary design work performed under the Teaming Agreement part of the Subcontract, and (as intended) subject to its liability cap.

- Next, there is the Subcontract's merger clause, which extinguishes the Teaming Agreement's uncapped liability limitation in favor of the Subcontract's capped liability limitation, per *Nelson*.

- Third, there is the order of precedence clause, which further and expressly confirms that as between the Teaming Agreement's uncapped liability limit and the Subcontract's capped liability limit, the Subcontract's limit controls.

- Finally, there is fact that the Subcontract's supersession and liability cap are *express terms of the Teaming Agreement itself.*  The parties thus stated how they intended from the outset, even while operating under the Teaming Agreement, that the future Subcontract would control over the existing Teaming Agreement if the Subcontract was entered into (which it was).

Because the relevant language about preliminary design work being incorporated into the Subcontract's Design Services is unambiguous, the Court does not need to invoke the merger, order of precedence, or supersession provisions in the contracts. But when the Court steps back and looks at both contracts from a higher vantage point, Flatiron's legal position is defeated by each of these three express contract provisions.

### 3.   Extrinsic evidence confirms that the parties intended the Subcontract's liability cap to apply.

Colorado law allows the Court to provisionally consider extrinsic evidence of the parties' negotiations to illuminate the parties' intent and thereby determine whether the contract is or is not ambiguous.  *Lazy Dog Ranch v. Telluray Ranch Corp.,* 965 P.2d 1229, 1235-36 (Colo. 1998); *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Fed. Ins. Co.,*

213 F.Supp.3d 1333, 1344 (D. Colo. 2016) (quoting *Lazy Dog Ranch* for principle that "courts frequently admit extrinsic evidence provisionally, not for the purpose of 'varying or contradicting' the writing, but to determine the fact that it is indeed unambiguous.").

The Court may also consider established industry customs and standards to inform its understanding of the parties' contracts and clarify any ambiguity.  And even if a contract term is not ambiguous, evidence of industry standards may be used to demonstrate the parties' intent.  *Atmel Corp. v. Vitesse Semiconductor Corp.*, 30 P.3d 789, 792-93 (Colo.App. 2001), *abrogated on other grounds by Ingold v. AIMCO/Bluffs, L.L.C. Apartments*, 159 P.3d 116 (Colo. 2007), citing *USI Properties East, Inc. v. Simpson*, 938 P.2d 168 (Colo. 1997) and *Benham v. Pryke*, 744 P.2d 67 (Colo. 1987).

If the Court determines that there is ambiguity, the Court may properly use the extrinsic evidence to resolve the ambiguity. *Stroh Ranch*, 935 F.Supp.2d at 1060.

As explained above, there is no ambiguity in the contracts – the plain language of the Subcontract controls.  But if the Court determines that there is an ambiguity, then that ambiguity can be resolved by reference to industry practices and the parties' drafting history, including how the parties expressly changed the stock language in their teaming agreement template to ensure that the Subcontract would supersede the Teaming Agreement and its liability cap would apply to <u>all</u> of ATS's design work (including the preliminary design work performed under the Teaming Agreement).

### a.  Design professionals require liability caps as a condition of working on large projects.

Per established practice in the construction industry, design professionals generally require caps on their potential liability as a condition of working on large

projects with large potential downside risk.  The industry-wide movement in this direction began in earnest with the case of *Perini Corp. v. Greate Bay Hotel and Casino*, 610 A.2d 364 (N.J. 1992).  Perini, a contractor, signed a $600,000 contract to serve as construction manager (not general contractor) for a $17 million renovation of the Sands Hotel & Casino in Atlantic City, New Jersey.  610 A.2d at 367.  The project went south. The casino terminated Perini as construction manager.  Perini sued for its contract balance, and the casino counterclaimed for its losses.  Arbitrators awarded the casino $14.5 million, which the New Jersey courts affirmed.  *Id.* at 368-69.  Perini thus had to pay $14.5 million in damages on a $600,000 contract.  *Id.*

The *Perini* case led to substantial changes in construction professionals' contracting practices.  The American Institute of Architects and Associated General Contractors of America changed their standard contract forms to more rationally allocate the massive risks that large-scale construction projects entail, in part by including a mutual waiver of consequential damages.  *See*, *e.g.*, Wheatley and Canchéa, *Navigating the Labyrinth of Consequential Damages in the Construction Industry*, 33 Construction Lawyer no. 6 (ABA, Summer 2013) (discussing institutionalization of consequential damage waivers in the wake of *Perini*); Ernstrom and Dehmlera, *Mutual Waiver of Consequential Damages: The Contractor's Perspective*, 18 Construction Lawyer no. 4 (ABA, January 1998).

But a mutual waiver of consequential damages is often not enough to entice design professionals to sign on to big projects.  Designers will typically require a <u>defined liability cap</u> as a condition of working on any large project where the potential downside

liability exceeds the contract price.  *See* Callahan, Ray and Popovsky, *Architect and Engineer Liability: Claims Against Design Professionals*, § 15.03 on "Contractual Limitation of Liability" (Aspen Publishers 2021).

As the Aspen treatise explains, for owners and general contractors, big projects can bring commensurate financial rewards that justify such large assumptions of risk. But in most cases, "the design professional's anticipated fees are much less than either the owner's expected long-term benefit or the contractor's projected profit."  *Id.*  Thus, to "entice the design professional to participate, the owner will either need to increase the expected professional fee, or decrease the perceived risk."  *Id.*  Limitation of liability clauses do this by "shifting some of the design professional's risk to the owner or contractor, who may be more willing to proceed even with the increased risk, given their different levels of expected benefit."  *Id.* and section D, collecting cases where courts have enforced liability caps for design professionals in big construction cases.

Thus, when Flatiron and AECOM first teamed up to bid on the C-470 Project in 2015, it was against this background: while a general contractor like Flatiron might be willing to accept big risks for a commensurate payday, no rational design professional like ATS would risk being saddled with hundreds of millions of dollars in potential downside risk in order to pursue a contract worth about $10 million (let alone a contract worth an order of magnitude less, like the Teaming Agreement).  *Id.*  That is why the parties expressly agreed that they would begin with a pre-bid Teaming Agreement to enable Flatiron to submit a bid for the Project; but if Flatiron won the bid and ATS was to serve as the Project's designer (*i.e.* if the potential for big downside risk materialized),

then the parties would enter into a superseding Subcontract that capped ATS's potential liability.

> ### b. The contracts' drafting histories further confirm that the Subcontract's liability cap applies.

In addition to this established industry practice, the drafting history of the contracts confirms the parties' intent for the Subcontract's liability cap to apply here.

As set forth above, the parties started with Flatiron's stock teaming agreement template.  The parties revised the stock language to include the future Subcontract's liability cap in the Teaming Agreement itself.  **Exhibit 6**, Armstrong deposition exhibit 475 at ATS01706016 (showing markup).  The parties also struck the stock language that the Teaming Agreement would be "incorporated" into the Subcontract in favor of the Teaming Agreement being "superseded" by the Subcontract, so that if ATS went forward as the Project's designer under the Subcontract (which it did), the Subcontract's liability cap would unquestionably apply.  **Exhibit 5**, Armstrong deposition exhibit 485 at ATS00787332, ¶ 4 (redline document showing strikeout and insertion).

Flatiron's own internal PowerPoint prepared during the pre-bid phase further confirms that Flatiron understood and accepted this liability limitation.  **Exhibit 9** at 15, FA0002184308 (describing the terms of Flatiron's "Designer Teaming Agreement" with ATS as including "Overall limitation of liability capped at 100% of post-award design fee."

So while the Court need not resort to it, the relevant extrinsic evidence further confirms that parties fully intended for the Subcontract's liability cap to apply here.

> ### 4.    Flatiron's anticipated arguments to the contrary lack merit.

83117927.4

### a. Intent for the Subcontract to supersede and control is not a question of fact.

Flatiron might try to challenge this inevitable result by citing cases describing supersession as a question of fact.  But that is because in most cases, the parties' intent to have the second contract supersede the first contract is not stated explicitly (and repeatedly), as it is here.  Rather, most cases addressing whether a later contract supersedes an earlier one deal with *implicit* supersession, where the intent to supersede must be divined from the nature and structure of the two contracts.  *E.g. McKay v. Fleming*, 134 P. 159, 161-62 (Colo. App. 1913) (quoting authorities regarding conditions under which "[o]ne written contract complete in itself will be conclusively *presumed* to supersede another one made prior thereto in relation to the same subject-matter") (emphasis added).

Determining whether the parties intended a supersession may well present a question of fact where the supersession is not explicitly stated, but must be divined in this manner.  *See Gadash*, 413 P.3d at 278 (contrasting implicit and explicit supersession), citing *Hill v. Ricoh Americas Corp.*, 603 F.3d 766, 778 (10th Cir. 2010) (holding under Kansas law that a later agreement did not supersede a prior agreement where the former did "not *explicitly* state that the prior agreement was nullified," and supersession was not implicit either) (emphasis added, cleaned up).

But where, as here, supersession is explicitly stated in a clear merger clause, supersession is not a question of fact but operates as a matter of law.  *Nelson*, *supra*. Indeed, the Subcontract's supersession of the Teaming Agreement is <u>triply</u> explicit: the

Subcontract says so categorically (per the merger clause), specifically (per the order of precedence provision); and the Teaming Agreement says so too.

### b.  The Teaming Agreement's survival provision is not implicated.

Flatiron might also try to sow confusion by citing to the Teaming Agreement's provision that its (uncapped) liability limit survives its termination:

> Upon any such termination, this Contractor/Designer Teaming Agreement shall have no further effect; provided, however, those provisions which, by their nature are intended to survive termination, including Section 10 (non-disclosure/confidentiality), Section 12 (liability upon withdrawal), Section 15 (limitation on damages) and Section 17 (Procurement Integrity) shall specifically survive termination.

Teaming Agreement, (ECF No. 37-1 at 4 ¶ 4).  But while the Teaming Agreement's damage limitation (a mutual waiver of consequential damages) would naturally survive termination, in the specific event that the Teaming Agreement terminates because the parties enter into the Subcontract, the parties agreed that the Subcontract's broader liability limitation (consequential damages waiver plus specific liability caps) would supersede and apply.

The Teaming Agreement enumerates 11 scenarios under which it would terminate, including a breach by ATS – *e.g.* if ATS failed to deliver acceptable preliminary design work for Flatiron to use in its bid, in which case Flatiron might need to hire a new designer.  *See id.* at ¶ 4(i)-(x).  The Teaming Agreement then provides generally that upon "any such termination" all the usual surviving provisions (like limitation on damages) will survive.  However, the Teaming Agreement has a more specific provision that addresses what happens with liability limitations when the Teaming Agreement terminates because the parties enter into the superseding

Subcontract.  In that event, the Subcontract's <u>capped</u> liability limitation supersedes the Teaming Agreement's uncapped liability limitation.  *Id.* at 3 ¶ 4; 7 ¶ 20, second bullet.

Any internal tension within the Teaming Agreement regarding survival of the Teaming Agreement's liability provision would be governed by the canon of construction that "a more specific provision controls the effect of general provisions."  *Level 3 Commc'ns, LLC v. Liebert Corp.*, 535 F.3d 1146, 1154 (10th Cir. 2008), quoting *E–470 Pub. Highway Auth. v. Jagow*, 30 P.3d 798, 801 (Colo.App. 2001), *aff'd*, 49 P.3d 1151 (Colo. 2002).  Thus, if the Court were construing the Teaming Agreement by itself, without reference to the Subcontract, then the Teaming Agreement's liability limitation would survive in every termination situation *except* where the Teaming Agreement terminates because the parties enter into a Subcontract – in that situation the parties intended (in the Teaming Agreement itself) that a capped liability limitation would apply.

But the Court is not construing the Teaming Agreement by itself.  The parties followed through by entering into the superseding and liability-capped Subcontract.  So even if there were any question about what the parties intended in the Teaming Agreement regarding survival of liability limitations, the Subcontract's plain language, merger and order of precedence provisions all confirm that the Subcontract's capped liability limit applies.

In sum, no matter how the Court looks at the Teaming Agreement and Subcontract, it must conclude that the parties intended that once they signed the Subcontract, any claim by Flatiron for damages is governed by the superseding Subcontract and subject to its liability cap.  For all these dispositive legal reasons,

Flatiron is foreclosed from bringing a claim for breach of the Teaming Agreement, but may only assert a claim for breach of the Subcontract which is subject to the Subcontract's liability cap.

**B.**   **Flatiron waived any right to sue on the Teaming Agreement when it signed the Subcontract.**

There is another analytical avenue that leads to the same inevitable legal conclusion: the Court can also dismiss Flatiron's claim for breach of Teaming Agreement based on waiver.

Where, as here, a party is faced with a choice of signing a second contract that will expressly *or* implicitly supersede a first contract, the party must choose whether to stand on its rights under the first contract or accept the different set of rights in the second contract.  The party's decision to accept the second superseding contract constitutes a waiver of its rights under the first.

This common law principle was first developed in Colorado in *McKay v. Fleming*, 134 P. 159 (Colo. App. 1913).  Fleming contracted to buy land from McKay, but McKay only owned a half interest in the subject land, and the other owner would not sell at Fleming's price.  *Id.* at 159.  Fleming could have sued McKay for breach.  Instead, Fleming decided to buy the co-owner's half interest at a higher price, and then bought McKay's half interest in a second superseding contract.  *Id.*[9]  Fleming then sued McKay for the additional amount he had to pay, and won in the trial court.  *Id.* The Court of

_____

[9] The opinion does not discuss the terms of the two contracts in any useful detail, but provides an extensive discussion of the common law rules governing when a later contract *implicitly* supersedes an earlier contract, *id.* at 161-62, indicating the supersession there was implicit.

Appeals reversed, explaining how Fleming had a choice: "he could have rested upon his rights under the first contract" and sued McKay; or he "could have done what he did" (*i.e.* make a second superseding contract with McKay); but he could not make the second contract and then still sue on the first. *Id.* at 160. Fleming's decision to enter into the second contract constituted a "**waiver** of any suit for damages" under the first contract. *Id.* (emphasis added).

The Tenth Circuit applied *McKay*'s waiver analysis in *United States v. Brookridge Farm*, 111 F.2d 461 (10th Cir. 1940). There, a dairy farm entered into a 12-month contract with the federal government to supply milk to Fitsimmons Hospital. The government immediately canceled the contract, so the dairy farm mitigated by selling milk as best it could for three months, but did not sue for breach. Then the government put out for bid a milk supply contract for the remaining nine months, which the dairy farm bid on (at a lower price) and won. The dairy farm then sued for its lost expectation under the first contract, and won in the district court. *Id.* at 462. Applying the Colorado law of *McKay v. Fleming* under *Erie*, the Tenth Circuit reversed, holding that the second contract implicitly superseded the first contract and required the dairy farm to choose between standing on its rights under the first contract or accepting the terms of the second. *Id.* at 465.

Most recently, in *Metropolitan State Faculty Federation, American Federation of Teachers Local 2042 v. State*, 514 P.2d 784 (Colo. App. 1973), the Colorado Court of Appeals applied the rule of *McKay* in holding that faculty who signed a second superseding contract waived their rights under an earlier contract. There, Metro State

hired assistant professors for the 1970 academic year under a contract providing that if the college hired the professors for the summer as well, they would be paid 28% of their regular academic year pay. *Id.* at 785. Because the General Assembly did not fund Metro State as anticipated, Metro State offered the professors a summer contract for 1971 at 25% of their regular academic year pay, which expressly waived any right to the previously contemplated 28% pay. *Id.* The professors signed the summer contract, but nonetheless sued for the 3% pay difference. *Id.* They won in the trial court. *Id.* Applying *McKay v. Fleming*, the Court of Appeals reversed, holding that by accepting the summer contract, the professors "**waived** any rights they might have had under the previous agreement." *Id.* at 786 (emphasis added).[10]

ATS develops the details of these waiver cases because Flatiron's waiver here is even more palpable. As set forth above, Flatiron identified alleged problems in ATS's preliminary design work under the Teaming Agreement, per the Armstrong and Bright emails. **Exhibits 10** and **11**. Flatiron also knew that if it went forward with ATS as Project designer under the proposed Subcontract, that Subcontract would expressly supersede the Teaming Agreement and cap ATS's potential liability at $10 million, plus another $10 million in insurance proceeds. Flatiron had a choice: it could stand on its

---

[10] The rule of *McKay* is a specific application of the general concept of waiver – "the intentional relinquishment of a known right." *Vanderbeek v. Vernon Corp.*, 25 P.3d 1242, 1248 (Colo. App. 2000), *aff'd* 50 P.3d 866 (Colo. 2002). *McKay* and its progeny describe one particular way a party can waive its contractual rights: by entering into a second contract that supersedes the first contract (implicitly per *McKay* and *Brookridge*, or explicitly per *Metro State*), and thereby extinguishes the party's right to sue under the first contract.

rights under the Teaming Agreement, *e.g.* by changing designers and suing ATS for the cost of doing so under the Teaming Agreement (if warranted); or Flatiron could sign the Subcontract in which case it would *waive* its right to sue under the Teaming Agreement. By signing the Subcontract, Flatiron expressly waived any right to sue on the Teaming Agreement. *McKay*, *supra*; *Brookridge*, *supra*; *Metro State*, *supra*.[11]

**C.    The damages Flatiron claims are, at best, consequential as a matter of law vis-à-vis the Teaming Agreement.**

There is yet another legal route to the same inevitable result: the Court can rule that the $263.5 million in damages that Flatiron seeks here are at best consequential damages vis-à-vis the Teaming Agreement, and hence unrecoverable in any claim for breach of the Teaming Agreement as a matter of law.

Under this analytical route, the Court can presume *arguendo* that Flatiron somehow retains the right to sue under the Teaming Agreement, despite the clear supersession and waiver developed above. But while the Teaming Agreement has no liability cap, it has an important liability <u>limitation</u>: a mutual waiver of consequential damages. (ECF No. 37-1 at 6 ¶ 15 ("In no event shall any Party be liable to the others for any indirect, special or consequential damages….")).

The Tenth Circuit's controlling decision in *SOLIDFX* explains the core difference between direct and consequential damages under Colorado law:

---

[11] Flatiron used its concerns about ATS's preliminary design work under the Teaming Agreement to bargain down ATS's Design Fee for the Subcontract. **Exhibit 11**, March 18, 2016, Bright email. That further confirms the waiver, and would support an estoppel – although ATS need not and therefore does not rely on that equitable doctrine here. There is no need to seek equitable relief when so many legal avenues lead to the same correct result.

> Direct damages refer to those which the party lost from the contract itself—
> in other words, the benefit of the bargain—while consequential damages
> refer to economic harm beyond the immediate scope of the contract.

*SOLIDFX*, 841 F.3d at 839, quoting *Penncro Assoc., Inc. v. Sprint Spectrum, L.P.*, 499

F.3d 1151, 1156 (10th Cir. 2007).  *See also Thomas v. Cummins Engine Co., Inc.*, No.

13-CV-2587-WJM-KMT, 2015 WL 708484, at *4 (D. Colo. Feb. 18, 2015) (citing

*Penncro* in holding, at summary judgment stage, that costs of purchasing, financing and

decorating RV were not even consequential damages caused by the RV's bad diesel

engine).

    Colorado also follows the generally accepted principle that consequential

damages are those damages that "do not flow directly and immediately" from a breach.

*Johnson Nathan Strohe, P.C. v. MEP Engineering, Inc.*, 501 P.3d 826, 830 (Colo. App.

2021), quoting Black's Law Dictionary (11th ed. 2019); *Johnson v. Liberty Mut. Fire Ins.*

*Co.*, 653 F.Supp.2d 1133, 1141 (D. Colo. 2009) (same).

    And to be recoverable, consequential damages must also be foreseeable by both

parties at the time of the parties' contracting.  *SOLIDFX*, 841 F.3d at 838; *Cook v.*

*Jackson Nat. Life Ins. Co.*, 885 F.Supp. 221, 224 (D. Colo. 1995) ("In order for

consequential damages to be recoverable in a breach of contract case, the plaintiff must

establish the defendant had reason to foresee such damages at the time the contract

was made.") citing *Husband v. Colorado Mountain Cellars, Inc.*, 867 P.2d 57, 60 (Colo.

App. 1993).

    With these definitions in mind, consider whether the $263.5 million in Project

losses that Flatiron seeks to recover are direct benefit-of-the-bargain damages that

Flatiron incurred under the $729,000 Teaming Agreement itself, or constitute economic harm beyond the immediate scope of the Teaming Agreement.

The purpose of the Teaming Agreement was to allow ATS to do just enough preliminary design work to enable Flatiron to formulate and submit a bid on the Project. *See* Teaming Agreement (ECF No. 37-1 at 2-3, recitals and agreement ¶¶ 1 and 5).  If ATS had quit, requiring Flatiron to spend money to hire a new designer to finish or redo ATS's preliminary design work double quick, these cover costs would be direct benefit-of-the-bargain damages. Similarly, if ATS's preliminary design work was accepted by Flatiron but rejected by CDOT for not meeting the bid specifications, Flatiron would have a cognizable claim under the Teaming Agreement for proportional refund of the unusable preliminary design work.  Indeed, the Teaming Agreement identifies this specific scenario as a cognizable claim.  (ECF No. 37-1 at 4, ¶ 8).  *That* is a perfect illustration of the sort of direct damages that Flatiron might seek for breach of the Teaming Agreement (or breach of the Subcontract, once the Teaming Agreement is superseded by the Subcontract).

Flatiron's Project losses, by contrast, cannot be direct damages under the Teaming Agreement as a matter of law because such losses could not occur under just the Teaming Agreement – Flatiron had to undertake the Project in order to rack up <u>any</u> Project losses (let alone the extraordinary $263.5 million in Project losses that Flatiron seeks); and to undertake the Project with ATS as designer Flatiron had to enter into the superseding and liability-capped Subcontract.

Similarly, Flatiron's $263.5 million losses did not flow *directly* and *immediately* from the Teaming Agreement.  Flatiron takes the position that all these losses resulted from ATS's breach of the standard of care in the preliminary work it did under Teaming Agreement.  **Exhibit 12**, C2G Expert Report at 8; **Exhibit 13**, February 11, 2022, Status Conference Transcript at 17:2-18:12, 24:2-14; **Exhibit 14**, Flatiron's Expert Kenneth O'Connell deposition at 64-90.  Flatiron was aware of these supposed breaches before signing the Subcontract, per Keith Armstrong's and Andy Bright's internal emails about "short comings" in ATS's preliminary design work.  **Exhibits 10** and **11**.  Imagine if instead of circulating these concerns internally, Flatiron sent those emails to ATS along with a notice of breach and demand for $263.5 million.  Such a demand would be properly rejected as absurd because Flatiron had not yet incurred those losses.  In fact, at that time, Flatiron had incurred no losses. These losses did not flow directly and immediately from the supposed breach of the Teaming Agreement, as required to be cognizable direct damages rather than barred consequential damages.[12]

Most or perhaps even all of Flatiron's claimed $263.5 million of Project losses are consequential damages under the Subcontract as well – but that determination requires

---

[12] Indeed, not only were the losses not benefit-of-the-bargain damages, or direct and immediate (which makes them at best consequential and barred) – the losses don't even make it to consequential status because they were not foreseeable at the time Flatiron and ATS entered into the Teaming Agreement.  That is because ATS could cause Project losses only if it went to work on the Project; and that could only occur if Flatiron signed the superseding Subcontract with its liability cap.  There is simply no reality-based way that Flatiron's claimed $263.5 million in losses could possibly flow directly and immediately from ATS's preliminary design work under the Teaming Agreement – the liability-capped Subcontract *has* to intervene to make this timeline possible.

83117927.4

full development of the extraordinarily complex details of the Project's design and construction under the Subcontract: the schedule, the construction work, the delays, etc.  ATS will therefore address the consequential nature of these claimed damages vis-à-vis the Subcontract at trial, or perhaps in an F.R.E. 702 motion.  But when considered vis-à-vis the Teaming Agreement, Flatiron's claimed $263.5 million in Project losses are consequential damages as a matter of law – if they can even make it that far.  *See SOLIDFX*, 841 F.3d at 838 (holding that the "the lost profits alleged by SOLIDFX are consequential damages **as a matter of law**.") (emphasis added).

Since cognizable damages are an element of a breach of contract claim, *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992), the Court can rule at the summary judgment stage that Flatiron's claim to recover Project losses as a breach of the Teaming Agreement fails as a matter of law.  *SOLIDFX*, *supra*; *Energy Drilling, LLC v. Overland Res., LLC*, Civ. Act. No. 12-cv-02882, 2015 WL 1258828-PAB–MJW, *2-4 (D. Colo. Mar. 17, 2015) (dismissing counterclaims as barred by the contract's consequential damages waiver).[13]

---

[13] *Energy Drilling* has a similar fact pattern and relevant disposition.  There, an oil drilling contractor sued the oil and gas developer for payment, and the developer counterclaimed for all of its losses incurred on the project.  *Id.* at *1.  In addition to dismissing the developer's negligence claim under the economic loss rule, the court also dismissed the contract claim as seeking damages that were consequential as a matter of law and waived under the contract.  *Id.* at *4-5.

Thus, even presuming *arguendo* that Flatiron could seek to recover its $263.5 million in Project losses as a breach of the superseded Teaming Agreement, that claim would have $0 cognizable damages and be ripe for summary judgment.[14]

### D.      Flatiron must pay ATS's fees.

As discussed above, summary judgment is useful to dispose of discrete claims and thereby narrow and speed up litigation.  *In re San Luis & Rio Grande R.R., Inc.*, 634 B.R. at 613.  Eliminating Flatiron's legally incognizable claim for breach of the Teaming Agreement is precisely what Rule 56 is for.

Summary judgment also permits the Court to "decid[e] important but discrete legal issues" that impact the litigation.  *Id.*  One such issue here is the application of the Subcontract's fee-shifting provision, which the Court can apply if it dismisses Flatiron's claim under the Teaming Agreement, as requested.

The Subcontract has an unusual but enforceable (and here very apropos) fee shifting provision: a party that "prevails on <u>less than half the claims it makes</u>" pays the other side's fees.  (ECF No. 37-2 at 7, ECF No. 37-3 at 31 ¶ 10.2).

Flatiron has (and has only ever had) one legally cognizable claim: breach of the liability-capped Subcontract.  In an effort to avoid that liability limitation, Flatiron brought two additional but incognizable claims: negligent misrepresentation, and breach of the Teaming Agreement.  The Court has already dismissed the negligent misrepresentation

---

[14] The Court may have anticipated this analysis when it denied ATS's early summary judgment motion: "Although the Court will deny AECOM's Motion, the Court will hold Flatiron to its representation that it is not seeking consequential damages." (ECF No. 168 at 12 n.5).

claim.  (ECF No. 97).  Eliminating the incognizable claim for breach of the Teaming Agreement now will mean that Flatiron can bat no better than .333 in this action, so the Subcontract's fee-shifting provision applies as a matter of law.

This provision is enforceable under Colorado law.  Colorado follows the familiar American Rule that parties bear their own legal fees absent a recognized exception, such as a contractual fee-shifting provision.  *E.g. Bernhard v. Farmers Ins. Exch.*, 915 P.2d 1285, 1287 (Colo. 1996).  And when called upon to interpret a contractual fee-shifting provision, Colorado courts apply ordinary contract interpretation principles: a fee-shifting clause is interpreted "according to the plain and ordinary meaning of its terms" and "in a common sense manner."  *Morris v. Belfor USA Grp., Inc.*, 201 P.3d 1253, 1259-60 (Colo. App. 2008) (cleaned up and citations omitted).  Indeed, Colorado courts are so committed to this plain language approach that they will enforce one-way fee shifting provisions where that is what the parties agreed to.  *Id.* (reversing the trial court for presuming that the one-way fee-shifting provision should automatically be treated as mutual).

The Subcontract's fee-shifting provision is perfectly clear in requiring Flatiron to pay ATS's fees if Flatiron loses on a majority of the claims it chooses to bring.  Entering summary judgment on Flatiron's incognizable claim for breach of the Teaming Agreement therefore triggers fee shifting.

And while this Court does not evaluate the wisdom of this rule, per *Morris*, it makes good sense – especially in a case like this.  Both fee-shifting predicates serve sensible and salutary purposes: the more familiar prevailing-party predicate warns

parties not to litigate if it looks like they might lose; and the instant win/loss ratio predicate warns parties not to waste and court's the opposing parties' time and resources by bringing incognizable claims.  In a massive and complex case like this, determining prevailing party status might be unusually difficult for a variety of reasons. The parties could thus sensibly decide, even before any dispute is joined, that the *get down to brass tacks* approach of the instant fee-shifting provision is a better choice.

Despite having agreed to this fee-shifting provision in the Subcontract, Flatiron brought three counterclaims in an effort to avoid the Subcontract's agreed-upon liability cap, when it knew or should have known that two of those claims were not cognizable and would be dismissed or disposed of by summary judgment.  And Flatiron did so despite knowing the likely result – that it would end up having to pay all of ATS's fees for this action.[15]

If the Court eliminates Flatiron's incognizable Teaming Agreement claim and rules that the fee-shifting provision applies as a result (as is logically compelled and entirely appropriate at this summary judgment stage), ATS will continue to defend against Flatiron's one cognizable claim for breach of the liability-capped Subcontract with resources that are reasonable, necessary, and commensurate to the magnitude and complexity of that claim.

---

[15] As the Court can appreciate from the relative size of the parties' claims, nearly all of ATS's legal work in this action is defending against Flatiron's $263.5 million counterclaims.  And in any event, the Court will not address the amounts of fees to be shifted until after trial.  Concerns about specifics and minutiae of the fee-shifting will not be joined until then.

## VI.   CONCLUSION

Per the plain language of their agreements, Flatiron and ATS intended that if they went forward on the Project, ATS's potential liability would be capped per the Subcontract's liability limits.  Flatiron's efforts to avoid that liability cap, including by suing on the Teaming Agreement, are without merit and fail as a matter of law.

WHEREFORE, Plaintiff ATS respectfully requests that the Court enter a partial summary judgment in its favor and against Defendant Flatiron which:

- Dismisses Flatiron's claim for breach of the Teaming Agreement;

- Rules that Flatiron's remaining claim for breach of the Subcontract is subject to the liability limitations contained in that agreement; and

- Rules that by virtue of having lost on two of the three claims it asserted, Flatiron must pay for ATS's attorney fees incurred in this litigation per the Subcontract's fee-shifting provision.

Respectfully submitted this 29th day of April 2022.

*s/ Bennett L. Cohen*
Bennett L. Cohen
Stephen D. Gurr
M. Adam Lewis
Cynthia Lowery-Graber
Carter McDonnell
Polsinelli PC
1401 Lawrence Street, Suite 2300
Denver, CO 80202
Phone: (303) 572-9300
Email: sgurr@polsinelli.com
        adam.lewis@polsinelli.com
        clowery-graber@polsinelli.com
        cmcdonnell@polsinelli.com
        bcohen@polsinelli.com

*Attorneys for Plaintiff/Counterclaim Defendant*
*AECOM Technical Services, Inc.*

## CERTIFICATE OF SERVICE

      The undersigned hereby certifies that on April 29, 2022, a true and correct copy of the foregoing was filed with the Clerk of Court using the CM/ECF system which will send notification of such filing on the following:

Buck Beltzer
Bret Gunnell
Laurie Choi
Michael Zehner
Beltzer Bangert & Gunnell LLP
5420 South Quebec Street, Suite 103
Greenwood Village, CO 80111
buck@bbglaw.com
bret@bbglaw.com
lchoi@bbglaw.com
mzehner@bbglaw.com

Brian L. Schwalb
David L. Feinberg
Katherine Wright Morrone
Venable LLP
600 Massachusetts Ave. NW
Washington, DC 20001
blschwalb@venable.com
dlfeinberg@venable.com
kwmorrone@venable.com

_s/ Bennett L. Cohen_____

83117927.4