**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:19-cv-02811-WJM-KLM

AECOM TECHNICAL SERVICES, INC.,

       Plaintiff/Counterclaim Defendant,

v.

FLATIRON | AECOM, LLC,

       Defendant/Counterclaim Plaintiff.

---

**FLATIRON | AECOM, LLC'S OPPOSITION TO
AECOM TECHNICAL SERVICES, INC'S
AMENDED MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

Defendant/Counterclaim Plaintiff Flatiron | AECOM, LLC ("Flatiron") respectfully opposes the Amended Motion for Partial Summary Judgment (ECF 215) (the "Amended MSJ") submitted by Plaintiff/Counterclaim Defendant AECOM Technical Services, Inc. ("ATS") on April 29, 2022.

## **INTRODUCTION**

Well aware that the Teaming Agreement[1] would hold it fully responsible for the damages it caused, ATS declares the Teaming Agreement no longer exists and that all of ATS's design work is governed instead by the Subcontract, which ATS claims caps its liability at $20 million. This argument requires the Court to reverse its prior finding of facial ambiguity in denying ATS's prior Early Motion for Partial Summary Judgment (the "Early MSJ"). However, ATS does not (and cannot) establish the absence of disputed facts supporting this theory, nor can it show it is entitled to judgment as a matter of law. Accordingly, the Court should deny the Amended MSJ.

ATS's primary argument is that the language of the Teaming Agreement and Subcontract is "unambiguous," and that "[t]here is no ambiguity" that the parties intended the Subcontract to supersede or replace the Teaming Agreement. (ECF 215 at 14). But this Court has already rejected this argument and ruled the relevant contract language is "ambiguous on its face." (ECF 168 at 10). In denying the Early MSJ, the Court held:

> The conflicting interpretations of what the parties intended regarding the limitation of liability provisions and how the Teaming Agreement and the Subcontract would interact are factual questions that are ***not susceptible to resolution on an early motion for partial summary judgment***.

---

[1] Unless otherwise defined, all capitalized terms have the same meaning as in the Amended MSJ (ECF 215).

*Id.* at 11-12 (emphasis added). This time around, in its effort to show why the result should be different, ATS offers only evidence that is disjointed and disputed. Further, ATS ignores the extensive facts (which must be construed in Flatiron's favor on summary judgment) demonstrating the opposite conclusion—i.e., that the parties intended the Teaming Agreement and Subcontract to operate as two separately enforceable agreements, one governing ATS's pre-bid design work (the "Pre-Award Services"), and one governing ATS's post-bid design work (the "Post-Award Services").

Next, ATS argues without basis that Flatiron "waived" its right to enforce the Teaming Agreement "[b]y entering into the superseding Subcontract." (ECF 215 at 31-34). Essentially, ATS claims Flatiron *knew* ATS's Pre-Award Services were so inadequate they would result in hundreds of millions of dollars in damages; *knew* the Subcontract would replace the Teaming Agreement and limit its recovery to $20 million; and signed the Subcontract anyway. Flatiron disputes every one of these assertions, including in sworn deposition testimony, rendering summary judgment improper. In fact, Flatiron has alleged ATS misrepresented the adequacy of its services to Flatiron, and that Flatiron never would have agreed to limit ATS's liability under the Subcontract had it known the extent of ATS's failures. This, too, directly undercuts ATS's waiver theory.

Finally, ATS claims all damages Flatiron seeks for breach of the Teaming Agreement are barred by the consequential damages waiver therein. *Id.* at 34-39. But ATS mischaracterizes the nature of these damages, arguing they are consequential simply because they did not accrue until after execution of the Subcontract. ATS ignores that, regardless when the damages began to accrue, they were *caused* by ATS's breach of the Teaming Agreement. In basic terms, ATS's Pre-Award design omitted miles of

concrete barrier and drainage pipe, and thousands of square feet of overhead signage that were required for the Project. And because Flatiron relied on ATS's Pre-Award design, Flatiron's bid similarly did not include costs for the materials, labor, equipment, and time necessary to build those required elements. As a result, Flatiron locked itself into a price that came nowhere close to covering the actual costs of the scope of the work for the Project. These costs, in excess of Flatiron's bid amount, are direct damages as a matter of law.

In sum, ATS offers no new, undisputed evidence sufficient to meets its burden on summary judgment. Despite this, ATS also seeks an award of attorneys' fees and costs. ATS points to a fee-shifting provision in the Subcontract and misinterprets it to mean Flatiron must pay ATS's fees and costs based on a blind tally of wins and losses on individual causes of action—without regard to the substance of either party's case or the possibility a jury will hold ATS liable for all of Flatiron's damages. ATS makes no attempt to show there is no genuine issue of disputed fact regarding the proper interpretation of that provision. Indeed, ATS's interpretation of the fee-shifting provision is unsupported by the text and would lead to absurd results. The Court should instead adopt a more common-sense reading that penalizes only the party who initiates litigation and fails on the balance of the issues in its case as a whole. At minimum, this fee-shifting provision is ambiguous and ATS offers no extrinsic evidence to show its proposed interpretation is correct as a matter of law.

For these reasons, the Court should deny the Amended MSJ in its entirety.

**RESPONSE TO MOVANT'S STATEMENT OF MATERIAL FACTS[2]**

Flatiron hereby responds to ATS's statement of material facts ("SOMF") as follows:

1.     Admitted.

2.     Disputed. Flatiron admits it negotiated the Teaming Agreement with ATS, but denies the purpose of the Teaming Agreement was to "enable ATS to do enough preliminary design work" for Flatiron to estimate quantities and "submit a bid" for the Project. Instead, the purpose was to obligate ATS to provide design services that complied with the applicable standard of care and that were adequate for Flatiron to submit a proposal for the Project that would comply with the standards set forth in CDOT's RFP. (ECF 37-1 at 3 § 5).

3.     Disputed. Flatiron admits it typically begins teaming agreement negotiations with a template form. However, ATS's Exhibit 2 is an internal email circulated within Flatiron (sent from Flatiron Constructors, Inc. to AECOM, its joint venture partner). It was not sent to ATS. ATS's Exhibit 1 is an excerpt of Mr. Armstrong's testimony wherein he admits Flatiron started negotiations with the template, but when shown the document attached as Exhibit 2 to the Amended MSJ, he testified: "I'm not certain if this is the current [template] . . . . I would not say that's our standard template because our standard template does not reference any specific project." (ECF 215-1 at 5-6; Flatiron 30(b)(6) Dep. at 39:12-13, 40:8-11).

4.     Disputed. Flatiron admits ATS's Exhibit 2 contains the language quoted, but denies ATS's characterization of this document as "Flatiron's teaming agreement

---

[2] ATS's Statement of Material Facts includes several headings that contain neither facts nor citations that should be disregarded by the Court.

template" for the reasons stated in response to SOMF ¶ 3.

5.      Disputed. Flatiron admits ATS's Exhibit 2 includes a document titled "DDB Terms & Conditions Summary," but denies ATS's characterization of this document as "Flatiron's teaming agreement template" for the reasons stated in response to SOMF ¶ 3.

6.      Disputed. Flatiron admits the parties executed the November 9, 2015 Teaming Agreement, but denies ATS's characterization of the negotiations preceding execution. Any implication that Mr. Armstrong corroborates ATS's characterization of these negotiations is false and materially misleading. ATS cites portions of Mr. Armstrong's transcript (some of which is missing from ATS's attached exhibit) where he simply reads the words of documents into the record at the direction of ATS's counsel— he makes no representation regarding their meaning or significance. (ECF 215-1 at 17-24; Flatiron 30(b)(6) Dep. at 84:7-25, 109:1-115:9); **Ex. 1**, K. Armstrong Aff. ¶ 6. In fact, Mr. Armstrong also testified on Flatiron's behalf that Flatiron did not intend for the Teaming Agreement to be superseded by the Subcontract. **Ex. 2**, Flatiron 30(b)(6) Dep. at 86:5-10 ("The JV's intention has always been that we have two agreements and they cover two different periods of time with two different scopes of work. Prebid is governed by the Teaming Agreement. Post award or post bid is governed by the subcontract.").

7.      Disputed for the reasons stated in response to SOMF ¶ 3. Flatiron further disputes that the term sheet shows any intention to cap ATS's liability under the Teaming Agreement. The "terms" in the "term sheet" fall under a large bold and underlined header titled: "**POST AWARD PHASE**." This "Post Award Phase" was specific to work done after the Project was awarded (i.e., after completion of ATS's Pre-Award Services) and was governed by the terms of the Subcontract, not the Teaming Agreement. Section 20 of the

Teaming Agreement simply lays out certain terms that were to be negotiated for the Subcontract but were not applicable to the Pre-Award Services. (ECF 37-1 at 7 § 20); (ECF 101-1 at 5 ¶ 14); **Ex. 18**, J. Couture Aff. ¶ 4; **Ex. 1**, K. Armstrong Aff. ¶¶ 8-9.

8.      Disputed. Flatiron admits the quoted language appears in the Teaming Agreement, but denies ATS's assertion that this liability limitation was meant to apply to the Teaming Agreement itself for the reasons stated in response to SOMF ¶ 7. *See also* **Ex. 1**, K. Armstrong Aff. ¶¶ 8-10.

9.      Disputed. Flatiron admits the parties entered into the November 9, 2015 Teaming Agreement, but denies this occurred as a result of the negotiations as characterized by ATS in SOMF ¶¶ 2 through 8 for the reasons stated in response thereto.

10.      Disputed. ATS again misrepresents the cited testimony included in its Exhibit 1. Mr. Armstrong's testimony was regarding Paragraph 8 of the Teaming Agreement, not Paragraph 4. Paragraph 8 makes no mention of "termination." (ECF 215-1 at 14-16); **Ex. 2,** Flatiron 30(b)(6) Dep. at 66:21-68:9. In fact, the Teaming Agreement included several provisions that survived, even if the Teaming Agreement terminated. (ECF 37-1 at 3 § 4).

11.      Disputed. The parties agreed only to *negotiate* a Subcontract if Flatiron won the Project. (ECF 37-1 at 2 § 3). Further, the parties did not intend for the Subcontract to supersede the Teaming Agreement or to place any limit on ATS's liability for direct damages caused by ATS's Pre-Award Services. *Id.* at 6 § 15 (limiting only the parties' ability to seek consequential damages); **Ex. 2**, Flatiron 30(b)(6) Dep. at 86:5-10 ("The JV's intention has always been that we have two agreements and they cover two different periods of time with two different scopes of work. Prebid is governed by the Teaming

Agreement. Post award or post bid is governed by the subcontract.").

12.     Disputed. Flatiron's payment of $729,661.35 to ATS was for ATS's time and materials incurred in performing Pre-Award Services under the Teaming Agreement. (ECF 37-1 at 3 § 5).

13.     Disputed. The presentation ATS attaches as Exhibit 9 was not prepared by Flatiron to "summariz[e] the bid" as ATS claims. Instead, it was a presentation regarding the overall Project. **Ex. 3**, A. Bright Dep. at 87:21-22 ("It is a presentation of the project."); **Ex. 4**, K. Armstrong 9/8/21 Dep. at 75:21-76:5 ("It was for the executives to understand the project . . . and then to ultimately give the thumbs-up or say whether we could bid it or not bid it."); (ECF 101-1 at 5 ¶ 14) (explaining that the presentation identified "terms from both the Teaming Agreement and terms that were to be included in the Subcontract"); **Ex. 18**, J. Couture Aff. ¶ 4.

14.     Admitted.

15.     Disputed. ATS misrepresents the meaning of the referenced PowerPoint presentation. John Couture, Flatiron's primary drafter of both the Teaming Agreement and Subcontract, explained the content of the presentation as follows:

> The "Key Terms" on the page ATS identified were intended to cover terms from both the Teaming Agreement and terms that were to be included in the Subcontract. For anyone involved in the Project, it would be obvious that some of the terms included on that page were not meant for the pre-bid phase. Most notably, the "Overall limitation of liability capped at 100% of post-award design fee. LDs capped at 20%" referred to the limitation of liability that would be included in the Subcontract; it had nothing to do with the limitation of liability over work performed under the Teaming Agreement. This intent to include the "Overall limitation of liability" in the Subcontract is identified in Section 20 of the Teaming Agreement, which lays out certain terms that were to be included and/or negotiated further in the Subcontract. The terms in Section 20 of the Teaming Agreement do not apply to work performed under the Teaming Agreement itself.

7

(ECF 101-1 at 5 ¶ 14); **Ex. 18**, J. Couture Aff. ¶ 4.

16. Disputed. Flatiron admits Mr. Armstrong states he was disappointed with some of ATS's design efforts in the email ATS attaches as Exhibit 10, but he does not refer to these as "problem areas." Instead, the purpose of Mr. Armstrong's email was to note items for consideration by Flatiron Constructors, Inc. regarding future joint venture and teaming arrangements with AECOM generally. (ECF 215-10); **Ex. 1**, K. Armstrong Aff. ¶ 13.

17. Disputed. Flatiron admits only that the email ATS attaches as Exhibit 11 is an internal email sent by Andy Bright. Flatiron disputes ATS's characterization thereof. In his deposition, Mr. Bright testified this email was mere "venting" about being "frustrated" by working with ATS during the pre-award stage. **Ex. 3**, A. Bright Dep. at 146:16-147:1 ("[A]t the time, it could have been that I was frustrated. . . . You know, it appears that I'm venting . . . ."). Flatiron also disputes that Exhibit 11 shows Flatiron "knew" about ATS's extensive design failures prior to executing the Subcontract. To the contrary, Flatiron believed all issues that arose during the Pre-Award period were resolved prior to submission of the Proposal, and at no time was Flatiron aware ATS was in violation of the standard of care in the Teaming Agreement. *Id.* at 148:1 (A. "I believe that these [issues listed in Exhibit 11] were resolved."); **Ex. 2**, Flatiron 30(b)(6) Dep. at 221:5-6 ("[A]s I have tried to communicate, these issues got resolved prior to the bid going in."). Flatiron certainly was not aware at the time of bid that ATS's Pre-Award design omitted seven miles of concrete drainage pipe, over 200 drainage inlets, and more than six miles of concrete traffic barrier. *See infra* SADF ¶¶ 48-51, 77-78.

18. Admitted.

19.     Disputed. Flatiron admits it executed the Subcontract with ATS, under which ATS would be the designer for the Project. Flatiron further admits that, in the Teaming Agreement, the parties contemplated negotiating a Subcontract if Flatiron won the Project. To the extent this Paragraph implies any other conclusion, Flatiron disputes it and refers the Court to the Teaming Agreement and Subcontract for a full recitation of their terms. (*See generally* ECF 37-1, 37-2, 37-3, 37-4).

20.     Disputed. The Subcontract states ATS will provide "Design Services," which is a defined term under the Subcontract. (ECF 37-3 at 16 § 1.1).

21.     Disputed. Flatiron admits only that the quoted language appears in the Subcontract, and refers the Court to the Subcontract for the full and complete language. *Id.* Flatiron also disputes ATS's characterization of the quoted provision and the characterization of its Pre-Award Services as "preliminary" for the reasons stated in response to SOMF ¶ 2.

22.     Admitted.

23.     Admitted.

24.     Admitted.

25.     Flatiron responds to the following sub-parts of paragraph 25 as follows:

a.   Flatiron admits the quoted language is accurate.

b.   Flatiron admits the quoted language is accurate.

c.   Flatiron admits the quoted language is accurate.

d.   Flatiron admits the quoted language is accurate.

e.   Flatiron admits the quoted language is accurate.

f.   Flatiron admits the quoted excerpt is accurate but ATS omits the preceding

9

sentence, which states: "If the Party submitting the claim prevails on more than half the claims it makes, then each party shall pay its own costs of such litigation." (ECF 37-2 at 6-7 ¶ 5).

## STATEMENT OF ADDITIONAL DISPUTED FACTS

Flatiron, for its statement of additional disputed facts ("SADF"), hereby states as follows:

### I.   The Project

26.     In September 2015, CDOT issued to Flatiron a Request for Proposals ("RFP") for the Project. *See generally* **Ex. 5**, Excerpt of RFP.

27.     The RFP directed that any proposal for the Project "shall respond fully to all applicable requirements of the RFP." *Id*. at FA0000130322 § 2.4.1. CDOT, however, does not analyze the entire Pre-Award design at the Proposal phase for compliance with the RFP. *Id*. at FA0000130344-45 § 4.7. Specifically, minor drainage elements, such as inlets and pipe, were not reviewed by CDOT prior to award. *Id*. The final Released For Construction ("RFC") plans and calculations, in comparison, were heavily reviewed and scrutinized by CDOT to ensure strict compliance with the Project requirements. **Ex. 6**, Excerpt of Book 2 Technical Requirements at FA0002081767-68 § 3.5.3 ("Ultimately CDOT Design Acceptance will be though the Acceptance of the Final Design Documents.")

28.     The RFP also stated: "The Proposer shall be solely responsible for examining, with appropriate care, the RFP Documents, including any Addenda issued, and for informing itself, with respect to any and all conditions that may in any way affect the amount or nature of the Proposal or the performance of the Work in the event of

Award. Failure of the Proposer to so examine and inform itself shall be its sole risk and CDOT will provide no relief for error or omission." **Ex. 5**, RFP at FA0000130347 § 5.2.

29.     Flatiron chose to engage in negotiations with ATS for the Teaming Agreement because ATS is an AECOM subsidiary, and is one of the largest and most sophisticated engineering design firms in the world, with extensive experience on construction projects in the Denver metro area. **Ex. 7**, Excerpt of Statement of Qualifications at FA0000157519; *see also* **Ex. 4**, K. Armstrong 9/8/21 Dep. at 187:24-188:2 ("[T]he expectation from ATS, being an international, world-class designer, was that anything they gave us met our technical provisions and the requirements of the contract.").

30.     Based on its disclosures in this case, ATS carries a tower of insurance that provides at least the amount of Flatiron's damages, $263.5 million, in annual coverage for errors and omissions. *See* **Ex. 8**, ATS Am. Resp. to Flatiron Interrogatory 20 (providing information for $285 million in errors and omissions coverage).

## II.   The Teaming Agreement

31.     In November 2015, the parties executed the Teaming Agreement and agreed to "work exclusively with each other . . . in coordinating the submission of a proposal" (the "Proposal") to CDOT for the Project. (ECF 37-1 at 2 § 1).

32.     The Teaming Agreement governed ATS's obligations prior to the submission of the Proposal (the "Pre-Bid" or "Pre-Award Services"). *Id.* at 3 § 5; **Ex. 2**, Flatiron 30(b)(6) Dep. at 86:8-9 ("Prebid is governed by the Teaming Agreement."); (ECF 101-1 at 2 ¶ 5); **Ex. 18**, J. Couture Aff. ¶ 4.

33.     ATS's Pre-Award Services included, but were not limited to, the preparation

of a design for the Project sufficient for Flatiron to develop quantity and cost estimates that would form the basis for Flatiron's lump sum Proposal to CDOT for the Project. (ECF 37-1 at 3 § 5).

34.     In exchange, Flatiron paid ATS for its time and materials, which ultimately amounted to $729,661.35. *Id.* at 4 § 7; (ECF 37-2 at 2 ¶ 1).

35.     In the Teaming Agreement, ATS promised its Pre-Award Services would "be consistent with all professional engineering principles generally accepted as standards of the industry in the state or province where the Project is located . . . ." (ECF 37-1 at 3 § 5).

36.     ATS also promised its Pre-Award Services would adhere to the applicable standard of care. Specifically, ATS promised its design services would:

> be performed in accordance with the standard of care, skill and diligence commensurate with that provided by other design professionals at the Pre-Award Services stage for projects of similar size, type and complexity, in accordance with any additional standards set forth in the RFP, and shall be adequate and sufficient for bidding the construction of the Project as described in the RFP Documents.

*Id.*

37.     ATS's duty to prepare a design "adequate and sufficient for bidding the construction of the Project as described in the RFP" is a duty that arises exclusively under the Teaming Agreement. *Id.* It does not arise under the Subcontract. (*See generally* ECF 37-2, 37-3, 37-4).

38.     If Flatiron was awarded the Project, the Teaming Agreement provided the parties would "negotiate in good faith a subcontract (the 'Subcontract') for design services . . . ." (ECF 37-1 at 2 § 3).

39.     Further, if the parties were able to agree upon and execute a Subcontract,

the Teaming Agreement stated:

> [T]he terms of this [Teaming] Agreement shall be superseded by the Subcontract, [sic] Upon any such termination, this . . . Teaming Agreement shall have no further effect; provided, however, those provisions which, by their terms are intended to survive termination, including . . . ***Section 15 (limitation on damages)*** . . . ***shall specifically survive termination*** . . . .

*Id.* at 3 § 4 (emphasis added).

40.     The parties also agreed a future Subcontract, if any, would include an "[o]verall limitation of liability capped at 100% of the final design portion of the agreed-upon Subcontract amount." *Id.* at 7 § 20.

41.     The Teaming Agreement itself, however, contained no limitation on liability except for a provision in which both parties waived the right to seek consequential damages. *Id.* at 6 § 15; **Ex. 2**, Flatiron 30(b)(6) Dep. at 68:4-5 ("Sir, there was never, ever a liability cap on the Teaming Agreement."); (*see also* ECF 101-1 at 3 ¶ 7); **Ex. 18**, J. Couture Aff. ¶ 4.

42.     The Teaming Agreement's consequential damages waiver stated: "In no event shall any Party be liable to the others for any indirect, incidental, special or consequential damages (including, but not limited to, loss of profits, loss of interest or other financing charges, or loss of use) . . . ." (ECF 37-1 at 6 § 15).

43.     It also stated:

> The Parties hereto agree that the provisions of this [Teaming] Agreement which, by their nature, are intended to survive termination or expiration of this [Teaming] Agreement, including, but not limited to, releases or limitations on liability or remedies, shall survive and continue in full force and effect following any such termination or expiration.

*Id.*

44.     When Flatiron intends to limit a designer's liability under a teaming

agreement, it expressly includes such language in the teaming agreement itself.  **Ex. 1**, K. Armstrong Aff. ¶ 12.  Indeed, Flatiron has done so in teaming agreements for numerous other projects. *Id.* (Flatiron's teaming agreements for the I-40, Rodanthe, and Wellsburg projects all included limitation of liability provisions); *see also* **Ex. 2**, Flatiron 30(b)(6) Dep. at 60:7-21 ("[T]here's a few projects I can roll off the top of my head where we had specific language in the Teaming Agreement for limits of liability.").

45.     ATS's own expert witness, Mark Buchanan, testified that 60% of the teaming agreements he has seen over the course of his career have included an explicit limitation of liability clause. **Ex. 9**, M. Buchanan Dep. at 38:19-39:4 ("Q. How often do you see limits of liability in teaming agreements? A. Fairly often. . . . I would say it's about 60 percent of the teaming agreements.").

46.     Mr. Buchanan admitted parties also intentionally leave liability limitations out of a teaming agreement because "[s]ometimes discussing limitations of liabilities in the pre-award phase during the teaming agreement complicates developing that teaming agreement quite a bit, because it is a big risk for the designer, but it's a much greater risk for the contractor as it prepares to develop its proposal." *Id.* at 239:19-25.

## III.   Flatiron is Awarded the Project

47.     ATS completed its Pre-Award Services in March 2016. **Ex. 10**, ATS00001926 (3/3/16 email regarding delivery of Proposal); **Ex. 11**, FA0004254215 (3/30/16 email regarding award of Project).

48.     While Flatiron had reasons to be frustrated with ATS during the Pre-Award phase, it believed all issues and concerns were resolved prior to finalization of the Proposal. **Ex. 3**, A. Bright Dep. 146:12-148:1 (testifying that, while there were issues with

ATS's design during Pre-Award phase, it was Flatiron's understanding that "these were resolved."); *see also* **Ex. 12**, A. Bright Aff. ¶ 8; **Ex. 1**, K. Armstrong Aff. ¶¶ 13-14. Further, issues with ATS's performance Flatiron knew about at the time it submitted its Proposal were completely different in scope and nature—and paled in comparison to—ATS's egregious breaches of the standard care Flatiron discovered later. **Ex. 12**, A. Bright Aff. ¶¶ 9-11; see *also infra* SADF ¶¶ 77-81.

49. At no time prior to executing the Subcontract was Flatiron aware that ATS's Pre-Award Services failed to meet the Teaming Agreement's standard of care in the ways that have since been identified by Flatiron's experts in this dispute. **Ex. 3**, A. Bright Dep. at 204:13-14 ("I was always expecting my designer to provide a compliant design."); *see also* **Ex. 12**, A. Bright Aff. ¶¶ 9-11; **Ex. 1**, K. Armstrong Aff. ¶¶ 16-17; *infra* SADF ¶¶ 77-81.

50. Neither Andy Bright (who coordinated Flatiron's receipt of ATS's Pre-Award design) nor Keith Armstrong (who led Flatiron's estimating team and was the person primarily responsible for preparing the Proposal) were aware at the time the Proposal was submitted, or at the time the Subcontract was executed, that ATS's Pre-Award Services failed to meet the standard of care by violating the RFP in material ways that could cause Flatiron to incur hundreds of millions of dollars in increased costs. **Ex. 12**, A. Bright Aff. ¶¶ 10-11; **Ex. 1**, K. Armstrong Aff. ¶¶ 16-17.

51. Thus, Flatiron was completely unaware of the massive problems to come when it relied on ATS's Pre-Award Services to prepare its Proposal for the Project, including preparation of the required cost estimates and proposed schedule for CDOT. **Ex. 12**, A. Bright Aff. ¶¶ 10-11; **Ex. 1**, K. Armstrong Aff. ¶¶ 16-17; *see also* **Ex. 3**, A. Bright

Dep. at 137:6-8 ("We estimate. We need drawings to estimate. We don't guess at scopes. We don't make stuff up. We need the detail."); **Ex. 2**, Flatiron 30(b)(6) Dep. at 108:12-14 ("[W]e relied on ATS to follow the requirements in that Teaming Agreement."); (ECF 101-1 at 3 ¶ 8); **Ex. 18**, J. Couture Aff. ¶ 4.

52.     Flatiron submitted its Proposal to CDOT on March 3, 2016. *See, e.g.*, **Ex. 13**, FA0002172461; **Ex. 14**, ATS00005283.

53.     In its Proposal, Flatiron represented it could complete the Project for $204 million in 33 months. **Ex. 15**, FA0002172625 (4/29/16 email from K. Armstrong providing estimate recap and bid price); **Ex. 16**, FA0000023623 (excerpt from Volume IV Project Plans and Schedule showing project duration).

54.     Under the terms of the RFP, Flatiron was bound to the price and schedule set forth in its Proposal. **Ex. 5**, RFP at FA0000130347 § 5.2. Unless CDOT added scope, Flatiron could not seek increased compensation or time to complete its work on the Project. *Id.*

55.     In April 2016, CDOT awarded the Project to Flatiron. (*See* ECF 168 at 4 (citing ECF 80-1 at 2)).

56.     The prime contract for the Project stated: "The Contract Price shall be full compensation for the work and all other obligations to be performed by the Contractor under the Contract Documents. The Contract Price, and ***maximum amount payable*** to the Contractor, shall be $204,270,973.00." **Ex. 17**, Excerpt of Prime Contract at FA0000011046 § 11.1.1 (emphasis added).

57.     When Flatiron and ATS began negotiating the terms of a Subcontract, they exchanged various drafts. (*See, e.g.*, ECF 101-5).

58.     The initial draft of the Subcontract included two notable definitions. First, Section 1.1 defined "Design Services." *Id.* at 16 § 1.1. Next, Section 1.2 defined "Pre-Award Services." *Id.* at 17 § 1.2.

59.     Section 1.3 of the initial draft of the Subcontract then clarified that ATS's work under the Subcontract was "in addition to the Pre-award Services." *Id.* at 17 § 1.3.

60.     In ATS's redline of the initial draft Subcontract, however, ATS's general counsel, Jeff Rosenstein, commented on Section 1.2 that: "Pre-bid is fully addressed in the TA [i.e., the Teaming Agreement]." *Id.* at 17 § 1.2.

61.     Section 1.2 was therefore deleted and does not appear in the final Subcontract. (*See generally* ECF 37-2, 37-3, 37-4).

## IV.    The Subcontract

62.     In May 2016, Flatiron and ATS executed the Subcontract. *Id.*

63.     The purpose of the Subcontract was to govern ATS's post-award performance. **Ex. 2**, Flatiron 30(b)(6) Dep. at 86:9-10 ("Post award or post bid is covered by the subcontract."); (ECF 101-1 at 3 ¶ 9); **Ex. 18**, J. Couture Aff. ¶ 4.

64.     Under the Subcontract, ATS agreed to provide "Design Services," defined to include "all obligations of design professionals required by the Contract Documents [i.e., Flatiron's prime contract with CDOT for the Project]." (ECF 37-3 at 16 § 1.1).

65.     The Subcontract also states: "Design Services includes any additional services provided by [ATS] pursuant to any 'Teaming Agreement' or similar agreement between the Parties regarding the Project." *Id.*

66.     Under the Subcontract, ATS promised to adhere to a new standard of care that was distinct from the one in the Teaming Agreement:

17

> [ATS] acknowledges and agrees that . . . all Design Services performed pursuant to the Contract Documents shall conform to all professional engineering principles generally accepted as standards of the industry in the state or province where the Project is located for projects of similar size, type and complexity, shall be sufficient for construction of the Project and shall conform to all standards relating to design contained in the Contract Documents.

*Id.* at 18 § 1.9.

67.    The parties specifically agreed that: "Pre-Award services are not included in the [Subcontract's] Base Design Fee ***or scope of work***." (ECF 37-2 at 25) (emphasis added).

68.    The duty to perform Pre-Award Services in a manner "adequate and sufficient for bidding the construction of the Project as described in the RFP" is not included in the Subcontract. (*See generally* ECF 37-2, 37-3, 37-4).

69.    The Subcontract included the following provisions limiting liability:

a.    A "Limitations of Liability" provision (the "LOL Clause"), which stated:

> [ATS's] aggregate liability to [Flatiron] for any damages, claims, costs, or expenses ***arising under the Subcontract*** . . . shall be limited to 100% of the . . .Total Design Fee . . . .

(ECF 37-2 at 6 ¶ 1) (emphasis added). The "Total Design Fee" was defined to mean "100% of the Lump Sum in the aggregate, less direct costs, plus additional design fees . . . ." *Id.*

b.    A "Liability for Schedule" provision (the "Delay Subcap"), which stated:

> In the event [ATS] fails to timely perform ***the Design Services*** resulting in a demonstrable delay to the Project's critical path of construction, then [ATS] shall be liable [for any liquidated damages levied by CDOT against Flatiron] to the extent directly resulting from this delay . . . .

(ECF 37-2 at 6 ¶ 2) (emphasis added).

70.    The LOL Clause contains no reference to the term "Design Services." (ECF 37-2 at 6 ¶ 1).

71.    In stark contrast, the Delay Subcap expressly applies to all of ATS's "Design Services." (ECF 37-2 at 6 ¶ 2).

72.    The LOL Clause and Delay Subcap are next to each other on the same page of the Subcontract as follows:

1.    **Limitations of Liability:** Designer's aggregate liability to Contractor for any damages, claims, costs, or expenses arising under the Subcontract, whether in contract, tort or otherwise, shall be limited to 100% of the Lump Sum in the aggregate, less direct costs, plus additional design fees incurred pursuant to this Agreement ("Total Design Fee"). Any project specific insurance proceeds shall not count toward this cap. Liability to third parties (who are not under contract with the Contractor or Owner) for injury, death or property losses shall not count toward the cap. It is expressly agreed that Contractor's sole and exclusive remedy against Designer under this Agreement, whether based in contract, tort or otherwise, is the award of damages, costs or expenses not to exceed the stipulated amount defined above.

2.    **Liability for Schedule.** In the event Designer fails to timely perform the Design Services resulting in a demonstrable delay to the Project's critical path of construction, then Designer shall be liable to Contractor for the Owner's liquidated damages ("LDs") the Contractor is charged to the extent directly resulting from this delay, along with Contractor's other direct costs and time related project overhead arising from such delay, including acceleration and other mitigation costs. Contractor shall use commercially reasonable efforts to mitigate such delay. Such liability for delay (including but not limited to LDs) shall be limited to 20% of the Total Design Fee in the aggregate which shall be included as part of the overall limitation of liability.

*Id.* at 6.

73.    The Subcontract also set forth a provision regarding fee-shifting in the event of a dispute (the "Fee-Shifting Provision"). The Fee-Shifting Provision provided:

> If the Party submitting the claim prevails on more than half the claims it makes, then each party shall pay its own costs of such litigation. If the party submitting the claim to litigation prevails on less than half the claims it makes, then the Party submitting the claim to litigation shall pay both Parties' costs of such litigation, including reasonable attorneys' fees.

(ECF 37-2 at 6-7 ¶ 5).

74.    The Fee-Shifting Provision did not define the term "claim" or "claims," nor did it explain how to determine when or whether a party "prevails". *Id.*

19

75.     The parties intended the Fee-Shifting Provision to penalize any party who "submitted a claim" to litigation (i.e., by filing a complaint in court), and then failed to prevail in litigation on the balance of the issues it raised in its affirmative case. **Ex. 18**, J. Couture Aff. ¶ 10.

76.     Finally, the Subcontract contained a clause incorporating certain terms of the Teaming Agreement, but only to the extent they were not inconsistent with the Subcontract itself. This clause stated:

> This Agreement (together with any exhibits and documents incorporated herein by reference and any terms of a Teaming Agreement between the Parties regarding the Project not inconsistent with this Subcontract), represent the entire agreement between [ATS] and [Flatiron] and supersedes all prior negotiations, representations and agreements regarding the Project . . . .

(ECF 37-3 at 33 § 16.10).

## V.   The Parties' Dispute

77.     Flatiron did not begin to discover the design deficiencies in ATS's Pre-Award Services until June 27, 2016—after the Subcontract was executed. At that time, Flatiron began to discover the extent to which ATS's Pre-Award design omitted required design elements for the Project. *See, e.g.*, **Ex. 19**, FA0001948250 (6/27/2016 email from M. Barnes initiating roadway constructability review); **Ex. 20**, FA0002111643 (6/29/2016 email from R. Kiser showing drainage quantity takeoffs); **Ex. 21**, FA0002121499 (similar quantity overruns discovered on 8/22/16 in Segment 1 constructability review set); **Ex. 22**, FA0002712892 (overrun in wedging quantity identified on 1/16/17); **Ex. 23**, FA0002190327 (barrier quantities as of 4/4/17 showing budget overruns).

78.     In March 2018, ATS performed its own secret, internal analysis to figure out the magnitude of omissions in its Pre-Award design as compared with its RFC design.

**Ex. 24**, W. Carrier 3/16/22 Dep. at 279:24-280:3. In this comparison, ATS found its Pre-Award design omitted significant quantities necessary for the construction in a variety of disciplines including, drainage, signage, and barrier. *See* **Ex. 25**, ATS01718685 (drainage); **Ex. 26**, ATS02026340 (signage); **Ex. 27**, ATS01041284 (barrier).

79.      ATS's corporate representative, Will Carrier, explained ATS omitted the following from its Pre-Bid design:

    a.  More than 37,000 feet of drainage pipe (**Ex. 24**, W. Carrier 3/16/22 Dep. at 318:5-8);

    b.  200 inlets (*id*. at 320:11-21);

    c.  6.1 miles of concrete Type 7 barrier (*id*. at 353:5-18);

    d.  More than 7,250 square feet of signage panels (*id.* at 388:12-15); and

    e.  34 bridge or cantilever sign structures (*id*. at 388:16-20).

80.      Mr. Carrier claimed he was not aware of omitted quantities in the Pre-Award design until Summer 2016, which was after Subcontract execution. *Id*. at 283:8-25.

81.      ATS's Pre-Award design omissions were caused by its abdications of professional duties, which include but are not limited to ATS's failure to:

    a.  Coordinate the design of different engineering disciplines to work together and not conflict (**Ex. 28**, Excerpt of OCL Report at 4, Opinion #5);

    b.  Design to the Project's Ultimate Condition as required by CDOT (*id.*);

    c.  Design in compliance with the Project's RFP (*id.*); and

    d.  Perform adequate Quality Assurance and Quality Control ("QA/QC") (*id.*).

82.      In October 2019, ATS submitted a claim against Flatiron by filing a lawsuit asserting two causes of action, one for breach of contract and one for unjust enrichment.

(ECF 1 at 10-12 ¶¶ 40-51).

83.     In response, Flatiron filed compulsory counterclaims for breach of the Teaming Agreement, breach of the Subcontract, and negligent misrepresentation. (ECF 37 at 10-13 ¶¶ 41-67).

84.     Flatiron's cause of action for negligent misrepresentation was later dismissed pursuant to the economic loss rule. (ECF 97 at 10). The Court explained that Flatiron could seek recovery for ATS's misrepresentations under its cause of action for breach of the Teaming Agreement. *Id.* at 9-10.

85.     The damages value Flatiron seeks under its remaining causes of action is $263,512,812.00. **Ex. 29**, Excerpt of C2G Expert Report at 8, Opinion #6.

86.     This damages figure is comprised of the following categories of expectation damages: $90,494,713 in direct costs; $10,163,341 in other impacted direct costs; $68,729,939 in direct support costs; $38,033,032 in acceleration costs; $25,947,787 in profit and markup; and $30,144,000 in contractual payments withheld by CDOT due to ATS's breaches. *Id.* at 113-14 tbl.V.1 (Summary of Damages Quantification).

87.     The majority of these damages flowed directly from ATS's breach of the standard of care when providing Pre-Award Services under the Teaming Agreement. *See, e.g.*, **Ex. 30**, K. O'Connell Dep. at 71:15-19 ("The root cause of this issue [sic] were the violations and errors made under the teaming agreement."); *id.* at 72:2-8 ("What I'm saying is the root cause of these changes occurred in the failed design during the teaming agreement phase, when that was the only contract that existed. Had it been done properly at that time, there would have been no need to correct it during the post-award design."); *see also id.* at 72:15-17, 74:3-5, 74:22-23, 77:20-78:1, 78:24-79:3, 121:11-17, 176:4-8.

88.     Flatiron's expert witness acknowledged that a small portion of these damages may also arise from ATS's breach of the Subcontract. *Id.* at 73:24-74:5 ("[I]n addition to the failure that occurred and the violation of the standard of care that occurred during the pre-award design, in addition to that, there is a requirement in the design subcontract that was also breached."); *id.* at 84:13-16 ("Q. This $1.85 million is damage that arises out of breach of the subcontract agreement? . . . A. I believe that's correct.").

## LEGAL STANDARD

"'Summary judgment is a drastic remedy' and should be awarded with care." *Benson v. U.S.*, 934 F. Supp. 365, 368 (D. Colo. 1996) (citing *Conaway v. Smith*, 853 F.2d 789, 792 n.4 (10th Cir. 1988)). It is warranted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986).

A court reviewing a motion for summary judgment must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Alder v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). All factual ambiguities must be resolved against the moving party, thus favoring the right to a trial. *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

## ARGUMENT

## I.   ATS IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON FLATIRON'S CLAIM FOR BREACH OF THE TEAMING AGREEMENT.

### A.  The Court has Already Ruled the Relevant Contract Language is Ambiguous.

In its Amended MSJ, ATS merely revisits the same arguments it made—and lost—in its Early MSJ. Indeed, the Amended MSJ does little more than invite the Court to take a second look at the relevant language and declare, without any evidentiary support, that "properly understood, the [relevant] language admits no ambiguity." (ECF 215 at 19). But this Court has already held, in no uncertain terms, that:

> The conflicting interpretations of what the parties intended regarding the limitation of liability provisions and how the Teaming Agreement and the Subcontract would interact are factual questions that are not susceptible to resolution on an early motion for partial summary judgment.

(ECF 168 at 11-12). The Court also found that "provisions of the Subcontract render it ambiguous on its face."[3] *Id.* at 10.

In particular, the Court identified contract provisions that were susceptible to different interpretations, pointing to "the apparent clear conflict between two provisions that appear in the Subcontract itself." (ECF 168 at 10-11). It noted that: "[ATS] correctly observes that the definition of "Design Services" appears to incorporate work performed under the Teaming Agreement and the Subcontract." *Id.* at 11. At the same time,

---

[3] ATS misrepresents the Court's holding on this point, claiming the Court merely "hesitated" due to "possible" ambiguity in the Subcontract's language that "might" allow Flatiron to sue on the Teaming Agreement. (ECF 215 at 3); *see also id.* at 13 (claiming the Court observed "that the Subcontract *might* be ambiguous") (emphasis in original); *id.* at 16 (claiming the Court demonstrated "concern that the Subcontract *might* harbor some ambiguity in its definition of 'Design Services'") (emphasis added). In fact, the Court's language was far more conclusive. (ECF 168 at 10) ("[P]rovisions of the Subcontract render it ambiguous *on its face*.") (emphasis added).

"[h]owever, the Court agree[d] with Flatiron that the language in the Design Assumptions portion of the Subcontract, which provides that 'Pre-Award Services are not included in the Base Design Fee or scope of work,' points toward a different conclusion." *Id.* The Court further noted "the limitation of liability provision of the Subcontract specifies that it pertains to damages 'arising under the Subcontract'"—as opposed to the larger category of Design Services. *Id.* Thus, the Court warned that ATS's "steadfast reliance on the definition of 'Design Services'" was "insufficient to overcome the conflict between these provisions in the Subcontract." *Id.*

To succeed on summary judgment this time, therefore, ATS must do more than regurgitate failed arguments about the plain language of the agreements from its Early MSJ. It must "allege an absence of evidence to support [Flatiron's] case *and identify supporting portions of the record*" justifying summary judgment in its favor. *Benson*, 934 F. Supp. at 368 (emphasis added); *see also In re San Luis & Rio Grande R.R.*, 634 B.R. 599, 612 (D. Colo. 2021) ("The moving party bears the initial burden of identifying the basis for its motion and designating those portions of the record which it believes entitles it to judgment."). Rather than offering undisputed evidence, however, ATS merely tries for second bite at the apple—arguing once again in its Amended MSJ that the contracts are "plain and unambiguous." In so doing, ATS falls far short of its burden.

### B. ATS's Attempt to Portray the Contract Language as "Unambiguous" Fails Again.

Having previously lost on this issue, ATS's main strategy in its Amended MSJ is simply to tell the Court what it thinks the ambiguous contract language is supposed to mean without citing any evidence in support. But in many cases, ATS's proposed reading actually supports Flatiron's position that the LOL Clause applies only to damages caused

by Post-Award Services performed "under the Subcontract"—particularly when read in context with portions of the contracts that ATS omits. ATS failed to establish these same points in its Early MSJ and these arguments should be rejected again here.

### 1. **ATS's proposed interpretation supports the conclusion that the LOL Clause does not apply to Pre-Award Services**.

ATS acknowledges the language the Court found "[o]f particular importance" in denying ATS's Early MSJ was the "apparent clear conflict" between the Subcontract's definition of "Design Services" (which purports to encompass Pre-Award Services) versus the Subcontract's express directive that "Pre-Award services" are excluded from its scope of work. (ECF 168 at 10-11); (ECF 215 at 18). ATS attempts, but fails, to explain away this conflict. It claims (without evidence) that the Subcontract's exclusion of Pre-Award Services from the scope of work just means the Subcontract does not require ATS to get repaid for—or have to redo—work already performed under the Teaming Agreement. (ECF 215 at 18-19). According to ATS, "there is nothing inconsistent or ambiguous about excluding the already performed preliminary design work from ATS's 'scope of work' under the Subcontract." *Id.* at 19. ATS characterizes these "already performed" Pre-Award Services as a "subset of Design Services" that are excluded from "ATS's 'scope of work' under the Subcontract" but are still covered by the LOL Clause. *Id.*

In making this strained argument, however, ATS overlooks that the LOL Clause, by its own terms, also *only* applies narrowly to the scope of damages "arising under the Subcontract," and specifically omits any reference to the larger category of "Design Services." SADF ¶¶ 69-70; *see also Strohe v. MEP Eng'g, Inc.*, 501 P.3d 826, 831 (Colo. App. 2021) (a "reasonable interpretation of the [limitation of liability clause] . . . is that the limitation only applies to" the specific category of damages listed). Thus, by ATS's own

logic, the LOL Clause caps only those damages arising from the "subset of Design Services *yet to be performed* – [in other words,] the 'scope of work' under the Subcontract." (ECF 215 at 19) (emphasis added). It follows that Pre-Award Services (i.e., the "subset" of Design Services "already performed" under the Teaming Agreement) were meant to be excluded from the LOL Clause. Indeed, it makes no sense to characterize work performed before a contract existed as "arising under" that contract. *See* SADF ¶¶ 47, 62 (ATS's Pre-Award Services were completed in March 2016, two months prior to execution of the Subcontract). Further, if the parties wanted to ensure already-performed Pre-Award Services that did not "arise under" the Subcontract were still covered by the LOL Clause—they could easily have stated this in the LOL Clause itself. They did not.

Significantly, there are other instances in the Subcontract where the parties similarly divided the larger category of "Design Services" into Pre- and Post-Award subsets. For example, the Subcontract's standard of care for Post-Award Services expressly applies only to "Design Services *performed pursuant to the Contract Documents* [i.e., Flatiron's prime contract with CDOT] . . . ." *Id.* ¶ 66 (emphasis added). By its own terms, this standard of care language applies only to those Design Services performed *after* Flatiron executed the prime contract with CDOT—i.e., to Post-Award Services performed under the Subcontract. Pre-Award services, on the other hand, were performed *before* the Project was awarded and the prime contract was executed. *Id.* ¶¶ 32-33, 36. Thus, the Pre-Award subset of Design Services is subject to the standard of care in the Teaming Agreement. *Id.* ¶ 36 (requiring ATS to perform in a manner "adequate and sufficient" for bidding the Project "as described in the RFP."). It makes sense, therefore, that the parties also agreed to restrict the LOL Clause only to the subset of

services that "aris[e] under" the Subcontract and its distinct standard of care—rather than capping liability for all "Design Services" generally. *Id.* ¶¶ 66, 69.

Additionally, in contrast to the LOL Clause's deliberate omission of the term "Design Services," the Delay Subcap—which immediately follows the LOL Clause on the same page of the Subcontract—expressly *includes* the term "Design Services." *Id.* ¶¶ 69-72. The image below highlights the difference in language between the two clauses:



1.  **Limitations of Liability:** Designer's aggregate liability to Contractor for any damages, claims, costs, or expenses arising under the Subcontract, whether in contract, tort or otherwise, shall be limited to 100% of the Lump Sum in the aggregate, less direct costs, plus additional design fees incurred pursuant to this Agreement ("Total Design Fee"). Any project specific insurance proceeds shall not count toward this cap. Liability to third parties (who are not under contract with the Contractor or Owner) for injury, death or property losses shall not count toward the cap. It is expressly agreed that Contractor's sole and exclusive remedy against Designer under this Agreement, whether based in contract, tort or otherwise, is the award of damages, costs or expenses not to exceed the stipulated amount defined above.

2.  **Liability for Schedule.** In the event Designer fails to timely perform the Design Services resulting in a demonstrable delay to the Project's critical path of construction, then Designer shall be liable to Contractor for the Owner's liquidated damages ("LDs") the Contractor is charged to the extent directly resulting from this delay, along with Contractor's other direct costs and time related project overhead arising from such delay, including acceleration and other mitigation costs. Contractor shall use commercially reasonable efforts to mitigate such delay. Such liability for delay (including but not limited to LDs) shall be limited to 20% of the Total Design Fee in the aggregate which shall be included as part of the overall limitation of liability.

*Id.* ¶ 72 (emphasis added). That the parties referred to "Design Services" in one limitations provision, and not the other, shows they intended for the two provisions to apply differently. *KN Energy, Inc. v. Great W. Sugar Co.*, 698 P.2d 769, 777 (Colo. 1985) (The court "cannot presume that the parties intended to add such an important condition [to the contract] by implication or by silence."); *Rabideau v. Unifirst Mortg. Corp.*, 2018 Colo. Dist. LEXIS 537, at *39 (May 7, 2018) ("The doctrine of *expressio unius est exclusio alterius* instructs that when certain words are used in a contract and **other words omitted**, it implies the intentional exclusion of the omitted terms.") (emphasis in original). The Court must give effect to the parties' choice to apply the LOL Clause *only* to damages

28

"arising under the Subcontract," rather than expanding its reach beyond what the parties intended.[4] *See Strohe*, 501 P.3d at 830 ("The district court did not review the limitation of liability provision in its entirety, nor did the court give effect to all parts of the provision. . . . This was error.").

## 2. **ATS deliberately ignores plain language that contradicts its preferred interpretation.**

ATS also claims (without evidence) that an examination of the Teaming Agreement and Subcontract "in their entirety" proves the Subcontract unambiguously "makes the preliminary design work part of the Subcontract, and subject to the Subcontract's liability limitations." (ECF 215 at 19-20). ATS then proceeds to cite only contract language that might support this argument—often out of context—while at the same time ignoring all the language that undermines it.

For example, ATS selectively cites the Subcontract's merger clause, claiming it states "that the Subcontract is now the parties' entire agreement' which 'supersedes all prior . . . agreements.'" *Id.* at 20. Incredibly, ATS skips over an intervening parenthetical that changes the clause's meaning. In full, the merger clause reads:

> This Agreement (***together with any exhibits and documents incorporated herein by reference and any terms of a Teaming Agreement between the Parties regarding the Project not inconsistent with this Subcontract***), represent the entire agreement between [ATS] and [Flatiron] and supersedes all prior negotiations, representations and agreements regarding the Project . . . .

SADF ¶ 76 (emphasis added). In other words, the parties "entire agreement" includes both the Subcontract and certain portions of the Teaming Agreement. This does not, as

---

[4] Flatiron does not concede that the LOL Clause applies to limit the damages claimed under any agreement.

ATS claims, mean the Teaming Agreement "terminated" entirely.[5] (ECF 215 at 21). In fact, a plain reading of this provision shows the parties intended the "entire agreement" (i.e., the Teaming Agreement and Subcontract) to supersede any *other* agreements regarding the Project.

ATS also repeatedly points to another clause in the Teaming Agreement that states the terms of the Teaming Agreement "shall be superseded by the Subcontract . . . ." *See* SADF ¶ 39; (ECF 215 at 27). ATS ignores, however, that the same clause also lists exceptions to this directive. It states certain provisions of the Teaming Agreement are "intended to survive termination" and expressly designates the Teaming Agreement's "limitation on damages" for survival. SADF ¶ 39. This not only undermines ATS's argument that the "plain language" of the Teaming Agreement shows it was terminated, it also shows the parties intended the two agreements to operate under their own, distinct liability limitation provisions. As ATS itself argues, the contract must be read "as a whole" (ECF 215 at 20)—ATS cannot cherry-pick its favored language and ignore the rest. *Stroh Ranch Dev., LLC v. Cherry Creek S. Metro. Dist. No. 2*, 935 F. Supp. 2d 1052, 1060 (D. Colo. 2013) (Martinez, J.) ("When construing a contract, courts must *not* 'view clauses or phrases in isolation.'") (emphasis in original).

ATS also fails on its claim that "the Teaming Agreement's liability limitation . . .

---

[5] ATS has previously argued to this Court that its duties at the Pre-Award stage "stem[] from the express terms of the Teaming Agreement . . . ." (ECF 46 at 8). The Court agreed, holding that "any obligation on [ATS's] part to refrain from making misrepresentations regarding whether it had met the standard of care set forth in the Teaming Agreement 'stems from the express terms of the Teaming Agreement.'" (ECF 97 at 9) (quoting ATS). Thus, under the economic loss rule, the Court held Flatiron could not separately sue ATS for negligent misrepresentation because "any duty to refrain from making material misrepresentations was part and parcel of the Teaming Agreement" itself. *Id.* Yet ATS now argues Flatiron cannot sue for breach of the same standard of care in the Teaming Agreement that it previously argued existed to bar Flatiron's negligent misrepresentation claim. ATS cannot have it both ways.

survive[s] in every termination situation *except* where the Teaming Agreement terminates because the parties enter into a Subcontract". (ECF 215 at 30) (emphasis in original). Once again, ATS offers no evidence whatsoever for this interpretation. Nor is this a situation where, as ATS argues, a more "specific" provision of a contract governs the effect of a more "general" provision. *Id.* There is nothing "general" about the Teaming Agreement's directive that its liability limitation should survive. And the parties' agreement to include a liability cap in a subsequent Subcontract does not constitute a more "specific" limitation *on the Teaming Agreement*. *Compare* SADF ¶ 40 (Teaming Agreement § 20 stating the liability cap "shall be made part of and included in the Subcontract to be negotiated"), *with id.* ¶ 39 (Teaming Agreement § 4 stating "[u]pon any such termination [of the Teaming Agreement] . . . Section 15 (limitation on damages) . . . shall specifically survive termination").

Finally, ATS points to the Subcontract's "Order of Precedence" provision, which states the Subcontract prevails in the event of a conflict with the Teaming Agreement. (ECF 215 at 21-22). But as explained above, there is no conflict because the LOL Clause explicitly applies only to the subset of Design Services "arising under the Subcontract."[6] SADF ¶ 69; *see also supra* Section I.B.1. Moreover, by making this argument ATS admits the parties must have intended the Teaming Agreement to continue. There would be no reason to include an "Order of Precedence" provision to resolve a potential conflict with an agreement that does not exist. *Mt. W. Mines, Inc. v. Cleveland-Cliffs Iron Co.*, 470 F.3d 947, 951 (10th Cir. 2006) ("In construing the intent of the parties, 'common sense

---

[6] It is common sense that this cannot include work performed prior to the Subcontract's existence.

and good faith are the leading characteristics of contract construction.'").

### C.  ATS Offers No Evidence Sufficient to Change the Court's Prior Ruling.

Apart from conclusory theories, ATS offers almost no facts from the record to support its claim that the parties intended the Subcontract to supersede the Teaming Agreement. Although ATS correctly states "the Court may properly use the extrinsic evidence to resolve the ambiguity" (ECF 215 at 24), that exercise is improper and premature before trial unless there is an absence of disputed fact in the summary judgment record. What little extrinsic evidence ATS does offer is both disputed and contradicted by other evidence. This is insufficient to meet ATS's burden to show it is entitled to judgment as a matter of law.

#### 1.  ATS's purported "intent" evidence is insufficient.

The only extrinsic evidence ATS cites in its Amended MSJ are two redlined drafts of the Teaming Agreement and a single PowerPoint presentation that ATS previously cited in its Early MSJ. (ECF 215-5, 215-6, 215-9); (*see also* ECF 96-1) (PowerPoint presentation attached to the Early MSJ). ATS claims these documents comprise the "drafting history" of the contracts, and that this is sufficient to establish the parties intended to limit ATS's liability in the Teaming Agreement. (ECF 215 at 27). But these documents fall far short of establishing the parties' intent as a matter of law.

The first document ATS cites is an early draft of the Teaming Agreement, wherein the parties specified the terms they wanted to include *in a future Subcontract* (if any)—including a "Limitation of Liability" clause that would cap ATS's Subcontract liability. (ECF 215-6 at 12). Indeed, in the term sheet ATS cites, the parties specified that this limitation would apply in the "***Post-Award Phase***"—i.e., to ATS's work pursuant to the Subcontract.

*Id.* at 11 (emphasis in original). Nothing in the document states the parties intended the Subcontract's liability cap to also apply to the Teaming Agreement. To the contrary, the fact that the parties were contemplating during the Teaming Agreement negotiation how to limit ATS's liability under the Subcontract—and yet did not also insert a liability cap in the Teaming Agreement they were currently drafting—shows they were acting intentionally by omitting any limitation of liability from the Teaming Agreement. *See Rabideau*, 2018 Colo. Dist. LEXIS 537 at *39 ("[W]hen certain words are used in a contract and **other words omitted**, it implies the intentional exclusion of the omitted terms.") (emphasis in original). If the parties wanted to limit ATS's liability for Pre-Award Services, they could easily have inserted clear language to that effect into the Teaming Agreement right then and there. They did not.

The next document ATS cites is a later draft of the Teaming Agreement where someone (ATS does not even identify who) crossed out the phrase "incorporated into" and replaced it with "superseded by". (ECF 215-5 at 2 § 4). Notably, however, no one struck out the adjacent language stating the Teaming Agreement's limitation on damages provision should survive. *Id*. The parties also left in other, similar language stating the Teaming Agreement's "limitations on liability" provisions are intended to "survive and continue in full force and effect". *Id.* at 6 § 16. If anything, the unexplained insertion of the word "superseded" adds to the ambiguity since it appears incongruous with all the other language showing the parties intended the Teaming Agreement (and its liability limitation language) to survive.

Finally, ATS cites to a single slide of the same PowerPoint presentation it included in its Early MSJ. *Compare* (ECF 215-9 at 15), *with* (ECF 96-1 at 5). In that presentation,

Flatiron discussed the status of negotiations for the Teaming Agreement and forthcoming Subcontract, and listed the liability cap as a "Key Term[]". *Id.* ATS claims that, since the LOL Clause is mentioned on a slide discussing the Teaming Agreement, it must therefore cap work under the Teaming Agreement. (ECF 215 at 27). That is incorrect. This slide merely shows the Teaming Agreement would include a list of terms the parties would later insert or negotiate *in a Subcontract*, such as a liability cap. And this is exactly what the final Teaming Agreement did. SADF ¶ 40. The slide reveals nothing that is not already evident in the language of the Teaming Agreement itself. Further, in response to ATS's Early MSJ (where ATS made the same argument), Flatiron's primary drafter of both the Teaming Agreement and Subcontract, John Couture, confirmed that the same language ATS points to now "referred to the limitation of liability that would be included in the Subcontract; it had nothing to do with the limitation of liability over work performed under the Teaming Agreement." *Id.* ¶ 15. Flatiron submitted Mr. Couture's affidavit over a year ago, yet ATS has not submitted any contradictory evidence or affidavit from anyone involved in the drafting process from ATS's side. Despite having ample opportunity to do so, ATS also did not depose Mr. Couture. Thus, Mr. Couture's explanation is unrebutted.

### 2.  ATS's purported "intent" evidence also does not overcome evidence to the contrary.

ATS's paltry "drafting history" evidence also fails to overcome facts in the record—including the drafting history of the *Subcontract*—that support Flatiron's interpretation of the language in the Teaming Agreement and Subcontract. As but one example, the initial draft of the Subcontract expressly defined "Pre-Award Services" as separate from "Design Services," and clarified that ATS's work under the Subcontract was "in addition to the Pre-award Services." SADF ¶¶ 57-59. The provision defining "Pre-Award Services" was then

removed by ATS's counsel because "Pre-bid is fully addressed in the [Teaming Agreement]." *Id.* ¶¶ 60-61. This further reinforces Flatiron's argument above (*see supra* Section I.B.1) that the parties intended Pre-Award Services to be a subset of Design Services that arose under the Teaming Agreement, not the Subcontract.

Further, ATS has not and cannot refute Flatiron's evidence showing that where it intended to limit the liability of a subcontractor's work under a teaming agreement, its standard practice is to specifically insert language to that effect *in the teaming agreement itself*. SADF ¶ 44. Indeed, in teaming agreements for other projects (which were executed close in time to ATS's Teaming Agreement), Flatiron expressly included a limitation of liability clause. *Id.* Moreover, ATS's own expert witness confirmed that, more often than not, the teaming agreements he has seen over the course of his career have included their own limitation of liability clause. *Id.* ¶ 45. He also revealed that when such clauses are not included, they are left out intentionally because contractors take on a huge risk when developing their proposals, so a limitation of the designer's liability during the pre-award phase would complicate the entire collaboration. *Id.* ¶ 46. Thus, where parties intend to limit liability under a teaming agreement, they will say so. Where (as here) they do not, they will not. *Id.*; *see also KN Energy, Inc.*, 698 P.2d at 777 (The court "cannot presume that the parties intended to add . . . an important condition [to the contract] by implication or by silence.").

As a sophisticated and experienced engineering firm, ATS is well aware of this and more than capable of protecting itself from unreasonable risk. SADF ¶ 29. This is why the parties specified, in the Teaming Agreement, that any future Subcontract should include a limitation of liability. *Id.* ¶ 40. This is also why ATS carries a tower of insurance coverage

beyond any project-specific policies—including approximately $264 million in annual coverage for errors and omissions. *Id.* ¶ 30.  Thus, ATS's lengthy narrative regarding the history of liability provisions in the construction industry, and its remonstration that "no rational design professional . . . would risk being saddled with hundreds of millions of dollars in potential downside work" rings hollow. (ECF 215 at 24-27) (relying heavily on *Perini Corp. v. Greate Bay Hotel & Casino, Inc.*, 610 A.2d 364, 367 (N.J. 1992) (regarding consequential damages stemming from the lack of future gambling profit, not direct damages suffered on the project itself)). It also completely ignores the equally (if not more) compelling point that *Flatiron* took on enormous risk at the Pre-Award Services stage. As ATS has previously recognized, it "is not the business of the courts to draft a better contract for the parties than they did for themselves." (ECF 96 at 6-7) (citation omitted).

In sum, the relevant contract language and record evidence (which must be construed in Flatiron's favor) show that ATS's position is unsupportable. ATS's work pursuant to the Teaming Agreement is governed by the Teaming Agreement (and its lack of any applicable liability limitation), not the Subcontract. At minimum, the agreements are ambiguous, and it must be left to the jury to "engage in factfinding to determine" whether the Subcontract's narrow LOL Clause also applies to work performed under the Teaming Agreement. *Elliott Indus v. BP Am. Prod. Co.*, 407 F.3d 1091, 1108 (10th Cir. 2005); *see also Strohe*, 501 P.3d at 834 (directing that, determination of "the meaning of the limitation of liability clause [i]s an issue of fact."). ATS's request for summary judgment on Flatiron's claim for breach of the Teaming Agreement must therefore be rejected.

## II.   ATS'S WAIVER ARGUMENT FAILS

ATS's next attempt to evade Flatiron's claim for breach of the Teaming Agreement purports to assert the doctrine of waiver, but is really just a repackaging of ATS's supersession arguments.[7] ATS claims: "Where, as here, a party is faced with a choice of signing a second contract that will expressly *or* implicitly supersede a first contract, the party must choose whether to stand on its rights under the first contract or accept the different set of rights in the second contract." (ECF 215 at 31) (emphasis in original); *see also id.* at 33 ("Flatiron identified alleged problems in ATS's preliminary design work . . . [and] knew that if it went forward with ATS as Project designer under the Subcontract, the Subcontract would expressly supersede the Teaming Agreement and cap ATS's potential liability at $10 million, plus another $10 million in insurance proceeds."). As a threshold issue, it was ATS—not Flatiron—who was, or should have been, fully aware of the extent to which it had violated the standard of care. SADF ¶¶ 36, 77-81. Further, in claiming Flatiron somehow knowingly waived its rights, ATS relies on a disputed fact (i.e., that the Subcontract supersedes the Teaming Agreement in its entirety) to prove that same disputed fact. The Court should reject such circular reasoning and reject ATS's waiver argument for reasons that follow.

First, a waiver requires "the intentional relinquishment of a **known** right or privilege." *Dep't of Health v. Donahue*, 690 P.2d 243, 247 (Colo. 1984) (emphasis added). ATS fails to identify any known right or privilege that Flatiron relinquished. Indeed, the only evidence ATS proffers to show Flatiron somehow knew about and intentionally

---

[7] Thus, if the Court does not dismiss Flatiron's cause of action for Breach of the Teaming Agreement, ATS's waiver argument is moot.

relinquished the right to seek damages for ATS's breach of the Teaming Agreement are two emails that, according to ATS, shows "Flatiron identified alleged problems in ATS's preliminary design work" and signed the Subcontract anyway. (ECF 215 at 33); *id.* at 37 ("Flatiron was aware of these supposed breaches before signing the Subcontract . . . ."). But these two emails do not show Flatiron knew, prior to execution of the Subcontract, that ATS breached the standard of care by failing to adhere to the RFP. They certainly do not show Flatiron knew ATS omitted, for example, more than seven miles of drainage pipe, six miles of concrete barrier, 200 inlets, 7,250 square feet of overhead sign panels, and 34 overhead sign structures from its Pre-Award design, or that these egregious omissions would lead to hundreds of millions of dollars in damages. *Compare* SADF ¶¶ 77-79, *with* (ECF 215-10, 215-11). To the contrary, the emails demonstrate Flatiron's *resolution* of certain other, more modest issues with ATS's work prior to submitting the Proposal. *See* Resp. to SOMF ¶ 17; SADF ¶ 48.

Second, ATS has not cited a single case finding a waiver under the circumstances it advocates for here. The three cases ATS cites for its "waiver" argument were based upon the doctrines of substitution, supersession, and modification—not waiver per se. *See McKay v. Fleming*, 134 P. 159, at 160 (Colo. App. 1913) ("The second contract was not a renewal of the first, but a ***substitution***, whereby the first was discharged.") (emphasis added) (cited in ECF 215 at 31-32); *U.S. v. Brookridge Farm, Inc.*, 111 F.2d 461, 465 (10th Cir. 1940) (Two contracts "related to the same subject matter" but with inconsistent terms "could not stand together. Performance of both was impossible. Even though it did not contain a provision to that effect, the latter ***superseded*** and rescinded the former . . . .") (emphasis added) (cited in ECF 215 at 32); *Metro. State Faculty Fed'n*

*v. State*, 514 P.2d 784, 786 (Colo. App. 1973) ("Assuming the provision in the original contract . . . be deemed to give rights to the plaintiffs and impose obligations on the defendants, these rights and obligations could be and here were **modified** by the parties by mutual consent.") (emphasis added) (cited in ECF 215 at 32-33). The fact that these opinions mentioned the word "waiver" in explaining the *impact* of the substitution, supersession, or modification is inapposite. At its core, ATS is simply arguing—once again—that the Subcontract supersedes the Teaming Agreement, and this argument should be rejected for the reasons already discussed above. *See supra* Section I.

Third, ATS's waiver theory makes no sense. Crediting ATS's theory would mean Flatiron intentionally forfeited hundreds of millions of dollars by agreeing to severely limit its ability to recover from the party responsible. The idea that Flatiron would knowingly give up such a large sum is belied by the fact that Flatiron has directly accused ATS of *misrepresenting* the extent of its design failures during negotiations for the Subcontract. (ECF 37 at 6 ¶ 20) (alleging Flatiron was "[u]naware of ATS's breach of its standard of care and misrepresentations . . . [when it] used and reasonably relied on ATS's Pre-Award Services"); *id.* at 11 ¶ 50 (accusing ATS of making "material misrepresentations that ATS had complied with the Teaming Agreement's standard of care in performing Pre-Award Services.").[8] Thus, common sense compels the conclusion that Flatiron did not know ATS's services were so bad as to violate the standard of care, much less the full extent of damages that would ultimately flow from ATS's breach when it entered into the

---

[8] Incidentally, even if ATS could somehow show Flatiron knew the extent of its Pre-Award design failures when it signed the Subcontract, this would actually tend to show the parties did not intend the Subcontract's LOL Clause to apply to the Teaming Agreement. If Flatiron truly knew how badly ATS had performed under the Teaming Agreement, it would only make sense for Flatiron to proceed with the Subcontract and its LOL Clause if Flatiron knew it could still recover the full extent of its damages under the Teaming Agreement.

Subcontract. SADF ¶¶ 48-51. As such, Flatiron could not have "intentionally relinquish[ed]" the right to recover the full extent of its damages, and there has been no waiver.

Fourth, at a minimum, "the question of waiver is a question of fact which is . . . not normally appropriate for summary judgment." *James H. Moore & Assocs. Realty, Inc. v. Arrowhead at Vail*, 892 P.2d 367, 372 (Colo. App. 1994). Here, ATS is essentially arguing that Flatiron impliedly waived its right to sue under the Teaming Agreement by virtue of its conduct, i.e., by signing the Subcontract. (ECF 215 at 31). To prove this as a matter of law, "[t]he conduct must be free from ambiguity and clearly manifest the intention not to assert the benefit." *Burman v. Richmond Homes Ltd.*, 821 P.2d 913, 919 (Colo. App. 1991). As already discussed above, however, Flatiron's decision to sign the Subcontract did not unambiguously manifest an intent to waive all its rights under the Teaming Agreement; quite the contrary. *See* Resp. to SOMF ¶ 11; SADF ¶ 32 (Flatiron intended the Teaming Agreement and Subcontract to operate as separate agreements); *see also Burman*, 821 P.2d at 920 ("Generally, the issue of a party's intent is a question of fact and is not an appropriate issue for summary disposition."). For all of these reasons, ATS is not entitled to summary judgment on its waiver theory.

## III.   FLATIRON SEEKS ONLY DIRECT DAMAGES UNDER THE TEAMING AGREEMENT.

### A.   *Flatiron Seeks Recovery of Costs Accrued as a Direct Result of ATS's Breach of the Teaming Agreement.*

In a final attempt to avoid liability, ATS argues the damages Flatiron seeks under the Teaming Agreement are not direct, but consequential, and are therefore barred by the Teaming Agreement's mutual waiver of consequential damages. This argument also

fails. In fact, a direct line can be drawn between ATS's gross omission of required design elements in performing its Pre-Award Services under the Teaming Agreement (in violation of the standard of care), and the additional costs Flatiron later had to pay to add those missing elements into the design during construction.

As ATS acknowledges, "[d]irect damages refer to those which the party lost from the contract itself—in other words, the benefit of the bargain—while consequential damages refer to economic harm beyond the immediate scope of the contract.'" (ECF 215 at 35) (quoting *SOLIDFX, LLC v. Jeppesen Sanderson, Inc.*, 841 F.3d 827, 839 (10th Cir. 2016)). Here, the "benefit" of Flatiron's bargain (i.e., the Teaming Agreement) with ATS, was receipt of Pre-Award Services that were sufficient for Flatiron's use in preparing an accurate bid for the Project. SADF ¶¶ 33, 35-36. ATS did not hold up its end of the bargain. *Id.* ¶¶ 77-79, 81, 85-87. As a direct result of ATS's omission of required elements in its Pre-Award design and due to its failure to adhere to the RFP requirements, Flatiron likewise (and through no fault of its own) omitted those same elements from its Proposal. *Id.* ¶ 79 (showing ATS's Pre-Award design omitted six miles of concrete barrier, seven miles of concrete drainage pipe, among other things); *id.* ¶ 81 (ATS did not adhere to the RFP when it *inter alia* failed to conduct the required QA/QC check and failed to design to the ultimate condition). In other words, because ATS breached the standard of care in the Teaming Agreement, Flatiron had no ability to provide a bid that included all of the cost necessary to build the Project and thus unwittingly agreed to a Prime Contract value that should have been much higher. *Id.* ¶¶ 27-28, 51-54, 56, 79-81. These costs constitute direct damages as a matter of law.

In the construction context, increased project costs fall squarely within the sphere of direct damages. As one seminal treatise explains:

> *Direct damages* occur when specific project costs increase as a result of a certain event . . . . Those direct damages could include costs for additional labor and materials, escalation of material and labor costs, extended jobsite support costs, and unabsorbed home office overhead.

Robert F. Cushman et al., PROVING AND PRICING CONSTRUCTION CLAIMS § 1.04 (3d ed. 4th Supp.) (emphasis in original). ATS itself admits Flatiron's losses flow from *taking on the Project*, not from executing the Subcontract with ATS. (ECF 215 at 36) (admitting "Flatiron had to undertake the Project in order to rack up <u>any</u> Project losses . . . .) (emphasis in original). This distinction is significant because Flatiron took on the Project in reliance on ATS's Pre-Award design performed pursuant to the Teaming Agreement. As soon as it signed the Prime Contract, Flatiron was set to suffer increased costs, though it would not realize the extent of the increases until much later. SADF ¶¶ 27-28, 51-54, 77.

In contrast, consequential damages arise from "unusual circumstances" outside of either party's direct control or expectation. *Core-Mark Midcontinent Inc. v. Sonitrol Corp.*, 370 P.3d 353, 360 (Colo. App. 2016) (differentiating consequential damages as occurring in "cases in which there are unusual circumstances"). A good example of consequential damages, in fact, are the lost gambling profits demanded by the casino in the case of *Perini Corp. v. Greate Bay Hotel & Casino, Inc.*, which ATS discusses at length in its Amended MSJ. (ECF 215 at 25). The lost profits in *Perini* were consequential because they depended upon circumstances outside of either party's control—i.e., the gambling activities and outcomes of a large number of non-party casino patrons. *Perini*, 610 A.2d at 374 (Gambling "[l]ost profits fall under the category of consequential damages.").

Similarly, in *SOLIDFX*, which ATS also cites, the 10th Circuit observed that, where a party seeks lost profits, these would be considered consequential if they "depend on a separate agreement with a nonparty." *SOLIDFX*, 841 F.3d at 841.

Here, in contrast, Flatiron's damages did not stem from the involvement of non-parties or from any "unusual" circumstances outside of either party's control. Unlike the defendants in *Perini* and *SOLIDFX*, ATS had direct control over the quality of its own Pre-Award Services and the damages its breach of the standard of care would directly cause (i.e., increased quantities and associated costs). And Flatiron has now incurred hundreds of millions of dollars in increased costs due to the quantities (plus associated time, labor, and equipment required to construct them) ATS left out of its Pre-Award design in violation of the standard of care. SADF ¶¶ 77-79, 81, 85-87. These costs are direct damages, not consequential damages, because they were caused by ATS's breach of the Teaming Agreement.

### B.   Flatiron's Damages Arise Under the Teaming Agreement, Not the Subcontract.

Nor do Flatiron's damages hinge upon the parties' later execution of the Subcontract, as ATS suggests. (*See* ECF 215 at 37) (arguing that, before signing the Subcontract, "Flatiron had not yet incurred . . . losses. In fact, at that time, Flatiron had incurred no losses. These losses did not flow directly and immediately from the supposed breach of the Teaming Agreement"). Indeed, ATS tries to minimize the significance of its Pre-Award Services under the Teaming Agreement by claiming its only obligation was to do "just enough preliminary design work to enable Flatiron to formulate and submit a bid on the Project." *Id.* at 36. ATS also compares the size of its fee under the Teaming Agreement to the size of Flatiron's damages claim, implying the purportedly smaller

amount of work it performed under the Teaming Agreement could not have directly caused so much damage. *Id.* at 35-36. This is a gross over-simplification, and wholly ignores the particular significance of ATS's Pre-Award Services to the risk level Flatiron took on in its Proposal. *See* SADF ¶¶ 28, 33, 35-36.

In fact, as discussed above, ATS's Pre-Award services were critical. *Id.* ¶ 33. They formed the basis for Flatiron's Proposal and the amount of risk Flatiron undertook on the Project as a whole. *Id.* ¶¶ 28, 33, 35-36. Under the Teaming Agreement, therefore, it was not enough for ATS to simply do "just enough" for Flatiron to submit just *any* bid—it had to prepare a design **compliant with the Project requirements** and be "adequate and sufficient for bidding the construction of the Project **as described in the RFP Documents**." *Id.* ¶ 36 (emphasis added). ATS failed to meet those requirements when performing its Pre-Award Services under the Teaming Agreement.

Incredibly, ATS also suggests that Flatiron has some culpability because it did not fire ATS and hire a different engineering firm to complete the plans for the Project. (*See, e.g.*, ECF 215 at 2) (implying Flatiron was at fault because it "could have hired a different engineer for the Project"). This would not have solved the problem. To the contrary, while CDOT did not review all of ATS's Pre-Award design for compliance with the Project requirements, the RFC plans and supporting calculations *were* scrutinized by CDOT to ensure strict compliance with the Project requirements. SADF ¶ 27. Thus, a new engineer's RFC plans would have *also* been required to add in the six miles of concrete barrier, seven miles of drainage pipe, 200 drainage inlets, 7,250 square feet of overhead signs, and 34 overhead sign structures (among other things) ATS omitted from its Pre-Award design. *Id.* ¶ 79. And Flatiron *still* would have had to pay out of pocket for the

attendant costs. *Id.* ¶¶ 28, 53-56, 85-86. For this reason, the bulk of Flatiron's damages have nothing to do with ATS's performance of the Subcontract; they arise directly from ATS's performance of the Teaming Agreement and its failure to meet its standard of care.

That said, there is certainly some portion of Flatiron's damages (however relatively small) that arises under the Subcontract, rather than the Teaming Agreement. Flatiron itself has acknowledged this.[9] *Id.* ¶ 88. But these damages are not consequential either because they arise out of the Project and under the Subcontract itself. That Flatiron incurred damages under both contracts illustrates why Flatiron asserted two causes of action—each has its own distinct set of obligations, breaches of which led to distinct damages. In any event, it is for the jury to determine the proper amount and allocation of damages. *Black v. Hieb's Enters., Inc.*, 805 F.2d 360, 362-63 (10th Cir. 1986) ("It [i]s the jury's function, as the trier of fact, to determine the amount of damages . . . and the jury has wide discretion in making that determination.") (citation omitted). This disputed issue of material fact is not suitable for resolution on summary judgment. *Hatlee v. Hardey*, 2015 U.S. Dist. LEXIS 132905, at *60 (D. Colo. Sept. 29, 2015), *aff'd* 665 F. App'x 695 (10th Cir. 2016) ("The amount of damages is a finding of fact . . . not law, and the Court is not inclined to resolve the extent of damages resulting from . . . claimed losses at the summary judgment stage.") (citation and quotation omitted). For all these reasons, the Court should reject ATS's argument that Flatiron's damages are barred by the Teaming Agreement's consequential damages waiver.

---

[9] ATS's claim that Flatiron pins "every dollar" of damages to the Teaming Agreement is demonstrably false. *Compare* (ECF 215 at 13), *with* SADF ¶ 88 (Flatiron's expert witness testifying that a small portion of Flatiron's damages may arise from ATS's breach of the Subcontract).

## IV.   ATS IS NOT ENTITLED TO ATTORNEYS' FEES AND COSTS.

Finally, ATS is not now, and should never be, entitled to attorneys' fees and costs under the Subcontract's Fee-Shifting Provision, which states:

> If the Party submitting the claim prevails on more than half the claims it makes, then each party shall pay its own costs of such litigation. If the Party submitting the claim to litigation prevails on less than half the claims it makes, then the Party submitting the claim to litigation shall pay both Parties' costs of litigation, including reasonable attorneys' fees.

SADF ¶ 73.   To invoke this language and secure judgment as a matter of law on its entitlement to fees and costs, ATS bears the burden to show there is no genuine issue of disputed fact regarding the proper interpretation of the Fee-Shifting Provision. ATS has made no attempt to do so, instead offering an unsupported, overly-simplistic, and illogical reading that would lead to absurd results. The parties actually intended the Fee-Shifting Provision to align with common sense, and to penalize the party who initiated litigation for losing the balance of its overall case, rather than counting wins and losses on individual causes of action. At the very least, this provision is ambiguous, and a determination of its meaning must be left to the jury.

### A.   ATS's Proposed Interpretation of the Fee-Shifting Provision Makes No Sense and Leads to Absurd Results.

ATS's plain language argument is unsupportable. It blindly assumes the term "claim" must mean "cause of action" and argues that, if the Court dismisses Flatiron's claim for breach of the Teaming Agreement, this "will mean that Flatiron can bat no better than .333 in this action, so the Subcontract's fee-shifting provision applies as a matter of law." (ECF 215 at 40).   But ATS's definition of the term "claim" is unsupported in the text of the provision and would lead to consequences the parties could not have intended.

In fact, nowhere in the Subcontract is the term "claim" defined to refer narrowly to individual causes of action. SADF ¶¶ 73-74.  To the contrary, the Fee-Shifting Provision uses the terms "claim" (singular) and "claims" (plural) interchangeably. *Id.* ¶ 73. The Fee-Shifting Provision also does not dictate that a party "prevails" only when it gets a verdict on an individual cause of action. *Id.* ¶ 73-74. Indeed, such a reading would require the parties to do things that are factually impossible. For example, if *both* parties "prevail" on "less than half" the causes of action they assert, ATS's interpretation would mean both parties are required to simultaneously pay "both Parties' costs" and attorneys' fees. *Id.* ¶ 73. On the other hand, if one party prevails on "more than half" its causes of action, while the other party prevails on "less than half" its causes of action, ATS's reading would mean each party must pay its own fees, while at the same time the latter party must pay *both* parties' fees. *Id.*

ATS's interpretation also does not account for the fact that Flatiron, as the defendant, had no choice but to assert its compulsory counterclaims against ATS in this lawsuit, or forfeit them entirely. *See* Fed. R. Civ. P. 13(a) ("A pleading must state as a counterclaim any claim that . . . the pleader has against an opposing party if the claim . . . arises out of the transaction or occurrence that is the subject matter of the opposing party's claim . . . ."); *Avemco Ins. Co. v. Cessna Aircraft Co.*, 11 F.3d 998, 1000 (10th Cir. 1993) ("[I]f a compulsory counterclaim is not brought, the claim is later barred."). According to ATS's reading of the Fee-Shifting Provision, the defendant in a lawsuit would automatically be put in the untenable position of having to waive potential counterclaims, or assert them and risk being saddled with the aggressor's legal fees and costs. This makes no sense.

### B. The Fee-Shifting Provision Should Be Read in a Common-Sense Manner.

Instead of crediting ATS's reading, the Court should adopt a common-sense interpretation that reflects what the parties actually intended. *S. Colo. Orthopaedic Clinic Sports Med. & Arthritis Surgeons, P.C. v. Weinstein*, 343 P.3d 1044, 1047 (Colo. App. 2014) (Fee-shifting provisions should be given their "plain and ordinary meaning" and should be interpreted in a "common sense manner."). Here, a common-sense approach interprets the word "claim" to mean a party's case as a whole, and to penalize a party only if it loses the balance of the *overall case it brought*, rather than keeping a blind tally of wins and losses for causes of action, many of which may overlap or be asserted in the alternative. The Fee-Shifting Provision also penalizes only the party "submitting the claim"—i.e., the party who initiates litigation in the first place—rather than penalizing a responding party who has no choice but to assert or forfeit any compulsory counterclaims. This interpretation resolves many of the inconsistencies in ATS's interpretation, while maintaining the intended effect of deterring a party from injudiciously asserting myriad insupportable accusations. *See W. Stone & Metal Corp. v. DIG HP1, LLC*, 465 P.3d 105, 107 (Colo. App. 2020) ("[C]ourts interpret prevailing party provisions so as to best effectuate the parties' intent.").

A common-sense reading of the Fee-Shifting Provision is also consistent with how Colorado courts interpret fee-shifting provisions generally. Courts confronted with fee-shifting provisions try to determine which party prevailed "on a significant issue in the litigation and derive[d] some of the benefits sought by the litigation." *Archer v. Farmer Bros. Co.*, 90 P.3d 228, 230 (Colo. 2004). The issue on which the party prevails "need not be the central issue in the litigation, only a significant one.'" *Anderson v. Pursell*, 244

P.3d 1188, 1194 (Colo. 2010) (citation omitted). Further, "[t]he number of [causes of action] upon which a party prevails . . . is not determinative." *Archer*, 90 P.3d at 230.

In Flatiron's case, both of its remaining breach of contract causes of action represent different cross-sections of one overarching issue—i.e., ATS's failure to adhere to the applicable standard of care at all relevant times during the life of the Project. All three of Flatiron's causes of action implicate this issue at different points in time, and pursuant to different obligations and agreements. As such, Flatiron could prevail on the central issue of the case and recover its full damages, while at the same time only securing a verdict on "less than half" its causes of action.   For example, even though Flatiron's negligent misrepresentation claim has been dismissed, Flatiron can still seek recovery for ATS's misrepresentations via its surviving causes of action. SADF ¶ 84. It would be counterintuitive and unfair to penalize Flatiron for these pleading technicalities.

Thus, rather than merely counting whether a party secured verdicts on "more than half" its individual causes of action, the Fee-Shifting Provision should be interpreted to penalize only the party initiating litigation for failing, on balance, to prevail on the issues it raises in its affirmative case. *Cf. In re Greene*, 302 P.3d 690, 693-94 (Colo. 2013) (In the context of res judicata, the modern trend is to "treat[] a single claim broadly . . . so as to embrace all remedial rights of a plaintiff against a defendant growing out of the relevant transaction or series of connected transactions."). And because the central issues in this case must be determined by a jury at trial, ATS's demand for fees and costs is premature and must be rejected on summary judgment.

### C.  In the Alternative, the Subcontract's Fee-Shifting Provision is Ambiguous.

At minimum, the Parties' conflicting interpretations suggest the Fee-Shifting Provision is ambiguous and its meaning is disputed. *Ad Two, Inc. v. City & County of Denver*, 9 P.3d 373, 376 (Colo. 2000) ("Terms used in a contract are ambiguous when they are susceptible to more than one reasonable interpretation."). As such, extrinsic evidence must be consulted as "an aid to ascertaining the intent of the parties" when they drafted it. *Am. Family Mut. Ins. Co. v. Hansen*, 375 P.3d 115, 117 (Colo. 2016); *see also Ad Two*, 9 P.3d at 376 ("Extraneous evidence is . . . admissible to prove intent where there is an ambiguity in the terms of the contract."). ATS offers no such evidence. Flatiron, on the other hand, offers evidence showing ATS's proposed interpretation contradicts the parties' intent to penalize only the party who submits a claim (i.e., by filing a complaint in court), and then fails to prevail on the balance of issues it raises in its affirmative case. SADF ¶ 75. Thus, ATS cannot meet its burden to show it is entitled to fees and costs as a matter of law.

### CONCLUSION

For the reasons stated above, the Amended Motion for Partial Summary Judgment should be denied in its entirety.

Dated: May 20, 2022.

By:

/s/ Laurie Choi
Buck Beltzer, #37804
Bret Gunnell, #24579
Laurie Choi, #46514
Michael Zehner, #51312
Beltzer Bangert & Gunnell LLP
7900 E. Union Ave.
Suite 920
Denver, CO 80237
(720) 576-7225
buck@bbglaw.com
bret@bbglaw.com
lchoi@bbglaw.com
mzehner@bbglaw.com

Brian L. Schwalb
David L. Feinberg
Katherine Wright Morrone
Venable LLP
600 Massachusetts Ave. NW
Washington, DC 20001
(202) 344-4000
blschwalb@venable.com
dlfeinberg@venable.com
kwmorrone@venable.com

ATTORNEYS FOR FLATIRON | AECOM, LLC

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 20, 2022, a true and correct copy of the foregoing was filed with the Clerk of the Court using the Court's CM/ECF system and served on all counsel of record.

*/s/Rhonda Rudolph*
Rhonda Rudolph