**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:19-cv-02811-WJM-KAS

AECOM TECHNICAL SERVICES, INC., Plaintiff/Counterclaim Defendant,

v.

FLATIRON | AECOM, LLC, Defendant/Counterclaim Plaintiff.

**AECOM TECHNICAL SERVICES, INC.'S MOTION IN LIMINE**

AECOM Technical Services, Inc. ("ATS") moves *in limine*:

1) to limit evidence of damages recoverable by Defendant/Counterclaim Plaintiff Flatiron | AECOM, LLC's ("Flatiron") in this action in accordance with this Court's order granting partial summary judgment in favor of ATS and against Flatiron ("Motion No. 1");

2) to exclude all evidence and argument of Flatiron's dismissed and disallowed claims for negligent misrepresentation claim (dismissed in ECF No. 97), willful and wanton breach theory (rejected in ECF No. 169), and its fraudulent inducement and fraudulent concealment theories (rejected in ECF No. 275) ("Motion No. 2");

3) to permit ATS to present "Directive Letters," "Notice Letters," and "Default Letters" written by the Project owner, the Colorado Department of Transportation ("CDOT"), to Flatiron concerning the Project during construction ("Motion No. 3") as non-hearsay legal acts; and

4) to prevent Flatiron from attempting to present damages evidence through any source other than its designated damages expert, who is subject to a pending F.R.E. 702 motion ("Motion No. 4").

In support of this motion, ATS relies upon the pleadings filed in this matter and this Court's orders at ECF Nos. 97, 168, 169, 252 and 275; the illustrative CDOT letters and CDOT's contract with Flatiron attached for Motion No. 3; and the discovery hearing transcript at ECF 129 for Motion No. 4.

**CERTIFICATE OF CONFERRAL**

ATS has conferred with counsel for Flatiron by telephone on November 30, 2023, regarding this motion. Flatiron opposes the relief sought in this motion.

**LEGAL STANDARD**

Motions *in limine* are a well-established practice based on a district court's "inherent authority to manage the course of trials." *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984) (*citing*

F.R.E. 103). A motion *in limine* is a "pretrial request that certain inadmissible evidence not be referred to or offered at trial." *Edens v. The Netherlands Ins. Co.*, 834 F.3d 1116, 1130 (10th Cir. 2016). The purpose of a motion *in limine* is to "aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial." *Mendelsohn v. Sprint/United Mgmt. Co.*, 587 F.Supp.2d 1201, 1208 (D.Kan. 2008) *aff'd*, 402 Fed.App'x. 337 (10th Cir. 2010). In addition to streamlining the trial, granting motions *in limine* benefits the parties through savings in cost, time, and trial preparation. *Id.* Importantly, motions *in limine* give the trial court latitude to exclude irrelevant evidence and prevent it from otherwise wasting time, confusing the issues, misleading the jury, or creating unfair prejudice. F.R.E. 102, 401, 402, and 403; *see also Train v. City of Albuquerque*, 629 F.Supp.2d 1243, 1247 (D.N.M. 2009) (Browning, J.).

Where the proposed evidence—particularly on an issue that has been exhaustively evaluated and decided by the court—is irrelevant, likely to confuse and mislead the jury, and waste time, the evidence should be excluded pursuant to Federal Rules of Evidence 402 and 403. *See, e.g.*, *Silverman v. Greenfield*, 2019 WL 399233, at *1 (D.Colo. 1/31/2019) (Martinez, J.) ("The Summary Judgment Order holds that there is no theory by which Greenfield may be liable for moving too late to correct Magistrate Koppenhofer's error. . . . In this light, detailed evidence regarding what the Boulder County District Court and the Colorado Court of Appeal said is now irrelevant, and presenting it would otherwise be 'wasting time.'"); *see also Chimney Rock Pub. Power Dist. v. Tri-State Generation & Transmission Ass'n, Inc.*, 2014 WL 1715096, at *2 (D.Colo. 4/30/2014) (Martinez, J.) ("The Court agrees with the parties that any testimony by [the witness] on damages caused by an alleged breach of the implied covenant of good faith and fair dealing would be irrelevant, as well as confusing to the jury, now that no such breach is at issue in this case. Such evidence is therefore inadmissible under Rules 402 and 403."); *Iron Dynamics v. Alstom Power, Inc.*, 2008 WL 2078621, at *9 (N.D.Ind. 5/15/2008) (granting motion *in limine* to limit all evidence of damages in accordance with the court's order, which dismissed the non-movant's claims for breach of implied warranties and precluded recovery of consequential damages).

## **MOTION NO. 1**

ATS respectfully requests that the Court grant Motion No. 1 to exclude all evidence, testimony, argument, and references by Flatiron that Flatiron is entitled to damages in excess of the Subcontract's liability cap— which has now eroded to an amount less than $10 million. The Court has already ruled – twice – that the Subcontract's liability cap is enforceable. (ECF Nos. 252 and 275.) An order granting Motion No. 1 is appropriate to streamline the case and ensure Flatiron does not confuse the jury, waste this Court's and the jury's time, or prejudice ATS with irrelevant evidence about damages the Court has determined are not available to Flatiron.

In an attempt to narrow the issues in this case, ATS moved for partial summary judgment concerning the enforceability of the parties' agreed-upon liability cap in the Subcontract. (ECF No. 215.) This Court granted ATS's motion in its entirety. (ECF No. 252.) Specifically, the Court dismissed Flatiron's claim for breach of the Teaming Agreement and ruled as a matter of law that "Flatiron's sole remaining claim for breach of the Subcontract is subject to the liability limitations contained in the Subcontract." (*Id.* at 25.) The Court held that the language of the Subcontract

> turns any claim for breach of the Teaming Agreement into a claim for breach of the liability-capped Subcontract. In other words, as a result of the parties having signed the Subcontract, to the extent Flatiron believed that [ATS] had breached the Teaming Agreement, Flatiron could nonetheless no longer sue for breach of the Teaming Agreement; instead, Flatiron can sue for breach of the liability-capped Subcontract alone.

(*Id.* at 14.) Flatiron's recovery is thus limited to the amount of Subcontract's liability cap.

Flatiron has nonetheless tried to circumvent this limitation on at least four separate occasions, including by asserting a negligent misrepresentation claim (dismissed in ECF No. 97), a willful and wanton breach theory (rejected in ECF No. 169), and by attempting to add new claims for fraudulent inducement and fraudulent concealment (rejected in ECF No. 275). During trial, ATS anticipates Flatiron will seek to ignore the Subcontract's cap and this Court's orders.[1] Accordingly,

---

[1] Flatiron has recently tried yet another tack to avoid this Court's application of the Subcontract's liability cap. On November 3, 2023, Flatiron and its manager Flatiron Constructors, Inc. filed a new lawsuit in Colorado state court against ATS and two employees seeking a

ATS brings Motion No. 1 to limit evidence of damages in this trial as prescribed by the terms of the limitation of liability provision in the Subcontract, which this Court ruled valid and enforceable.

Any evidence of Flatiron's asserted damages exceeding the Subcontract's liability cap is irrelevant because this Court has already ruled that Flatiron's sole remaining claim for breach of the Subcontract is subject to the Subcontract's liability cap. (*See generally* ECF No. 252). During trial in this case, ATS expects that Flatiron will seek to argue and present evidence that the design services performed by ATS under the Teaming Agreement were the singular cause of Flatiron's quarter of a billion dollars in cost overruns and multi-year delay, thus entitling Flatiron to damages in excess of the Subcontract's liability cap by approximately $253 million (Flatiron's current damages calculation against ATS of roughly $263 million, minus the less than $10 million Subcontract liability cap). Such evidence is irrelevant in light of the Court's prior findings. (*See* ECF Nos. 252 and 275.) F.R.E 401, 402.

Not only did the Court dismiss Flatiron's claim for breach of the Teaming Agreement, but the Court also held that Flatiron's sole remaining claim for breach of the Subcontract is subject to the limitation of liability provision contained in the Subcontract: "the plain language of the Teaming Agreement and the Subcontract . . . confirms that by entering into the superseding Subcontract, Flatiron's sole claim against [ATS] is for breach of that Subcontract, and its recovery is capped per the Subcontract's enforceable liability limitation." (ECF No. 252 at 211.) Therefore, any evidence of damages in excess of the parties' agreed-upon limitation of liability should be excluded as irrelevant, inadmissible and confusing to the jury. *See, e.g.*, *JDB Med., Inc. v. Sorin Grp., S.p.A.*, No. 07-CV-00350-REB-CBS, 2008 WL 2764963, at *1 (D. Colo. June 11, 2008) ("[The Court has]

---

declaration that the Subcontract's liability cap is unenforceable on public policy grounds. This new lawsuit, Denver County District Court Case No. 2023-cv-33243, alleges fraud by ATS, ATS's Project Manager Mindy Steckmest, and ATS's Drainage Lead Will Carrier based on the allegations in Flatiron's dismissed 2020 negligent misrepresentation claim in this federal action (ECF No. 97) plus Flatiron's more recent motion to amend in the federal action (ECF No. 275). The state lawsuit seeks damages and also a declaratory judgment that "all exculpatory and limiting provisions in the Design Subcontract, including but not limited to the LOL Clause, are null, void, and unenforceable" on equitable grounds, as against public policy in light of ATS's "fraudulent, wanton, reckless, and/or grossly negligent conduct."

4

granted the defendants' motion for partial summary judgment as to the plaintiffs' claims for damages during any time period beyond the initial five year term of the [] Agreement. . . . In view of this ruling, any evidence presented by the plaintiffs concerning damages they claim they will suffer beyond [the term of the agreement], is irrelevant under Fed. R. Evid. 401, and, thus, is inadmissible under Fed. R. Evid. 402.").

Rather than wasting this Court's and the jury's time making a record on irrelevant evidence supporting a dismissed claim, if the Court grants ATS's motion, Flatiron can preserve its appellate rights regarding its claimed damages above the Subcontract's liability cap by filing an appropriate offer of proof under Fed. R. Evid. 103(a).

Alternatively, if the Court chooses to allow Flatiron to present damages in excess of the Subcontract's liability cap, the Court should instruct the jury as to (i) the existence of the limitation of liability provision in the Subcontract, and (ii) the Court's ruling that Flatiron's recovery is capped per the Subcontract's enforceable liability limitation. Flatiron's overreaching in seeking $263.5 million in damages despite a less than $10 million liability cap is highly relevant to the jury's credibility determinations and evaluation of evidence. *E.g. Lenexa 95 Partners, LLC v. Kin, Inc.*, 2023 WL 174507, at *6 (D.Kan. 1/1/2023), *appeal dismissed*, 2023 WL 5608807 (acknowledging relevance of party's overreaching in rejecting post-trial motion that supposedly inadequate verdict for plaintiff was tainted by counsel's argument that plaintiff had overreached with damage claims).

Also, consistent with this Court's orders at ECF Nos. 252 and 275, the limitation on Flatiron's evidence of damages should include a limitation that Flatiron cannot present any schedule-related or delay damages in excess of the liability cap because of the Subcontract's express provision that ATS's "liability for delay (including but not limited to LDs) shall be limited to 20% of the Total Design Fee in the aggregate which shall be included as part of the overall limitation of liability." *See* ECF No. 1-1 at 6, ¶ 2. Additionally, consistent this Court's order at ECF No. 168, the limitation on Flatiron's evidence of damages should include a limitation that Flatiron is contractually precluded from recovering consequential damages.

## MOTION NO. 2

ATS respectfully requests that the Court grant Motion No. 2 to exclude all evidence,

testimony, argument, and references by Flatiron regarding the claims and theories that this Court has already dismissed and/or disallowed, namely Flatiron's: (i) negligent misrepresentation claim (dismissed in ECF No. 97), (ii) willful and wanton breach theory (rejected in ECF No. 169), (iii) breach of the Teaming Agreement (dismissed in ECF No. 252), and (iv) its fraudulent inducement and fraudulent concealment theories (rejected in ECF No. 275).  Because the Court has dismissed and disallowed these claims and theories, they are irrelevant under F.R.E. 401, inadmissible under F.R.E. 402, prejudicial to ATS, confusing to the jury, and wasteful of this Court's and the jury's time under F.R.E. 403.  Accordingly, any evidence of these claims or theories should be excluded during trial.  *See Silverman v. Greenfield*, 2019 WL 399233, at *1.

While the Court has already rejected Flatiron's attempts to advance its claims and theories sounding in tort and its breach of the Teaming Agreement claim, ATS anticipates that Flatiron will attempt to introduce evidence and question witnesses about ATS's intent and mental state during its performance under both the Teaming Agreement and Subcontract.  Because the Court has held that "Flatiron's sole claim against [ATS] is for breach of that Subcontract," [ECF No. 252 at 211], any evidence about ATS's intent or mental state during its performance under either agreement is irrelevant—intent is not relevant to contract liability, which is a form of "strict liability."  *See Moran Foods, Inc. v. Mid-Atl. Mkt. Dev. Co., LLC*, 476 F.3d 436, 439 (7th Cir. 2007) ("liability for breach of contract is a form of strict liability").  In other words, Flatiron is trying a breach of contract case, not a fraud case.  Thus, any evidence about ATS's mental state or intent is irrelevant, inadmissible, and should be excluded.  *JDB Med., Inc.*, 2008 WL 2764963, at *1.  Again, Flatiron can preserve its record through an appropriate offer of proof.

## **MOTION NO. 3**

ATS respectfully requests this Court to rule in advance of trial that three categories of formal notice letters written by CDOT to Flatiron under their prime contract (the "Contract"), attached as Exhibit 1, have legal effect independent of the truth of any statements contained in them and are therefore not hearsay and are admissible.

Much like the existence of CDOT and Flatiron's contract is not hearsay, as well as the fact that certain statements were made in the contract is not hearsay, CDOT's letters to Flatiron are not

6

hearsay because the letters have independent legal significance prescribed by the Contract. *See Cagle v. James St. Grp.*, 400 F.App'x 348, 356 (10th Cir. 2010) (unpublished) ("First, the contract was not excludable as hearsay. It constituted an act of legal significance between Norris and her attorneys, not a 'statement' offered for its truth."); *see also Echo Acceptance Corp. v. Household Retail Servs.*, 267 F.3d 1068, 1087 (10th Cir. 2001) ("[I]f the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay.") (citation omitted); *Berkley v. Deutsche Bank Nat'l Trust Co.*, 2014 WL 1795828, at *8 (W.D.Tenn. 5/6/2014) (holding that notice of default was a not hearsay); *Sabre Intl. Sec. v. Torres Adv. Enter. Sols., LLC*, 72 F.Supp.3d 131, 142 (D.D.C. 2014) (holding that a letter terminating an agreement was admissible because of the letter's independent legal significance as proof of termination of the contractual relationship and to show defendant's belief that a bona fide dispute existed as to amounts due under the agreement, which belief was relevant to defendant's accord and satisfaction defense to breach of contract claim).

Here, the letters fall into three categories: (1) Directive Letters; (2) Notice Letters; and (3) Default Letters. Each category of letter, its function, and the requirements corresponding to its content and timing are defined in the Contract. *See, e.g.*, Ex. 1, Contract § 13.1.2 ("Directive Letter as Condition Precedent to Claim that CDOT-Directed Change Occurred"), § 4.2 ("Notices to Proceed"), § 20.1.4 ("Inspection and Issuance of Notice of Final Acceptance"), § 24.9 ("Notices and Communications"), and § 16.1 ("Default by Contractor" and "Right to Cure" (within 15 days of CDOT's notice)). The letters at issue are not only admissible evidence of non-hearsay legal acts, but they are relevant evidence of Project design changes directed by CDOT (not caused by ATS), Project schedule content changes directed by CDOT, and contract breach notices and pending disputes between CDOT and Flatiron over the same delay days and costs at issue in this case. Examples of each CDOT letter type for reference are attached as Exhibit 2:

- May 7, 2018 Directive Letter: "[T]his letter constitutes a Directive Letter and an Order to Proceed from CDOT to F|A relative to roadway, drainage, and structure design changes and construction requirements at the C470 and US-85 interchange area. Based on a request from Douglas County . . . CDOT is making the following design and construction changes to the Project." (FA0000304134).

7

- May 10, 2019 Notice Letter: "CDOT does not have confidence in F|A's ability to meet the Project Completion Deadlines in accordance with the terms of Change Order 018. CDOT has repeatedly expressed concerns over F|A's ability to meet the schedule and F|A has done little to address CDOT's concerns." (FA0000304313).

- July 18, 2019 Default Letter: "[C]onsider this notice that F|A is in breach of the Contract. The notice of breach derive from a variety of provisions, but primarily concerning: (1) F|A's inability to complete the Project by the contractually-imposed Project Completion Deadlines; (2) F|A's newfound claims and declaration of breach surrounding CDOT's de-scoping of Noise Wall 4 (F/A Letter CDOT-092) and a supposed weather impact to the Project (F/A Letter CDOT-091); (3) F|A's misrepresentations concerning Project Completion Deadlines and alleged delays; (4) F|A's failure to provide timely notices of delay; and (5) breaches of the implied warranties of good faith and fair dealing…" (FA0000304370).

- August 1, 2019 Directive Letter: "CDOT's position regarding deletions and modifications to the Scope of Work for Noise Wall 4 remains as previously documented in the CDOT May 28, 2019 and May 30, 2019 Directive and Order to Proceed letters. As previously noted, F|A's request for a time extension is not in accordance with the Contract Requirements and will not be Approved by CDOT." (FA0000304385).

- August 2, 2019 Default Letter: "CDOT Directive Removing Noise Wall 4 from the Project . . . F|A provided false and materially misleading representation including Project Completion Deadlines, F|A's alleged delays, and untimely notices. . . F|A failed to adequately address CDOT's comments and concerns and continually misrepresented in the Contract Schedules that they were able to meet the required Project Completion Deadlines. . . CDOT has ongoing concerns with F|A's apparent inability to accurately develop and execute a project schedule for timely completion of this Project." (FA0000304414).

- October 1, 2019 Notice Letter: CDOT issues notice to the surety and assesses liquidated damages because "F|A has not yet met the requirements to achieve Project Completion Notice by Contractor and has now failed to achieve the requirements for the October 1, 2019 Affidavit of Final Completion Deadline, as modified by Change Order 18." (FA0000620296).

- August 19, 2020 Default Letter: "F|A continues to provide false claims of CDOT-Caused Delays in an attempt to shift responsibility to CDOT. . . . It appears as though F|A is engaging in bad faith behavior, given the entirely inaccurate Project Completion notices, coupled with the fact that it is nowhere close to being eligible for Final Payment. . . . F|A provided false and materially misleading representation with the recently submitted Final As-Built Schedule submittal." (FA0003722838).

- August 21, 2020 Notice Letter: "CDOT is in receipt of F|A's Final As-Built Schedule transmitted for CDOT Acceptance on August 6, 2020. The schedule is in violation of multiple Contract requirements and is rejected in its entirety. F|A has persistently submitted schedules which fail to address CDOT comments from previous schedule submittals, violate Contract requirements, and expand and compound previous rejected schedules." (FA0003723371).

8

- June 22, 2022 Default Letter: "CDOT is putting F|A on formal notice of breach under the Contract that derive from a variety of Contract provisions, but primarily concerning: 1. F|A's failure to reasonably comply with the instructions of CDOT consistent with the Contract as set forth in Book 1, Section 20.1.3 and 20.1.3.1 related to advancing documentation for outstanding matters for achieving Affidavit of Final Completion; 2. F|A's failure to perform Contract obligation(s); 3. Breaches of the implied warranties of good faith and fair dealing." (ATS02026960).

CDOT's letters to Flatiron also meet the business records exception under F.R.E. 803(6) because they were prepared in the normal course of CDOT's business to ensure this state-funded project was completed on-schedule and on-budget.  The letters at issue were prepared contemporaneously by CDOT's Project Director and professional engineer, Michael Keleman, who has worked for CDOT since 1999, in accordance with the various Notice provisions in the Contract including Section 24.9 ("Notices and Communications"), and were exchanged with Flatiron through Aconex, a state-operated database and portal set up solely for the Project.  The preparation of correspondence from CDOT to a state project's general contractor are undisputedly a regular practice.  Accordingly, because ATS can establish the F.R.E. 803(6) predicates (addressed here generally), then the Court should conclude that the CDOT letters are admissible hearsay pursuant to the business records exception.

## **MOTION NO. 4**

ATS respectfully requests that the Court grant Motion No. 4 to prevent Flatiron from attempting to present damages evidence through any source other than its designated damages expert Melvin Torres.  Flatiron steadfastly objected and refused to meaningfully quantify its claimed damages in its initial disclosures or discovery responses by taking the position that its claimed damages would be quantified through the report of its damages expert, which Magistrate Judge Mix effectively permitted over ATS's objection. *See* ECF 129 (transcript of 10/6/2020 discovery hearing before Magistrate Judge Mix) at 83-89.

Flatiron's damages expert Mr. Torres is subject to a pending F.R.E. 702 motion.  In the event the Court excludes or limits Mr. Torres's expert opinions quantifying Flatiron's damages, Flatiron should not be permitted to avoid the consequences of its refusal to provide any discovery responses regarding damage quantification other than Mr. Torres's expert opinion, *e.g.* by having one of its

9

Project managers offer lay testimony quantifying damages, or otherwise offering undisclosed new evidence to quantify its claimed damages.  F.R.C.P. 37(c)(1).

Respectfully submitted this 1st day of December 2023.

*s/ Stephen D. Gurr*
Stephen D. Gurr
M. Adam Lewis
Bennett L. Cohen
Carter McDonnell
Polsinelli PC
1401 Lawrence Street, Suite 2300
Denver, CO 80202
Phone: (303) 572-9300
sgurr@polsinelli.com
adam.lewis@polsinelli.com
bcohen@polsinelli.com
cmcdonnell@polsinelli.com
*Attorneys for Plaintiff/Counterclaimant Defendant AECOM Technical Services, Inc.*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on December 1, 2023, a true and correct copy of the foregoing was filed with the Clerk of Court using the CM/ECF system which will send notification of such filing on all counsel of record.

*s/ Tammi Huff*