**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:19-cv-02811-WJM-KAS

AECOM TECHNICAL SERVICES, INC.,

      Plaintiff/Counterclaim Defendant,

v.

FLATIRON | AECOM, LLC,

      Defendant/Counterclaim Plaintiff.

---

**ATS'S MOTION FOR ATTORNEYS' FEES INCURRED FROM OUTSET OF
LITIGATION THROUGH CONCLUSION OF TRIAL**

---

Pursuant to this Court's 6/16/2023 partial summary judgment order (ECF 252), F.R.C.P. 54(d)(2) and D.C.Colo.LCivR 54.3, ATS moves for an award of the attorneys' fees it reasonably and necessarily incurred in litigating this action from its inception in November 2018 through the end of trial in February 2024.  ATS seeks $9,580,515.

**Conferral:** Counsel for ATS has conferred with counsel for Flatiron, which opposes the relief sought in this motion.

Because the Court has presided over this entire litigation, including the recent four-week jury trial, and is aware of the facts and procedural background, ATS will be succinct.

**I.    BASIS FOR FEE REQUEST**

The Design Subcontract's fee-shifting provision states:

If the Party submitting the claim prevails on more than half of the claims it makes, then each party shall pay its own costs of such litigation. If the Party

1

> submitting the claim to litigation prevails on less than half of the claims it makes, then the Party submitting the claim to litigation shall pay both Parties' costs of such litigation, including reasonable attorneys' fees.

ECF No. 37-2 at 7 ¶ 5; quoted at ECF 252 at 22.

In its June 2023 partial summary judgment order, this Court ruled that Flatiron, having lost two of the three claims it had asserted, was required to pay ATS's fees and costs incurred in this action pursuant to the Subcontract's fee shifting provision. ECF 252 at 22-25. Specifically, after reviewing and applying the Subcontract's unambiguous fee-shifting provision, the Court ruled: "Pursuant to the plain terms of the Subcontract, the fee-shifting provision applies, and thus, Flatiron must pay for AECOM's attorneys' fees and litigation costs." ECF 252 at 25, first sentence.[1]

Pursuant to Local Rule 54.3, ATS supports its fee request with an affidavit from lead counsel Steve Gurr reviewing the qualifications and experience of ATS's counsel, and a detailed description of the services rendered, time spent, hourly rates, and amount claimed. **Exhibit 1**. ATS also attaches its invoices (redacted as necessary for privilege and work product),[2] **Exhibit 2**; a spreadsheet that contains all the time entries for easier viewing and tallying, **Exhibit 3**; an opinion from its retained fee expert Laurin Quiat, who has practiced for 38 years in the field of complex construction and commercial litigation, and is BakerHostetler's national construction litigation practice

---

[1] The Court went on to note that its order was interlocutory and not necessarily the last word, since there was a possibility that ATS might also lose a majority of its claims (*i.e.* both of them). *Id.* The jury's verdict (ECF 441) and resulting judgment (ECF 454) have now eliminated that possibility.

[2] Flatiron is still suing ATS in a duplicative state court action, despite the obvious preclusion, so work product remains subject to protection.

group leader and Denver office managing partner, **Exhibit 4**; and a declaration from ATS's attorney Carter McDonnell, who assembled the invoices and spreadsheets attached to ATS's fee and costs motions, and attests to their accuracy, **Exhibit 5**.

## II.    SCOPE OF FEE REQUEST

ATS seeks its attorneys' fees incurred from the inception of this dispute in November 2018 through the conclusion of the trial, using February 29, 2024 to separate the five+ years of litigation culminating the verdict and judgment from the ongoing post-trial litigation.

ATS notes that under the plain language of the Subcontract's fee-shifting provision it is also entitled to recover its post-trial fees, and fees incurred in any appeal that Flatiron might take.  But as the Court appreciates, it is not possible to review and continually update the quantum of fees requested in real time.  ATS therefore seeks its fees incurred through the end of February 2024, and will apply for its post-trial fees after the conclusion of post-trial litigation (and also subsequently any appellate litigation), as this Court or the Tenth Circuit may direct, or as seems most appropriate.

## III.    LEGAL STANDARD FOR FEE RECOVERY

A party seeking an award of attorneys' fees and non-taxable expenses must demonstrate that the fees it seeks are reasonable.  *Mann v. Reynolds*, 46 F.3d 1055, 1062 (10th Cir. 1995).  To justify the request, counsel must make a good faith effort to exclude hours or expenses that are "excessive, redundant or otherwise unnecessary." *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983).

The starting point for any calculation of a reasonable attorneys' fee is the

3

"lodestar," that is, the number of hours reasonably expended multiplied by a reasonable hourly rate. *Hensley*, 461 U.S. at 433; *Malloy v. Monahan*, 73 F.3d 1012, 1017–18 (10th Cir. 1996).

To determine the number of hours reasonably expended, the Court reviews counsel's billing entries to ensure that counsel exercised proper billing judgment. *Case v. Unified Sch. Dist. No. 233*, 157 F.3d 1243, 1250 (10th Cir. 1998). Once the Court determines the lodestar, it may "adjust the lodestar upward or downward to account for the particularities" of the work performed. *Phelps v. Hamilton*, 120 F.3d 1126, 1131 (10th Cir. 1997). The Court is not required to reach a lodestar determination in every instance, however, and may simply accept or reduce a fee request within its discretion. *Hensley*, 461 U.S. at 436-37.

As for the hourly rate, the Tenth Circuit has indicated that "the court must look to 'what the evidence shows the market commands'" for analogous litigation. *Burch v. La Petite Academy, Inc.*, 10 Fed.Appx. 753, 755 (10th Cir. 2001) (quoting *Case*, 157 F.3d at 1255). The burden is on the party seeking fees to provide evidence of the prevailing market rate for similar services by "lawyers of reasonably comparable skill, experience, and reputation" in the relevant community. *Ellis v. Univ. of Kansas Med. Ctr.*, 163 F.3d 1186, 1203 (10th Cir. 1998). *Accord Bio Med Techs. Corp. v. Sorin CRM USA, Inc.*, 2016 WL 1161848, *6 (D.Colo. 2/24/2016) (Martinez, J.).

## IV.    ARGUMENT

ATS addresses the rate component of the lodestar first; then the time spent.

**A.      ATS's counsel's rates are reasonable.**

When this dispute began escalating in 2018, ATS hired counsel from Bryan Cave Leighton Paisner to handle this matter: principally Steve Gurr and Adam Lewis.  In April 2021 these attorneys moved their practice to Polsinelli.

Through the five+ years of litigation from inception through the conclusion of trial, other attorneys and paralegals worked on this matter.  Mr. Gurr's affidavit, **Exhibit 1**, contains a list of all billing timekeepers, plus a brief biography of the principal attorneys and paralegal, detailing their qualifications and experience.

Additionally, Mr. Gurr's affidavit includes a calculation of the "effective" rate of each attorney – that is, the average rate of each attorney over the course of the litigation, determined by total amount billed by that attorney divided by that attorney's number of hours.  This effective rate thus captures the average rate for each attorney as both firms raised their attorneys' rates in keeping with national and regional trends.  The effective rates of the attorneys who participated at trial are:

| Attorney | Position | Eff. Rate |
|---|---|---|
| Steve Gurr | lead counsel and shareholder at both firms, 34 years of experience | $634 |
| Adam Lewis | associate at Bryan Cave and shareholder at Polsinelli, 14 years of experience | $487 |
| William Meyer | shareholder at Polsinelli, 22 years of experience | $764[3] |
| Carter McDonnell | associate at Polsinelli, 7 years of experience | $386 |
| Ben Cohen | of counsel at Polsinelli, 31 years of experience | $551 |

[3] Mr. Meyer is an experienced construction litigation attorney who focused his full attention on this matter at beginning at the final trial preparation phase in December 2023.  As a result, his effective rate reflects only his most recent rates; it is not lowered by averaging in work done years earlier at a lower rate.

As further addressed in Mr. Gurr's affidavit and Mr. Quiat's expert opinion, these rates are reasonable and well within the range of rates charged by Denver area attorneys with the experience and skill required to litigate and try a case of this magnitude and complexity working in large firms (both Bryan Cave and Polsinelli are national law firms with about 1,000 attorneys each).

**B.    ATS's counsel's hours are reasonable.**

ATS's fee request reflects the time reasonably and necessarily spent to handle this matter from inception through the conclusion of the four-week jury trial in February 2024.  Per the attached invoices and spreadsheet (**Exhibits 2** and **3**), the $9,580,515 in fees that ATS seeks represents 20,499.2 hours of legal work at a blended effective rate of $467 per hour.

Having presided over the entirety of the pre-trial litigation and the four-week jury trial, the Court is intimately familiar with the amount of work that counsel for ATS was required to perform – especially in light of the size and duration of the Project, the technical complexity and the $260 million quantum of Flatiron's claim, and the litigation tactics Flatiron employed to pursue it.

**1.    The nature of this complex construction litigation required extensive work.**

ATS filed this action to recover $5.3 million that Flatiron owed ATS for unpaid design work.  As the Court will recall, Flatiron did not contest its liability for this work. The only reason Flatiron didn't pay that claim was because Flatiron presumed it would be set off against Flatiron's much larger and disputed counterclaim, and Flatiron wanted

to satisfy ATS's $5.3 million claim through setoff rather than by paying it when due (as required by the Subcontract).  As a result, all of the litigation surrounding ATS's $5.3 million claim was effectively caused by Flatiron, including through its last-minute and unsuccessful efforts to reverse the order of proof by accepting a *conditional* judgment, and unsuccessful efforts to challenge the claim at trial despite acknowledging its validity.

But the far more substantial driver of ATS's expenditure was the massive amount of legal work Flatiron required ATS to perform to defend against Flatiron's $260 million counterclaim.   Flatiron's overreaching efforts to blame ATS for hundreds of millions of cost overruns required a commensurate response, both through trial preparation and development of expert testimony.  As the Court will recall, the Project was lengthy (2016-2020), massive (13 miles in two directions) and complex (involving multiple technical disciplines).  The design work required engineering expertise in numerous roadway design disciplines: the roadway, drainage, signage, traffic maintenance, etc.  Flatiron's strategy was to attack every aspect of ATS's design as inadequate to support its theory that virtually all of its Project losses were caused by an inadequate and insufficient pre-bid design, and thereby justify its $260 million damage claim.

Flatiron presented four experts.  Flatiron's standard of care expert Dr. O'Connell identified 72 alleged violations of the standard of care, maintaining that nearly every aspect of ATS's design work was inadequate.  And Flatiron's damages expert Mr. Melvin Torres opined that these alleged errors in ATS's preliminary, pre-bid design work caused Flatiron $260 million in cost overrun damages.  Responding to a professional

7

negligence counterclaim of this magnitude and complexity required millions of dollars of legal work.

### 2. ATS also had to undertake extra legal work to counter Flatiron's efforts to avoid the liability cap.

If Flatiron had responded to ATS's undisputed claim for unpaid design work with a straightforward counterclaim for breach of the Subcontract, this case would have been complex and expensive. But Flatiron also forced ATS to incur extensive additional legal fees in responding to Flatiron's efforts to evade the bargained-for liability caps in the Subcontract. ATS therefore briefly reviews how Flatiron's litigation tactics (not just the sheer size of its claim) substantially ran up the fees in this litigation by requiring extensive legal work just to narrow the action to what it should have been at the outset.

Following about a year of demand letters and pre-litigation preparation, ATS filed this action in October 2019 to recover about $5 million in unpaid change order work from Flatiron – money that Flatiron acknowledged it owed to ATS, but had withheld based on an anticipated setoff against Flatiron's much larger claims against ATS. ECF 1. Given the parties' allocation of risk in the Subcontract via the limitation on liability cap, a damages for delay subcap, and a waiver of consequential and other damages, Flatiron knew that its best day in court would be capped at a low amount. Flatiron therefore should have tailored its counterclaim and litigation strategies accordingly. The five-plus years of litigation here was driven entirely by Flatiron's decision to demand $260 million and spend years of pretrial litigation trying to find some way to get around

8

the Subcontract's limitations on liability.[4]

Flatiron led with a tort claim for negligent misrepresentation alleging that ATS had duped Flatiron into agreeing to the Subcontract's liability limitations.  ECF 37 at 12-13.  The Court dismissed Flatiron's negligent misrepresentation counterclaim as barred by Colorado's Economic Loss Rule.  ECF 97, applying *Town of Alma v. AZCO Constr., Inc.*, 10 P.3d 1256, 1264 (Colo. 2000).

Flatiron also argued that ATS's alleged willful and wanton breach of the Subcontract vitiated the liability limitations.  The Court rejected this theory under controlling Tenth Circuit interpretation of Colorado law, holding that bargained-for contractual liability limits and damage caps are an enforceable allocation of risk.  ECF 169, applying *SOLIDFX, LLC v. Jeppesen Sanderson, Inc.*, 841 F.3d 827, 838-41 (10th Cir. 2016).[5]

Flatiron also asserted a claim for breach of the Teaming Agreement because the Teaming Agreement did not have liability caps like the Subcontract.  Indeed, Flatiron

---

[4] This caused ATS to burn through the $10 million project specific professional liability policy in defensive litigation fees.  Accordingly, a substantial portion of the fees and costs that ATS seeks through its Rule 54(d) motions were in fact paid by the insurance carrier that provided the $10 million project specific project liability (PSPL) policy discussed in the Subcontract.  ECF 37-2 at 3, first paragraph.  Now that the litigation is concluded and ATS has prevailed, the PSPL carrier has a subrogation-based right to recover its $10 million from ATS's fee and cost recovery from Flatiron.  As a result, ATS is largely obligated to seek full recovery of its fees and costs from Flatiron on behalf of its insurers.

[5] The Colorado Court of Appeals has since confirmed that this Court got the analysis right by again holding that bargained-for risk allocations are enforceable in this precise context.  *See Johnson Nathan Strohe, P.C. v. MEP Eng'g, Inc.,* 501 P.3d 826, 831-32 (Colo.App. 2021).

made the strategic decision to start arguing and have its expert opine that *every dollar* of Flatiron's $260 million claimed damages was caused by design errors in the roughly 10% of preliminary design work performed under the Teaming Agreement.  In June 2023 this Court ruled that the Teaming Agreement was subsumed into the superseding Subcontract, so Flatiron's claim for breach of Teaming Agreement was now cognizable only as a claim for breach of liability-capped Subcontract, severely limiting Flatiron's potential recovery.  ECF 252 at 20-22.

After this ruling, Flatiron should have resigned itself to the inescapable fact (which it should have known from the outset) that its best day in court would yield no or at most limited recovery.  It nevertheless chose to press on.  Flatiron tried motions to reconsider and to belatedly add fraud claims, to no avail.  ECF 264.[6]  Then Flatiron forced ATS to prepare for a four-week jury trial, knowing that any verdict would be capped, apparently hoping that the Tenth Circuit would remove that cap on appeal.  In the leadup to trial, ATS therefore reminded Flatiron of the limitation on liability, the full erosion of the $10 million project specific professional liability policy, the Court's fee-shifting ruling (ECF 252 at 22), as well as of Flatiron's liability to ATS, and invited Flatiron to mediation.  **Exhibit 6**, 12/5/2023 letter.  Flatiron still maintained its overreaching damages claim through the final push of pretrial litigation, in which Flatiron belatedly tried to reverse the order of proof by requesting entry of a conditional

---

[6] Flatiron is still trying to litigate its fraud theory in state court, despite the obvious preclusion, election of remedies, and other legal doctrines that prevent it from trying the same claims a second time.  ATS does not seek its state court fees here, but anticipates recovering them in the state court action under C.R.S. § 13-17-201.

judgment on ATS's affirmative claim, instead of offering a straightforward and unconditional confession of judgment.

All of this pretrial legal work was necessary just to pare Flatiron's counterclaim back to the only cognizable claim it ever had: breach of the liability-capped Subcontract.

### 3.  Work required to win the four-week jury trial.

Even thus pared back to what it should have been in the first place, Flatiron's $260 million counterclaim for cost overrun damages required a commensurate trial response.

The more recent trial is no doubt fresher in the Court's recollection than the litigation going back to 2019.  ATS therefore will not review the trial in this motion, beyond noting that it was handled skillfully and professionally by both sides.  ATS is confident that the Court will view its trial efforts as appropriate and warranted in light of the amount at stake.[7]

Mr. Gurr's affidavit summarizes the magnitude of pleadings, motions, discovery, discovery disputes, fact witness deposition and trial testimony, expert witness reports, depositions and trial testimony that went into the four-week jury that the Court presided over in February 2024.  **Exhibit 1.**  That extensive summary need not be repeated here.

ATS has also taken care to remove from its fee request the fees it incurred in responding to Flatiron's F.R.E. 702 motion to exclude ATS's experts Wayne Kalayjian

---

[7] Flatiron's staffing of the trial and efforts were comparable to or exceeded ATS's, even though Flatiron was proceeding in hopes of a large recovery despite the backdrop of the court's limitation on liability and fee shifting rulings, whereas ATS was defending against a potentially crippling claim.

and Mark Buchanan.  *See* ECF 344 at 3 (order on motion).[8]

**C.    ATS's fee expert Laurin Quiat provides an opinion that ATS's fees were reasonable and necessary.**

Finally, ATS has engaged Laurin Quiat as an expert to provide an opinion regarding the reasonableness and necessity of the fees and costs that ATS incurred in this litigation.  **Exhibit 4**.  Mr. Quiat is BakerHostetler's nationwide construction team leader, and managing partner and litigation leader of the firm's Denver office.  He is eminently qualified to opine on the reasonableness and necessity of fees incurred in a construction liability case of this magnitude.  He has familiarized himself with the litigation, reviewed ATS's fees, and provides his expert opinion that ATS's incurring $9.6 million in attorneys' fees was reasonable and necessary under the circumstances.  *Id.*

### V.    CONCLUSION

The Court presided over the entirety of this litigation and trial.  It knows the amount of effort and time that ATS's attorneys had to put in to prevail on ATS's $5 million affirmative claim, and defend against Flatiron's $260 million counterclaim.  The Court should conclude that counsel's rates are reasonable, and the time spent was reasonable and necessary in light of Flatiron's gargantuan counterclaim, and that the resulting fee request is commensurate with the nature of this extraordinary lawsuit.

WHEREFORE, ATS requests the Court to award ATS its fees in the amount of $9,580,515.

---

[8] The Court has recently concluded that it will not order ATS to pay Flatiron's fees in connection with this Rule 702 motion.  ECF 455.

Respectfully submitted this 16th day of April, 2024.

*s/ Stephen D. Gurr*

Stephen D. Gurr, sgurr@polsinelli.com
M. Adam Lewis, adam.lewis@polsinelli.com
William R. Meyer, wmeyer@polsinelli.com
Carter McDonnell, cmcdonnell@polsinelli.com
Bennett L. Cohen, bcohen@polsinelli.com
Polsinelli PC
1401 Lawrence Street, Suite 2300
Denver, CO 80202
Phone: (303) 572-9300
*Attorneys for Plaintiff/Counterclaim Defendant
AECOM Technical Services, Inc.*

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on April 16, 2024, a true and correct copy of the foregoing was filed with the Clerk of Court using the CM/ECF system which will send notification to all counsel in this action, including:

Buck Beltzer, *et al.*
Beltzer Bangert & Gunnell LLP
5420 South Quebec Street, Suite 103
Greenwood Village, CO 80111
buck@bbglaw.com

David Feinberg, *et al.*
Venable LLP
600 Massachusetts Ave. NW
Washington, DC 20001
dlfeinberg@venable.com

*s/ Tammi Huff*

13